B1040 (FORM 1040) (12/15)

| **ADVERSARY PROCEEDING COVER SHEET** (Instructions on Reverse) | **ADVERSARY PROCEEDING NUMBER** (Court Use Only) **17-5169** |
|---|---|

**PLAINTIFFS**
*Leslie D. Hughes*

**DEFENDANTS** J.P. Morgan Chase + Related Subsidiaries; SETERUS, Inc. Federal National Mortgage Association Brock + Scott; First American Title

**ATTORNEYS** (Firm Name, Address, and Telephone No.)

**ATTORNEYS** (If Known)

**PARTY** (Check One Box Only)
☑ Debtor    ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☐ Other
☐ Trustee

**PARTY** (Check One Box Only)
☐ Debtor    ☐ U.S. Trustee/Bankruptcy Admin
☐ Creditor    ☑ Other
☐ Trustee

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)
Declaratory Judgement status of interest in real property
Respa/Tila violations
FDCPA violations Force Rescission effective since 11-1-2006

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property – §542 turnover of property
☐ 12-Recovery of money/property – §547 preference
☐ 13-Recovery of money/property – §548 fraudulent transfer
☑ 14-Recovery of money/property – other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☑ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner – §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge – §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability – §523(a)(1),(14),(14A) priority tax claims
☑ 62-Dischargeability – §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability – §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability – §523(a)(5), domestic support
☐ 68-Dischargeability – §523(a)(6), willful and malicious injury
☐ 63-Dischargeability – §523(a)(8), student loan
☐ 64-Dischargeability – §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☐ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
☑ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

FILED IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT
OF GEORGIA
2017 JUN 27 PM 3:16
M. REGINA THOMAS, CLERK
BY DEPUTY CLERK

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ To be determined |

Other Relief Sought: Damages – Punitive – Statutory – Actual

B1040 (FORM 1040) (12/15)

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR *Leslie D Hughes* | BANKRUPTCY CASE NO. *17-52260-LRC* | |
| DISTRICT IN WHICH CASE IS PENDING *Northern* | DIVISION OFFICE *Atlanta* | NAME OF JUDGE *lrc* |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF *Leslie D. Hughes* | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING *Northern* | DIVISION OFFICE *Atlanta* | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) *Leslie D. Hughes* | | |
| DATE *6-27-17* | PRINT NAME OF ATTORNEY (OR PLAINTIFF) *Leslie D. Hughes* | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs and Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

FILED IN CLERK'S OFFICE
U.S. BANKRUPTCY COURT
NORTHERN DISTRICT
OF GEORGIA

2017 JUN 27  PM 3: 16

M. REGINA THOMAS
CLERK

BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

| | |
|---|---|
| Leslie D. Hughes, | ) Case No.: |
| | ) |
| Pro Se | ) CHAPTER 13 CASE # 17-52260-LRC |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) COMPLAINT FOR: |
| | ) ENFORCEMENT OF RESCISSION |
| J. P. Morgan Chase and Related Subsidiaries | ) QUIET TITLE |
| | ) DAMAGES |
| Seterus, Inc. | DECLARATORY RELIEF |
| Federal National Mortgage Association | |
| Brock & Scott | **17-5169** |
| First American Title | |
| Defendants | |

COMES NOW Plaintiff, Leslie D. Hughes with complaint against Defendants, states and alleges

as follows:

## I. PRELIMINARY STATEMENT

1. Plaintiff Leslie D. Hughes institutes this action against defendants J. P. Morgan Chase and

Related Subsidiaries (F/K/A Chase), Chase in its capacity as purchaser of certain assets of Washington

Mutual Bank F.A.; Seterus,Inc; Federal National Mortgage Association F/K/A (Fannie Mae); Brock &

Scott, PLLC; First American Title to enforce a rescission, dispute a claim and assert various violations of

both federal and state laws and to seek damages related to those violations.

[1]

### III. AGENCY

2. Plaintiff is informed and believe, and on that basis allege, that at all times herein mentioned each of the Defendants was an agent, servant, employee, and/or joint venture of each of the remaining Defendants, and was at all times acting within the course and scope of such agency, service, employment, and/or joint venture, and each Defendant has ratified, approved, and authorized the acts of each of the remaining Defendants with full knowledge of said facts.

### III. AIDING AND ABETTING/CONSPIRACY

3. Defendants, and each of them, aided and abetted, encouraged, and rendered substantial assistance to the other Defendants in breaching their obligations to Plaintiffs, as alleged herein. In taking action, as alleged herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of its/his/her primary wrongdoing and realized that its/his/her conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing. There is a unity of interest between Defendants, and each acts as the alter ego of the other.

### IV. JURISDICTION AND VENUE

4. Jurisdiction of the Bankruptcy Court in this matter is provided by 28 U.S.C § 1334 and 157 as core proceedings.

5. This court has supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

### V. PARTIES

6. Plaintiff/Debtor, Leslie D. Hughes, is a natural person currently residing at 2270 Charleston Place in Lithia Springs, GA 30122 and is the Debtor in the above captioned Chapter 13 Bankruptcy case.

7. Defendant J.P. Morgan Chase (hereafter "CHASE") organized and existing under the laws of the United States of America, has its principal executive offices in Columbus, OH. Chase is a lender and servicer of "federally related mortgage loans" as defined under 12 U.S.C § 2602 and § 2605.

[2]

8. Defendant Seterus, Inc is a debt collector in the business of servicing residential mortgage loans with a principal place of business in Beaverton, Oregon. Seterus is a servicer of "federally related mortgage loans" as defined under 12 U.S.C § 2602 and § 2605.

9. Defendant Fannie Mae is a government sponsored enterprise and not an agency of the federal government with its principal place of business in Washington, DC.

10. Defendant Brock & Scott, PLLC are debt collectors as defined under 15 USC 1692 et seq. and maintains an office within the state of Georgia.

11. Defendant First American Title provides title insurance protection and settlement services within the state of Georgia with Headquarters located in Santa Ana, CA.

## VI. CONDITIONS PRECEDENT

12. All conditions precedent have been performed or have occurred and, at minimum, TILA: Reg. Z violations may be asserted affirmatively and defensively as a recoupment or set-off pursuant to 15 U.S.C § 1638 *et seq.* The mere loss of a statutory right to disclosure is an injury that gives the consumer standing for Article III purposes.

13. Plaintiff has standing as of the date of the contract and where the contract is a federally related mortgage transaction governed by TILA and Reg. Z.

## VII. TOLLING OF STATUTES OF LIMITATION BY FRAUDULENT CONCEALMENT

14. Any applicable statutes of limitation have been tolled by Defendants' continuing, knowing and active concealment of the facts alleged herein. By virtue of Defendants' concealment and misrepresentations to Plaintiffs, Plaintiffs could not and did not discover Defendants' actions.

15. In the alternative, Defendants should be estopped from relying on any statutes of limitation. Defendants owed Plaintiffs an affirmative duty of full and fair disclosure, but knowingly failed to honor and discharge such duty. Finally, Defendants' conduct is not barred by any statutes of limitation because Defendants' conduct constitutes an ongoing violation of Plaintiffs' rights, which continues to the present.

## VIII. BACKGROUND

[3]

16. The core of this case is centered around two Federally-related mortgage loans as defined by 12 U.S.C. §2602 originated on or about July 5, 2006 by Washington Mutual Bank, FA with corresponding transaction(loan) numbers of 0734948896 and 3010145575. The transactions were closed end credit transactions as that term is defined in Reg. Z § 226.2(10) and secured an interest in Plaintiff's principal dwelling. Washington Mutual Bank was sent and confirmation of receipt of a written request to cancel the contracts related to the 2 loan numbers referenced above on November 1, 2006. Plaintiff had a statutory right to cancel the transactions as she did not receive accurate material disclosures related to the loan transactions nor did Plaintiff receive Notice of Right to Cancel for the HELOC identified by loan # 0734948896.  Pt. 226, Supp. I of 12 CFR Ch. II (1–1–07 Edition) Section 226.23(a)(1)4 states in relevant parts:

*Notwithstanding the general rule that consumers may have only one principal dwelling, when the consumer is acquiring or constructing a new principal dwelling, any loan subject to Regulation Z and secured by the equity in the consumer's current principal dwelling …. is subject to the right of rescission regardless of the purpose of that loan. Furthermore, WAMU's violations of GAFLA O.C.G.A 7-6A for High Cost Loans also lends itself to rescission granted and defined under 15 U.S.C. Section 1601, et seq.*

*a. Washington Mutual although verified receipt, did not take all necessary steps to fully unwind and terminate the security interest.*

b. Washington Mutual never sent a written response to the notification of rescission to either object or agree.

c. After Washington Mutual received plaintiffs notice of rescission, it had two options.

1. It could have begun the unwinding process by returning plaintiff's down payment and earnest money and taking the actions necessary to "reflect the termination of the security interest, pursuant to 15 U.S.C. §1635(b). Those actions would in turn have triggered plaintiff's obligation to tender a payoff of the remaining loan amount, which Plaintiff could have achieved.

2. Washington Mutual could have filed a lawsuit to dispute Plaintiff's right to rescind the loans, which Washington Mutual did not do.

[ 4 ]

d. Washington Mutual having decided to ignore the valid timely rescission and take no action, the rescission and voiding of the security interest are effective as a matter of law as of the date of the notice. See decisions of *Jesinoski v. Countrywide Home Loans, Inc.*, 135 S. Ct. 790 (2015) and *Paatalo v. JPMorgan Chase Bank*, 146 F. Supp. 3d 1239 (D. Or. 2015).

17. Plaintiff asserts that according to § 1635(b) WAMU had twenty days after its receipt of Plaintiffs Rescission Notice and offer to return to the Plaintiff any money or property given as earnest money, down payment, or otherwise and to take any action necessary or appropriate to reflect the termination of the lien created on Plaintiffs residence under the loan transactions. Focusing on the portion of §1635(b) that states

*"Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if the return of the property in kind would be impractical or inequitable, the obligor shall tender its reasonable value."*

18. WAMU failed to fulfill its obligation under § 1635(b) and having failed to do so Plaintiff focuses on another relevant portion of § 1635(b) which states:

*"If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it."*

19. Plaintiff argues that because WAMU did not comply with its obligations to tender under 1635(b), she should be relieved of her obligation to tender. See Shepeard v. Quality Siding Window Factory, 730 F. Supp. 1295, 1306-07 (D.Del. 1990) (ruling that if a "creditor does not properly respond to the consumer's notice of rescission," the consumer's obligation to the creditor can be eliminated but noting that "courts have avoided such a harsh result when there is no evidence that the creditor tried to cheat or deceive the consumer."); also *Clifton BURLEY v. BASTROP LOAN COMPANY, INC citing ("an elementary principle of contract law that tender by party A is excused when party B fails to or refuses to perform the essential prerequisites which trigger tender by party A.")*

20. Plaintiff offers 3 additional points to support her argument against Plaintiffs requirement to tender after WAMU's failure to comply:

[5]

A. Rescission was effected in 2006 prior to WAMU receivership by the FDIC. Plaintiff was fully prepared to tender verified funds paid by Washington Mutual FA. WAMU used a tactic known to Plaintiff now as a bait and switch commonly used in predatory loans.

B. Although Plaintiff had no knowledge of Fannie Mae's investment with WAMU and the loans in question. Fannie Mae through the FHFA has settled its losses for the fraudulent securitized loans of WAMU and JP Morgan Chase. According to Fannie Mae the loans in question were securitized.

C. Plaintiff has suffered for 10 years trying to survive the failings of WAMU and those that followed to try and profit from WAMU's fraud while the Defendants Fannie Mae and Chase have already recovered their losses from WAMU's fraud through various insurances, and settlements with the FDIC and others.

21. Plaintiff completed *one* loan application and was quoted and qualified for a 6.5% interest rate on a 30 year fixed rate conventional loan. Plaintiff questioned if a buy down to 5.5% was available and was told by WAMU' Dionne Gajadhar, yes, she could buy down the rate to 5.5% to keep monthly expenses easily manageable as she was a single mom with no other support. Had Plaintiff been told that the 5.5% interest rate was not available Plaintiff would have continued to shop for a better rate or waited to purchase.

22. The closing of these two loans were to initially take place at the Law offices of Jackson and Hardwick but last minute request by Community Trust Bank and WAMU the closing was moved to the office of Mr. William T. Cox. Unknown to the Plaintiff at the time of closing, Mr. Cox served as the closing agent, escrow agent and a First American Title agent as well. The closing lasted less than 10 minutes as Mr. Cox stated he had another closing to do. All loan documents were not ready and available and would be provided later.

23. First payment due September 1, 2006 was more than what had been previously quoted by WAMU loan officer and then in October of 2006 Plaintiff received a letter stating yet another increase in monthly installment by nearly 500.00 a month due to an alleged increase in taxes and or property insurance.

[6]

24. Plaintiff immediately contacted the WAMU loan officer Ms. Gajadhar to dispute the increase. Plaintiff provided loan officer with 6 years worth of property tax assessments that showed a decrease not an increase and the property insurance that was paid 1 full year in advance before closing and the insurance quote provided by agent prior to making the advance payment had not changed. There was no justification for increase. Plaintiff made a down payment of $59,332.88 plus an additional $4,475.25 in an unjustified demand by WAMU, to cover the rate reduction to 5.5%, closing cost and to reduce the amount needed to be financed. When Plaintiff received part of the closing documents weeks later, the terms of the loan #3010145575 were not as promised and no paperwork was received for loan # 0734948896 yet.

25. Plaintiff relied on the reassurances of the local WAMU representative to correct and or clarify the small increase in monthly payment given enough time to investigate by the representative. The last increase of nearly 500.00 without justification or legitimate explanation was taking too long.

26. As both of these loan transactions had material violations of RESPA, TILA, and GAFLA; Plaintiff exercised her right to rescind under TILA Section 1635(a), and that rescission was both timely and unchallenged. (*See Plaintiff exhibit 1*) Written notice was submitted by fax to the fax number provided by Ms. Gajadhar and Ms. Gajadhar verified receipt. Confirmation Sheet from the fax shows date and time as November 1, 2006 at 12:26 pm to the only known alleged creditor at the time, WAMU Financial Center Manager Dionne Gajadhar. Ms Gajadhar was the WAMU representative that wrote the two loans. Plaintiff never received notice of rescission forms to complete and there were material disclosure to the transaction being concealed. Plaintiff sent written letter identifying loans and request to cancel.

27. Plaintiff began and continued to pay the highly elevated monthly installments in anticipation that Ms. Gajadhar would cancel these heavily flawed transactions. Plaintiff feared she would be considered in default and would lose everything in a *non-judicial foreclosure* if she did not pay until the transactions were cancelled. Plaintiff wanted to secure better and more accurate terms elsewhere. Plaintiff was growing weary of delays with Ms. Gajadhar's progress and was suddenly facing another possible Cancer diagnosis. Plaintiff tried to secure an attorney to expedite the process of terminating the

[ 7 ]

loans, but was unsuccessful. Plaintiff continued to pay the elevated monthly installments under protest while she continued her search for legal assistance.

28. Plaintiff is not an attorney, but was recently provided with a copy of the unanimous *Jesinoski* decision handed down by the Supreme Court that explains in terms that Plaintiff could understand just what WAMU (Washington Mutual Bank) should have done upon receiving the written request to cancel (rescind) and that the debt and security instruments were extinguished by operation of law on November 1, 2006, when the rescission request was received and ignored.

29. Plaintiff continued to pay the unjustified monthly installments admittedly a struggle at times. Plaintiff continued to pay through six surgeries and multiple periods of treatments. Plaintiff also continued to seek the assistance of an attorney to help with finding out what happened at the closing that produced such unfounded results when nothing produced was as agreed prior. Plaintiff still could not find an attorney willing to take on the bank.

30. Plaintiff made several attempts to secure a copy of the closing file from closing attorney with no success. When WAMU failed Plaintiff contacted the FDIC and was told that she could not file a claim as the mortgages did not qualify as a claim. Plaintiff was directed to address the issue with Chase pertaining to the loans and their disposition. Chase followed in WAMU's footsteps and ignored the notice to cancel the contracts.

## IX. CHASE'S OWN DECEPTION AND CONDUCT AFTER PURCHASING WAMU FROM THE FDIC, NOT THE CONDUCT OF WAMU PRIOR TO THAT PURCHASE.

31. All of Plaintiffs efforts through phone calls and mail to get Chase to terminate and or correct the loan transactions were being ignored, including the letter requesting cancellation of the loans previously given to WAMU then provided to Chase numerous times. No objections to the rescission notice were ever provided by mail or otherwise just strategic moves to liquidate the bad loans through misapplied payments, payments sitting in suspense accounts for no reason, and repeated attempts to force a default, all while Chase identified itself as the new owner of the loan by purchase from the FDIC.

32. June 17, 2011 having just endured another surgery Plaintiff hand delivered the written notice to cancel into the hands of CHASE representative Mr. Donald S. Morgan. Mr. Morgan said he

[8]

understood what went wrong and that Chase would redo the loan to put the terms in line with what they should have been.

33. Following Mr. Morgan's instructions Plaintiff stopped making payments and began sending Mr. Morgan an endless amount of repetitive paperwork. Plaintiff began to question the integrity of Mr. Morgan and Chase.

34. Plaintiff woke up in the middle of the night and GOOGLED her address to find that despite all of the reassurances of Mr. Morgan that her documents were with the underwriters finally for her new loan; her property was listed for *foreclosure* October 4, 2011. Plaintiff immediately called CHASE as soon as the offices opened and was still being told that her file was with the underwriters.

35. Plaintiff never received notice of foreclosure sale until after she discovered information on the internet. Plaintiff received a $500.00 payment from the "independent foreclosure review" but paid out over $7,000.00 to keep from losing her home in a non-judicial state. *(See Plaintiff exhibit 2)*

36. Plaintiffs loan account was recognized as qualifying for a payout from the Independent Foreclosure Review for the misconduct of Chase in fabricating the 2011 default to foreclose. Plaintiff received $500.00 for what was listed as a final payment with no appeal rights. Plaintiff had to pay out over $7,000.00 to keep her home with attorney's fees and cost imposed by Chase's deception.

37. Plaintiff retained monthly installments in an account despite being told not to make the payments. Plaintiff immediately paid the amount requested by the attorney's office and was made to wait weeks for a cancellation of sale and reinstatement.

38. Plaintiff learned through this attempted foreclosure in 2011 that Fannie Mae was the owner of the loan and that Fannie Mae acquired ownership September 1, 2006. Chase directed Plaintiff to contact Fannie Mae when Plaintiff objected to the attempted foreclosure of her home.

39. Fannie Mae sent confirmation that the loan was acquired September 1, 2006 and was securitized. But would not address the issue of what needs to be done about the written letter to cancel the contracts given to WAMU in 2006. No representative of Fannie Mae would take the steps to terminate the security interest.

[ 9 ]

1      40. Chase has known for years that the loans were not a part of the assets acquired in the

2   purchase of only certain of WAMU undisclosed assets.

3      41. From the 2006 origination through the 2011 attempted foreclosure there were no assignments

4   of the original deeds recorded until June 14, 2015. Chase recorded a deed indicating Loan no.

5   3010145545 was acquired as an asset of WAMU through its purchase of **certain** assets to further

6   memorialize the transfer that occurred by operation of law on September 25, 2008.**(See exhibit 3)** Chase

7   later admits in a letter dated January 25, 2017 sent to Plaintiff in response to a complaint Plaintiff filed

8   with the CFPB that they did not acquire ownership of the loan as part of the assets of WAMU in 2008, but

9   have not withdrawn the fraudulent assignment of security deed. Chase also on the same day had an

10   assignment of security deed filed giving ownership to Fannie Mae. **(See exhibit 4)** The false filings violate

11   O.C.G.A. 16-8-102(5). Also, this filing violates 12 U.S.C. § 2605 there was no notification of assignments.

12      " **Files or causes to be filed with the official registrar of deeds of any county of this state**

13   **any document such person knows to contain a deliberate misstatement, misrepresentation, or**

14   **omission**."

15      Definition of Mortgage Lending Process as amended:

16      "Article 5 of Chapter 8 of Title 16 of the Official Code of Georgia Annotated, relating to

17      Residential mortgage fraud, is amended by revising paragraph (1) of Code Section 16-8-101,

18      Relating to definitions, as follows:

19      "Mortgage lending process means the process through which a person seeks or

20      Obtains a residential mortgage loan including, but not limited to, solicitation, application,

21      Or origination, negotiation of terms, third-party provider services, underwriting, signing

22      And closing, and funding of the loan. **Such term shall also include the execution of deeds**

23      **Under power of sale that are required to be recorded pursuant to Code Section 44-14-160**

24      **And the execution of assignments that are required to be recorded pursuant to subsection**

25      **(b) Of Code Section 44-14-162."**

26      42. Chase did not acquire the assets of WAMU by **operation of law** as recognized in **Kim v. JP**

27   **Morgan Chase Bank, NA, 493 Mich. 98, 825 N.W.2d 329 (2012).** The Kim Court explained that

28

[10]

1    "a transfer that takes place by operation law is one that occurs unintentionally, involuntarily, or through no

2    affirmative act of the transferee." Kim, 493 Mich. at 110, 117, 825 N.W.2d 329. The Court concluded that

3    Chase did not acquire the plaintiffs' mortgage from the FDIC by operation of law because the transfer was

4    effectuated through a voluntary purchase agreement, which necessitated affirmative conduct on the part

5    of the transferee. Id. at 110, 825 N.W.2d 329. The FDIC chose to transfer Washington Mutual's assets

6    through the voluntary purchase agreement, not by a merger, which would have effectuated the transfer of

7    assets by operation of law under 12 USC 1821(d)(2)(G)(i)(I). FDIC relied on a different statutory

8    provision, 12 USC 1821(d)(2)(G)(i)(II), which allows the FDIC to "transfer" the assets and liabilities of

9    failed institutions.  This is yet another misrepresentation Chase has made to Plaintiff and filed in the

10    official recorder's office with willful intent to deceive. Further reference to Chase's pattern of filing false

11    documents can be found in *Jan Kalicki et al. v. JP Morgan Chase Bank, N.A*. finding that Chase had

12    executed and recorded false documentation purporting to transfer ownership of the Kalickis' mortgage to

13    Chase and that a Chase executive created a document in which Chase fraudulently represented that a

14    prior assignment had been lost and that Chase owned the Kalickis' mortgage. The judgment voided the

15    fraudulent documents and enjoined Chase from recording any false or misleading documents

16    representing that it owned the Kalickis' mortgage.  The Kalicki loan was previously serviced by WAMU

17    prior to being placed into receivership by the FDIC in 2008.

18         43. In a letter dated September 12, 2011, but received much later, from Shapiro & Swertfeger,

19    LLP Chase Home Finance as Servicer for JP Morgan Chase Bank, NA was foreclosing as successor in

20    interest by purchase from the Federal Deposit Insurance Corporation, as Receiver of Washington Mutual

21    Bank f/k/a Washington Mutual Bank, FA.  Chase refused to void the contracts that had been rescinded in

22    2006 when provided the written request multiple times already. Chase devised the default to foreclose

23    *rather than follow the statute.  Although there was no recorded assignment in 2011 to Chase for the*

24    *purchase of the dead note, Chase still attempted to foreclose without ownership, or assignment. (See*

25    *Plaintiff exhibit 5)*

26         44. The fraudulent assignment of deeds: 1st assignment listed at BK 3395 PG 112-113 Notarized

27    March 1, 2016 and filed June 14, 2016 states:

28

[11]

1                    *Assignor:*

2      *JPMORGAN CHASE BANK, NATIONAL*

3      *ASSOCIATION, AS ATTORNEY IN FACT FOR*

4      *THE FEDERAL DEPOSIT INSURANCE CORPORATION*

5      *AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A*

6      *WASHINGTON MUTUAL BANK, FA*

7      *The FDIC appointed Chase "to act as Attorney-in-Fact for the [FDIC]" for the limited*

8 *purpose of transferring "any interest in real estate . . . and any personal property appurtenant to*

9 *the real estate from the [FDIC] to [Chase] or to an affiliate of [Chase]." The document states that*

10 *the limited power of attorney was effective on September 25, 2008 and "automatically revoked" on*

11 *September 25, 2010. This limited power of attorney has no effect in 2016 and puts yet another*

12 *cloud on Plaintiffs Title as the Deeds are already void by operation of law since 2006. Also, as*

13 *previously stated and shown WAMU had already sold the void instruments to Fannie Mae in 2006.*

14 *Therefore, the instruments were not a part of the assets acquired by the FDIC in 2008. (See*

15 *Plaintiff exhibit 6)*

16      45. Over the course of time CHASE has provided many different variations of "verified true and

17 accurate copies" of original applications for which *Plaintiff only completed 1 application* and none of

18 the information is accurate on any of the applications, multiple versions of documents labeled "final HUD-

19 1" with various dollar amounts for fees and expenses, and documents that Plaintiff knows for a fact she

20 did not sign. All in an effort to profit from the misdeeds of WAMU's fraud by attempting to recreate the

21 missing and fraudulent documents of WAMU loans.

22      46. Plaintiff identified an "*unholy marriage*" while trying to understand the circumstances

23 surrounding the continued efforts to take her home.

24      47. This unholy union would be identified in 2 Federal Cases that were sealed for years and only

25 recently partially unsealed.

26      *Case #1*. UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF NEW YORK S&A

27 CAPITAL PARTNERS, INC.,MORTGAGE RESOLUTION SERVICING,LLC; and 1ST FIDELITY LOAN

28

SERVICING, LLC, v JPMORGAN CHASE BANK, N.A., JP MORGAN CHASE & COMPANY, and CHASE HOME FINANCE LLC. *(See relevant portions to this action attached as Plaintiff exhibit 7).* This case provides the reasoning behind Chase changing Loan Numbers to defraud not just the Plaintiff but others for profit.

Case #2. U.S. ex rel. William Lawrence v. <u>International Business Machines Corp</u>. et al., SETERUS, INC, in the U.S. District Court for the Southern District of New York. *(See relevant portions to this action attached as Plaintiff exhibit 8).* This case explains why Plaintiff and other consumers are receiving letters denying their requests for loan modification when they have no knowledge of such requests.*(See Plaintiff exhibit 9)*

48. These two cases not only provide the details of how Chase with the aid of other financial industry insiders has devised a system for increasing its profits from the purchase of WAMU's assets, while the assets remain a mystery, and leaving the liabilities of WAMU's past actions for homeowners, investors, and taxpayers to absorb.

49. Fannie Mae is a central figure in case #2 which started as a Complaint for Violations of the Federal False Claims Act, 31 U.S.C. 3729 et seq.

50. Fannie Mae also settled with Chase through a suite initiated by the Federal Housing Finance Agency as Conservator for Fannie Mae *Case 1:11-cv-06188-PKC* demanding full rescission and recovery of damages for mortgage backed securities "GSE Certificates" purchased from both WAMU and JP Morgan Chase that contained defective and/or questionable loans. *(See relevant portions to this action attached as Plaintiff exhibit 10)*. The FHFA/FNMA suite outlines some of the misrepresentations Plaintiff outlines in this action contained within against the Defendants.

51. Fannie Mae's silence to Plaintiffs inquiries into the disposition of any claimed obligations she has with the GSE has been to conceal the efforts of the remaining Defendants illegal gains from WAMU's failures and fraud in originating her loan and if anyone knows the true disposition of Loan #3010145575 after multiple suites and settlements between various parties without any official legal record of transfer.

52. *Plaintiff informed Fannie Mae that she received 2 letters denying her request for a loan modification from Seterus for loan number 29875273 and that she has no loan with Seterus and Fannie*

[13]

Mae did not respond. That is the nature of the suite. U.S. ex rel. William Lawrence v. International

Business Machines Corp. et al., SETERUS, INC, in the U.S. District Court for the Southern District of New

York. Seterus submitting false claims for payments on loan modifications they do not process on fake

loan numbers.

53. Further evidence of Chase's unlawful claims of owner of previously serviced WAMU loans

with the aid of other industry insiders "Fannie Mae and a vast Attorney Network" can be found in court

opinions all over the United States. Such as the opinion in the JP Morgan Chase Bank v. Butler, where

Judge Arthur M. Schack in a detailed decision castigated the JP Morgan Chase Bank, National

Association lawsuit that involved the distribution of the proceeds of a sale of real property, on first

mortgage issued in 2007 by Washington Mutual Bank, FA. Judge Schack found that JP Morgan Chase

Bank, National Association and its litigation team furnished misrepresentations to the court, and engaged

in continued subterfuge, and bad faith. The trial court, after hearing all the evidence, made the following

findings:

"This case is troubling because various counsel for CHASE falsely claimed for almost two

years, from January 20, 2010 until December 2011, that CHASE was the owner of the mortgage

and note."

CHASE's counsel admitted, in opposition to defendant BUTLER's October 26, 2011 order

to show cause, that plaintiff CHASE did not own the BUTLER mortgage and note, but only the

servicing rights to it.    CHASE's counsel in its opposition papers, "submitted an affidavit, dated

December 9, 2011, from Greg DeCastro, Director/Servicing Management of FANNIE MAE, claiming

that FANNIE MAE had acquired from WAMU the BUTLER Mortgage and Note and 'Chase is the

servicer of the loan.'  " The trial court noted that: "The Automated City Register Information

System (ACRIS) does not show any assignments of the WAMU mortgage to FANNIE MAE or

CHASE." "Thus, plaintiff CHASE ultimately acknowledged that FANNIE MAE is the 'Wizard of Oz'

operating behind the curtain, and the real owner of the subject BUTLER note and mortgage."

The trial court relied on the September 25, 2008, documents which no doubt are the identical

documents that are before this court, as the Purchase and Assumption Agreement.   The trial

[14]

*court further found that: "CHASE, despite its assertions to the contrary for almost two years in*
*the instant action, purchased the servicing rights to WAMU's mortgages and notes, not the actual*
*mortgages and notes."*

**54.** The issues raised by Judge Schack in the **BUTLER** case were reverberated in the decision delivered by the Hon. Kevin Tierney of Connecticut in **JP Morgan Chase Bank, National Association v. Michael Porzio et al.** were he expressed his own additional concerns regarding the documents being presented to the courts falsely claiming ownership of faulty and fraudulent mortgages stemming from WAMU's past destructive loan activities.

55. Fannie Mae remains silent to Plaintiffs inquiries into the disposition of any claimed obligations she has with the GSE.

### X. Fannie Mae

56. Plaintiff had no knowledge of Fannie Mae's involvement with the transactions at issue until 2011. In 2011 Fannie Mae representatives provided the acquisition date but would not disclose if the notice to cancel was forwarded to FNMA by WAMU or what Plaintiff should do to cancel the contract since Fannie Mae funded the loans and there was no way the Plaintiff could have known of Fannie Mae's interest in her property.

57. Most recently Plaintiff contacted Fannie Mae regarding the creation of a new loan that Seterus states they are servicing for Fannie Mae which the loan number did not correspond with either Fannie Mae Loan number of 1702040017 nor the original loan number # 3010145575 on any official documents filed pertaining to Plaintiffs property.

58. Plaintiff requested to know the disposition of Loan number #3010145575 in their records as Chase letter indicates a zero principal balance and credit report now shows a zero balance.

59. Plaintiff also wanted to know what financial institution initiated another loan transaction and tied it to her property in the name of Fannie Mae with a loan number of #29875273. Fannie Mae representative Erica from the Fannie Mae Resource Center would not respond to Plaintiffs December 14,

[15]

2016 letter sent explaining that Seterus was threatening to take her home for not making payments on this loan number #29875273 that they were collecting for Fannie Mae in which she was not a party to.

60. Plaintiff also informed Erica that she had received 2 letters denying her request for a loan modification for which Plaintiff never requested and that Fannie Mae pays servicers to process. After months of no return calls and no return correspondence from Erika, Plaintiffs call was elevated to Erika's supervisor Royce. On January 27, 2017 at 11:41 am Royce called Plaintiff back and according to Royce, Fannie Mae no longer owns the note and the note is no longer in a pool of loans now. But Royce would not or could not disclose who owns the note today.

61. Royce stated that there were no new loans on Plaintiffs property since the 2006 acquisitions from WAMU, but stated he could not say more.

## XI. Seterus

62. Plaintiff is not nor has never been in default of loan # 29875273 as Plaintiff has no relationship with this loan.

63. Plaintiff had her identity stolen for financial gain by the defendants in order to deprive her of property.

64. Seterus has now to date attempted and listed Plaintiffs property for foreclosure twice for a defaulted loan that Plaintiff was not a party to. Seterus has assigned a fictitious loan account with a new balance, fictitious escrow advances, fictitious corporate advance account that includes transfer taxes related to the fictitious loan with identifying number 29875273. Seterus has declared this fictitious account to be in default and has attempted to foreclose on Plaintiffs property twice using this fictitious loan.

65. Chase received the 28.00 misc. balance indicated on the transfer notice for Loan # 3010145575 and returned the payment to Plaintiff stating that Seterus was the new servicer. Chase sent plaintiff a letter dated March 21, 2017 in reference to Loan # 3010145575 stating that Chase answers questions and service the loan on behalf of the investor, which is Fannie Mae. *(See Plaintiff exhibit 11)* Why is Seterus declaring Plaintiff in default for their Loan # 29875273 that is being serviced for Fannie Mae and Fannie Mae remains silent while these threats and deception continue.

[16]

66. Plaintiff sent certified QWR'S indicating NOE and RFI dated December 16, 2015, December 27, 2015 and January 11, 2016 requesting the origins of the fictitious loans with no documentation of the loans (29875273) origins. Explanation as to who created the loan would never come. Finally, in response to subsequent correspondence Seterus sent Plaintiff a copy of the voided deed with loan # 3010145575 and hand wrote the fictitious number on it. Plaintiff also sent the QWR's to Chase and Brock & Scott with no explanation for the creation of the new loan.

67. Standard language of Form 3011 with respect to Security Deeds states in plain language throughout "**This Document" "This Security Instrument**". The Security Deed is a contract and that contract has a unique identifying number evidencing a specific transaction related to that contract.

68. Not to set aside the fact that Plaintiff rescinded the only alleged loans tied to her property and the security instruments were extinguished by operation of law on November 1, 2006, and the defendants have no standing to challenge the already valid and effective rescission.

69. No party can subsequently obtain, through a transfer, any rights to enforce the void security interest or void transaction post this date of November 1, 2006.

70. Seterus through Chase created this new loan as Seterus letters reflect the "set up of a new loan for which Plaintiff is not a party to. **(See Plaintiff Exhibit 12)** Review of the CFPB consumer complaint data base reveals the creation of unidentified loans is a common practice of Seterus and the transfer of servicing from lenders such as Chase. Consumers question the rebranding of existing loans with new loan numbers when there have been no new contracts signed.

71. Seterus' misrepresentation that Plaintiff has requested a loan modification of Loan # 29875273 and has been denied according to letters dated April 8, 2016, July 6, 2016, and again on April 5, 2017. **(See Plaintiff Exhibit 13a-13c)** These statements are wholly false and misleading. Plaintiff *requested proof of these claims and Defendant Seterus has never provided any documentation to support* the denials of modification requests.

72. Similar complaints have been documented on the CFPB complaint board as well as questions pertaining to not being able to make a payment on loans they have had for years as it did not have the new Seterus loan number on the payment.

[17]

73. Plaintiff had been working with Congressman Scott's office for assistance and Myah Duboise contact Seterus on January 5, 2016 and initiated a conference call to include Plaintiff and Seterus representative Eric to come to a resolution about this allege new loan. Plaintiff stated that she would pay what was being asked but under protest and to try and prevent another attempted *non-judicial foreclosure* and that she would only use the loan number that was on file at the register of deeds. Seterus representative Eric stated that no payment submitted with loan #3010145575 would be accepted.

74. Plaintiff is not an attorney and can only rely on common sense. If Fannie Mae has no record of this loan number and there are no records of this loan on file anywhere, and there is still a note and deed on file at the courthouse with #3010145575 which Chase has not filed a cancellation of and it has been more than 1 1/2 years since the principal balance was reduced to zero, the created transaction cannot be legal that carries the loan identification number of #29875273.

75. Loan numbers identify specific transactions and the OCC, Federal Reserve Board, FDIC, OTC and the National Credit Union Administration acknowledge the importance of the identifying information for individual financial transaction. "*Necessary to effect, administer, or enforce the individual transaction*". The act of selling various rights to service and own MBS requires the identity of the individual loans as identified by loan tapes provided with offerings on the secondary market.

76. Plaintiff is not in default to Fannie Mae or Seterus for a loan she has not been a party to.

77. Defendant Seterus was transferred a void loan identified by #3010145575 that Defendant Chase indicated had a remaining principal balance of 0.00 and an unidentified miscellaneous fee of 28.00.

78. Plaintiff could not send the 28.00 to Seterus as Seterus was not servicing loan # 3010145575 and would not accept a payment with that loan number.

79. Plaintiff submitted the 28.00 payment to Chase just to finally have some amount of peace after years of unending abuse and Chase returned the payment and told plaintiff to send payment to Seterus for which Seterus will not accept.

## XII. BROCK & SCOTT

[18]

80. Plaintiff received a debt collection notice from Brock & Scott dated August 5, 2016 and received on or about August 12, 2016 that stated in part: ***"The above referenced loan has been placed with Brock & Scott, PLLC ("B & S") for foreclosure."*** Letter did not state who referred this loan ending in *******5273 to Brock and Scott.

81. Plaintiff responded by certified mail and by fax August 16, 2016 fully disputing with great detail the account reference and the amount.

82. Defendant Brock & Scott had already prepared and had post marked the foreclosure notice August 19, 2016. Which is clear indication that validity of the debt that defendant was collecting was of no consequence, their foreclosure machine was on auto-pilot.

83. Plaintiff calls the office of Brock & Scott and spoke with Gloria a customer service representative and Gloria included the attorney of record on the phone Mr. Taggart. Mr. Taggart stated that Plaintiffs dispute was 11 days late and therefore was not entitled to a reply or verification.

84. Plaintiff advised Mr. Taggart that his statement is false as reply was sent certified mail and the card came back. Also had confirmation of successful fax transmission that shows response was timely.

85. Plaintiff provided Brock & Scott with every piece of proof that Seterus and Chase have received that this debt is not valid and is not the responsibility of Plaintiff and the loan #29875273 was not Plaintiffs loan. Plaintiff has requested from Brock & Scott in writing numerous times documentation of the origination of loan #29875273 and Brock and Scott have never produced a single application Deed or Note or otherwise with this loan number on it.

86. Plaintiff visits the offices of Brock & Scott January 25, 2017 as they deny receiving additional documentation disputing the validity of the debt. Plaintiff spoke with Jerry McFadden and Gary. Plaintiff was told point blank that Brock & Scott will not verify any debt. Plaintiff was told that an attorney was needed to stop the foreclosure. Plaintiff signed the guess book and left. Apparently the validity of the debt does not matter nor does the FDCPA if a consumer does not have an attorney willing to fight the validity in court.

[19]

87. Defendants Brock & Scott listed Plaintiffs property for sale by **foreclosure** twice without verification of the debt and knowing that the account/loan number was fictitious and fraudulent. Defendant's actions were more than just negligent they were deliberate, malicious and reckless.

88. Defendants Brock & Scott's reckless disregard for ethical conduct and the FDCPA led to an onslaught of uninvited spectators, investors, of all kinds on Plaintiffs property. Plaintiff would come home to find posting of flyers on her mailbox, on her doors and in her driveway, offering to help "**SAVE YOUR HOME FROM FORECLOSURE**" in big bold colors. Plaintiff had people lined up in her cul-de-sac taking pictures of her home. Plaintiff's mailbox was filled daily with numerous flyers and letters pertaining to her losing her home.

89. Plaintiff had strangers walk up to her daughter while her daughter was playing in the yard and hand her a flyer to give to your parents to save your home.

### XIII. First American Title

90. First American Title is where the concealment and fraud began in 2006 with its agent Mr. William T. Cox PC in 2006, with the request for change in closing attorneys by Community Trust and Washington Mutual Bank FA.

91. Plaintiff was asked if she wanted to purchase Title Insurance at the closing and was told of the $100.00 fee for the owner's policy but was not told of the $267.00 fee for the lenders policy nor that it was required. Plaintiff was not advised of any options for choosing a title company.

92. Upon information and belief Plaintiff has reason to doubt that funds from Washington Mutual FA were paid to Community Trust Bank.

93. For years the Plaintiff has requested the closing file to try and determine what specific changes Washington Mutual made that changed all terms of the original loan that began in the local WAMU branch in Lithia Springs, GA in 2006.

94. Promises were made that the documents would be sent and they never would come. A First American underwriter looked at the file and told Plaintiff point blank "You will have to sue us to get the file".

[20]

95. Plaintiff resorted to sending certified mail to request file with copies of her title insurance package. Plaintiff received responses to request that "First American does not have Closing Documents", "your request has been forwarded to the closing department and you should have your response in 30 days". Response never arrives. **(See *Plaintiff Exhibit 14*)**

96. Plaintiff has recently discovered that Community Trust Bank would not have clear title to the property in question as Sun America Mortgage Corporation still had a lien on the property that had not been satisfied. The infamous DOCX, LLC in Alpharetta, GA that was shut down for fraud and the Linda Green signatures that appeared on the television show 60 minutes, prepared the "authority to cancel deed to secure debt" as an employee of Wells Fargo. **(See *Plaintiff Exhibit 15*)**

97. Plaintiff is left to wonder if someone someday will come back for payment on that deed with an obviously fraudulent release.

98. First American has been concealing this obvious cloud on Plaintiffs title and numerous *violations of RESPA by its agent Mr. Cox in his closing of Plaintiffs loan in 2006.*

99. Plaintiff paid for a title search and the results came back with a few gaps. Plaintiff called the title company and questioned the gaps in title and explained what she has endured for the last ten years and the title company provided the missing information that contained the Linda Green signature and DOCX, LLC.

100. Mr. Cox as agent of First American Title violated his fiduciary duty as escrow agent and First American received benefit from that violation.

### XIV. CONCLUSION

101. The Defendants have abused the non-judicial process in the state of Georgia.

102. Defendants have conspired to profit from fraudulent acts of Washington Mutual and unjustly enrich themselves at the expense of the Plaintiff and the general public.

103. "***Section 1635(a) nowhere suggests a distinction between disputed and undisputed rescissions, much less that a lawsuit would be required for the latter.***"

[21]

104. Plaintiff sent a valid letter of rescission of the loan transactions originated by Washington Mutual Bank in 2006, November 1, 2006. Washington Mutual Bank chose to ignore the verified receipt of the rescission letter.

105. Plaintiffs debt and security instruments were extinguished by operation on November 1, 2006, no party could obtain any rights or interest to enforce or challenge the already valid and effective rescission. WAMU's obligation was to comply with TILA and unwind the transactions as TILA allows, or contest the rescission in 20 days and WAMU did neither.

106. *Section 1635(b) states that, "[w]hen an obligor exercises his right to rescind under subsection (a)," he "is not liable for any finance or other charge, and any security interest * * * becomes void upon such a rescission." 15 U.S.C. 1635(b). Accordingly, "[w]ithin 20 days after receipt of a notice of rescission, the creditor shall return to the obligor" certain money or property, "and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction."*

107. Plaintiff was not in default when she rescinded the loan transactions in 2006 originated by WAMU. Plaintiff is not and cannot be in default of Seterus' fictitious loan for which she has never been a party to.

108. If Chase or Fannie Mae or any other party believed they had a valid claim to Plaintiff's extinguished debt after the valid rescission on November 1, 2006 they had six years to file the claim against the contract.

109. Plaintiff has provided details and supporting case law outlining Chase's continued efforts to extort money and property from Plaintiff through deception and proven fraud. None of the Defendants filed a claim to dispute the rescission. Instead all parties conspired to profit from Washington Mutual Banks predatory actions. The Plaintiffs loan transactions were wrought with false and incomplete disclosures of the true nature of the loans, switching the interest rate, the amount to be financed and how the funds provided by the Plaintiff were to be applied in the transactions. All of these failures were apparent on the face of the documents and as industry insiders the Defendants unlike the Plaintiff have been well aware of WAMU's failures in originating, servicing, and securitizing mortgage related products

[22]

as the Defendants battle in court with their unlimited resources of money and law firms to rid themselves of losses caused by WAMU. Defendants have opted to conceal and profit from that knowledge at the expense of consumers, taxpayers and the public at large.

110. The review of thousands of Exhibits from the many Congressional Hearings with respect to Washington Mutual and its demise. Not published until 2010 for the public.

1. *memo dated November 17, 2005 indicating 42% of the loans contained suspect activity or fraud.*

2. *Senior Loan Coordinator John Ngo "He and others took steps to fix applications by creating false documents or adding false information to the applications or the loan file".*

111. Upon information and belief this why the applications provided by Chase that were not completed by the Plaintiff nor was the information on those various versions provided by the Plaintiff. Plaintiff would not have risked nearly 20 years of federal service by falsifying information on a loan application. Plaintiff definitely did not have over a quarter million dollars in assets; 150,000.00 in furniture? The first piece of furniture Plaintiff ever bought new came from *Rooms 2 Go* the rest of Plaintiffs little furniture came second hand from family. If Plaintiff had 377,000.00 in assets Plaintiff would have paid cash.

112. What was most telling and pertains to all actions by Chase since 2008 when Chase claimed ownership of certain assets of WAMU. Chase knew of the fraudulent issues with the WAMU loans, on most of the Exhibits detailing WAMU's misconduct even down to how the WAMU employees would cut and paste signatures on the newly created loan documents they needed for meeting those tough goals set by the organization to make more money no matter what. There is a little stamp at the bottom of those pages that says *"JPM_WM" "Confidential Treatment Requested by JPMC"*, provided to the various financial committees of Congress.

113. Defendant Chase claimed ownership of a loan from 2008-2016 and collected payments on that loan despite knowing both of those transactions were fraudulent and had been rescinded. Misapplied payments to create a default through Representative Donald Morgan told Plaintiff to stop paying and then attempted to foreclose.

[23]

114. When Chase encourage Plaintiff to stop paying on the loan in 2011, based on information and belief from transaction histories a settlement payment was made to the **ASSUMING INSTITUTION FOR WASHINGTON MUTUAL BANK (CHASE)** posted September 23, 2011, in the amount of $135,583.10. Plaintiff contends the Note and Deed although null and void were paid in 2011 by other sources after Defendant Chase orchestrated and reported the default.

115. Plaintiff had multiple surgeries and multiple treatments in 2011 fighting for her life and Chase took advantage of Plaintiffs failing health for profit.

116. Fannie Mae provided the documentation in 2011 that they acquired a whole loan from WAMU on September 1, 2006 and according to Fannie Mae up until 2016 nothing else changed, definitely no new loan numbers added for this address. Chase in a letter dated January 25, 2017 admits they only acquired servicing rights to a loan Chase knew had been rescinded.  Chase, in violation of Georgia Mortgage Fraud Act, willfully files a deed indicating ownership to a void instrument to continue the extortion of funds from the Plaintiff by rebranding loan #3010145575 through Seterus and created loan # 29875273.

117. Plaintiff has to this day paid in excess of $210,000.00 toward loan # 3010145575 which was rescinded in 2006. Although, Chase shows a zero principal balance of the loan, Chase has never filed a satisfaction of loan #3010145575 for $140,500.00 and Seterus, Chase, and Fannie Mae created loan # 29875273 originated for $119,954.20 without Plaintiffs knowledge or consent.

118. Plaintiff has mailed to Defendants April 29, 2017 via certified mail return receipt requested a letter to further memorialize the written request of rescission provided to Washington Mutual Bank November 1, 2006. **(See Plaintiff Exhibit 16)**

119. The Defendants collectively have failed to timely seek judicial guidance and fully comply with Plaintiffs timely request for rescission of the transactions.

120. The foregoing acts and omissions of the Defendants were undertaken willfully, persistently, intentionally, knowingly, and in gross and reckless disregard of the rights of the Plaintiff.

[ 24 ]

## XV. CLAIMS FOR RELIEF

### COUNT 1.

**Failure to Rescind/ Take action to reflect termination of security interest under TILA & Reg.**

**Z Against all Defendants**

121. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

122. Plaintiff was and is entitled to and has exercised her right of rescission of the transactions.

123. Citing from Supreme Court Decision in relevant part:

*Cite as: 574 U. S. ____ (2015)*

*Opinion of the Court*

"*Congress passed the Truth in Lending Act, 82 Stat. 146, as amended, to help consumers "avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair credit billing." 15 U. S. C. §1601(a). To this end, the Act grants borrowers the right to rescind a loan "until midnight of the third business day following the consummation of the transaction or the delivery of the [disclosures required by the Act], whichever is later, by notifying the creditor, in accordance with regulations of the [Federal Reserve] Board, of his intention to do so." §1635(a) (2006 ed.)........*

"*Section 1635(a) explains in unequivocal terms how the right to rescind is to be exercised: It provides that a borrower "shall have the right to rescind . . . by notifying the creditor, in accordance with regulations of the Board, of his intention to do so" (emphasis added). The language leaves no doubt that rescission is effected when the borrower notifies the creditor of his intention to rescind. It follows that, so long as the borrower notifies within three years after the transaction is consummated, his rescission is timely.".......*

"*Section 1635(a) nowhere suggests a distinction between disputed and undisputed rescissions, much less that a lawsuit would be required for the latter.".....*

124. TRUTH IN LENDING ACT (TILA) 15 USC 1601-1667f

Sec. 1601. - Congressional findings and declaration of purpose:

*Sec. 1635. - Right of rescission as to certain transactions*

[25]

*(b)* Return of money or property following rescission When an obligor exercises his right to rescind under subsection (a) of this section, he is not liable for any finance or other charge, and any security interest given by the obligor, including any such interest arising by operation of law, becomes void upon such a rescission. Within 20 days after receipt of a notice of rescission, the **creditor** shall return to the obligor any money or property given as earnest money, down payment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction. **If the creditor has delivered any property to the obligor, the obligor may retain possession of it. Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.** Tender shall be made at the location of the property or at the residence of the obligor, at the option of the obligor. **If the creditor does not take possession of the property within 20 days after tender by the obligor, ownership of the property vests in the obligor without obligation on his part to pay for it.**

**TILA a creditor is defined as:**

**[A] person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments of for which the payment of a finance charge is or may be required, _and (2) is the person who the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such indebtedness, by agreement._**

**_(WASHINGTON MUTUAL FA WOULD BE THE ONLY "NOW DEFUNCT" CREDITOR/ENTITLED TO TENDER)_**

125.  Once the loan is rescinded, the security interest or lien becomes automatically void, by operation of law. 15 USC §1635(b); Reg Z §§226.15(d)(1), 226.23(d)(1). The note also is voided. The lender's interest in the property is "automatically negated, regardless of its status and whether or not it was recorded or perfected." Official Staff Commentary §§226.15(d)(1)-1, 226.23(d)(1)-1.

[26]

126. As set forth in **FEDERAL RESERVE SYSTEM 12 CFR Part 226 Regulation Z; Docket No. R-1167 Truth in Lending AGENCY; Board of Governors of the Federal Reserve System. ACTION: Final Rule**

Under the proposal, comment 15(d)(4)-1 was revised to state expressly that the sequence of procedures under § 226.15(d)(2) and (3), or a modification of those procedures by a court, does not affect consumer's substantive right to rescind. Thus, *where the consumer's right to rescind is contested by the creditor,* a court would normally determine whether the consumer has a right to rescind and determine the amounts owed before establishing the procedures for the parties to tender any money or property.

127. The creditor as defined in 15 U.S.C § 1602(g) did not contest the valid rescission and did not perform its obligation. Washington Mutual FA chose to forfeit its right to tender by not performing its obligation to return Plaintiffs proceeds of more than $60,000.00. There was no successor creditor due to other WAMU failures as originator, servicer, and bundler of toxic loan products.

### COUNT 2.

### Violations of RESPA (12 USC §§ 2601, et seq). Against all Defendants.

128. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

129. Violations of 12 USCS §2605(e) *et seq.* by failing to respond to Qualified Written Requests, Notices of Error, and Requests for Information in reference to alleged loans in default and the creation and origination of the new loan.*(See attached Exhibits 17)*

130. Defendants will not identify the owner nor the originator of loan # 29875273. Defendants continuous failure to comply with RESPA caused Plaintiff to suffer frustration because she was unable to obtain information about the origination of this loan to make a determination about any valid obligation she may have unwitting assumed. That uncertainty caused Plaintiff a great deal of frustration, sadness, fear, and anxiety. The emotional toll suffered by Plaintiff increased with each failure and refusal to identify the origins of the mystery loan. Plaintiff was continuously harassed by a flood of notices demanding payment on the alleged loan with the threat of having her home foreclosed upon. The emotional distress caused by the Defendants additionally caused Plaintiff ailments in the form of depression, migraines,

[27]

insomnia, increased blood pressure, heart problems, and stressed induced paraesthesia leaving Plaintiff temporally partially paralyzed on her left side requiring weeks of physically therapy. Plaintiff as a result of Defendants actions became socially withdrawn and unable to work. Plaintiff requests exemplary damages for the intentional and purposeful actions against all Defendants and their agents.

**COUNT 3.**

**Tortuous Interference with Property Rights Against all Defendants.**

**O.C.G.A 51-9-1**

131. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

132. The *right of enjoyment of private property being an absolute right of every citizen, every act of another which unlawfully interferes with such enjoyment is a tort for which an action shall lie.*

133. By listing Plaintiffs property not just once but twice as being in default of a loan that Plaintiff had proven was not hers and Defendants have never provided documentation to the contrary, Plaintiff had to suffer a very difficult task of keeping her 11 year old daughter away from a constant parade of investors and onlookers taking pictures of her home, attaching flyers to her doors, leaving flyers taped to her mailbox and in her driveway and even approaching her daughter in her own yard.

134. Plaintiff and daughter were confined to staying inside with windows and blinds closed and daughter cannot play in her own yard and no garden.  Constant knocks on the doors from unknown persons.(investors)

**COUNT 4.**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS/AGAINST ALL DEFENDANTS**

135. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

136. The Plaintiff was damaged as a direct and proximate result of the actions of the Defendants, their agents, contractors and/or employees.

137. Defendants knowingly and intentionally published untrue information about Plaintiff.

138. Defendants initiated a deliberate, malicious, reckless campaign of harassment.

[28]

139. On January 24, 2016 Plaintiff was rushed to Wellstar Douglas.  Diagnosis :  Paraesthesia

140. After further testing paralysis was determined to be *stress* induced. Recommendations of Physical Therapy and Counseling had to be followed by Plaintiff.

141. Plaintiff was unable to work for weeks. Suffering from panic attacks, elevated blood pressure and having to deal with the temporary paralysis on her left side. The Prolonged nature of Defendants actions and the related stress has led to Plaintiff having heart problems and out on medical leave without pay again.

142. Damage was not limited to just the Plaintiff as she is a single parent of an 11 year old daughter.

143. Plaintiffs daughter has been stressed by the discovery of the meaning of foreclosure. Plaintiff's efforts to resolve the issue with the fabricated loan were ignored. A contemptible amount of UPS deliveries from Defendant Seterus demanding payment on their loan or they will take our home and a **ludicrous number of** flyers and mailers could not be hidden to shield Plaintiffs daughter from the harmful actions of the Defendants.

144. Plaintiffs daughter passed out in the neighbor's back yard and the paramedics had to be called. Plaintiff's daughter wasn't eating and could not sleep.  She was stressed and she was referred for counseling as well.

### COUNT 5.

### GEORGIA RICO/OCGA 16-14-4 et.seq/ AGAINST ALL DEFENDANTS

145. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

146.  The Georgia RICO Act provides: *"It is unlawful for any person, through a pattern of racketeering activity or proceeds derived there from, to acquire or maintain, directly or indirectly, any interest in or control of any enterprise, real property, or personal property of any nature, including money."*

147. It shall be unlawful for any person employed by or associated with any enterprise to conduct or participate in, directly or indirectly, such enterprise through a pattern of racketeering activity.

[29]

148. Directly or indirectly acquire or maintain any interest in or control of any enterprise, real property or personal property through a pattern of racketeering or the proceeds derived from a pattern of racketeering activity.

149. Directly or indirectly participate in an enterprise through a pattern of racketeering activity while being employed by, or associated with, the enterprise.

150. Conspire or endeavor to directly or indirectly acquire or maintain any interest in, or control of, any enterprise, real property or personal property through a pattern of racketeering or the proceeds derived from a pattern of racketeering activity.

151. Conspire or endeavor to directly or indirectly participate in an enterprise through a pattern of racketeering activity while being employed by, or associated with, the enterprise.

152. Defendants unlawful scheme constitutes a criminal enterprise executed through a pattern of racketeering activity that included multiple, repeated, intentional criminal acts of:

a. Mail fraud

b. Identity Fraud

c. Violating the Georgia Residential Mortgage Fraud Act

d. False statements and writings or false lien statements

e. Records and reports of currency transactions in violation of Article 11 of Chapter 1 of Title 7

f. Subornation of perjury or false swearing

g. False statements and writings, concealment of facts, and fraudulent documents in matters within jurisdiction of state or political subdivisions.

h. Theft as defined by Chapter 16

153. **O.C.G.A. 10-6-53 Form in which agent acts immaterial. Also, O.C.G.A § 10-6-50 to -64.**

**The form in which the agent acts is immaterial; if the principal's name is disclosed and the agent professes to act for him, it will be held to be the act of the principal.**

**154.** Defendants conspired and did use Plaintiffs person identifying information to create a security instrument in the form of a loan with a transaction ID number of #29875273 without Plaintiffs consent.

[30]

155. Defendants created the security instrument to deprive Plaintiff of her property by way of creating a false obligation on a note that does not exist.

156.  Defendants have also submitted this fabricated instrument to unwitting investors as there are and have been corporate advances being reported against the earnings, which also include transfer taxes that are not being reported or paid to the proper taxing authorities.

157. The fabricated loan information was presented to Plaintiffs property insurer Allstate.  New Mortgagee is SETERUS INC ITS SUCCESSORS &/OR ASSIGNS for *loan number: 0029875273.*

158. Defendant Chase mailed Plaintiff a letter indicating they acquired ownership of her alleged obligation to Washington Mutual FA when in fact Chase did not. Recognized years later by Defendant Chase's own admission that they did not acquire ownership only after accepting thousands of dollars from the Plaintiff.

159. Defendants have threatened and intimidated Plaintiff directly in furtherance of their scheme to harm not only the Plaintiff but the Public at large.

160. This pattern of racketeering will continue as Defendants have developed a scheme of rebranding loan transactions with new numbers to subvert regulatory authorities sanctions for systemic violations already committed.

161. *Citation(s): §1026.37(a)(12) and Commentary ¶37(a)(12)-1*

*" A Loan ID Number determined by the creditor should be entered. Because it must allow for the identification of the particular credit transaction, a creditor must use a unique loan identification number"*

162. The Home Mortgage Disclosure Act *(HMDA)*, enacted by Congress in 1975, was implemented by the Federal Reserve Board's Regulation C (12 CFR Part 203). HMDA was made permanent in 1988, and was amended in 1989 to require the reporting of data about applications received and about applicant and borrower characteristics. *"HMDA"* reporting required unique identifiers for applications and loans.

### COUNT 6.

### VIOLATIONS OF THE FDCPA/AGAINST ALL DEFENDANTS

[31]

163. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

164. Plaintiff is a consumer as is a consumer within the meaning of the FDCPA, 15 U.S.C. § 1692, as she is a natural person who Defendants alleged was obligated to pay an alleged debt.

165.  Defendants have attempted to collect an alleged debt that is a "debt" within the meaning of the FDCPA, 15 U.S.C. § 1692, as the subject of the transactions composing the alleged debt were for primarily personal, family, or household purposes.

166. Defendants used instruments of interstate commerce in order to attempt to collect the alleged debt from Plaintiff, including the use of the United States Mail.

167. Defendants willfully and intentionally continue to make repeated false and misleading statements to the Plaintiff, the courts, and the public a large as part of an ongoing effort to mislead and misstate Defendants' legal rights to collect upon the alleged debt.

168. Defendants' actions violate the FDCPA's prohibitions against false or misleading statements about the legal claims they possess over a debt (15 U.S.C. § 1692e).

169. Defendants' actions have caused Plaintiff to have to retain legal counsel to defend against an improper claim, caused Plaintiff anxiety and stress, and have resulted in actual and direct harm to Plaintiff in an amount to be shown with more particularity at a later date.

170. Defendants are liable to Plaintiff for statutory damages of up to the maximum of $1,000, plus actual damages in an amount to be shown with more particularity at a later date, plus reasonable court costs and attorneys' fees in accordance with the FDCPA, 15 U.S.C. § 1692k(a)(2)-(3).

171. Defendant's false and misleading statements to the court were willful and intentional and an effort to mislead the court as to the legal status of the debt.

172. Defendants' actions constitute unfair and unconscionable means of collecting a debt in violation of the FDCPA (15 U.S.C. 1692f).

173. Defendant Chase's letter dated January 12, 2016 in response to Plaintiffs request for balance transferred to Seterus indicated $28.00. The letter did not disclose a unilateral action of creating a new loan.

[32]

174. Defendants fail to provide the origins of the allege obligation they continually threaten to foreclose on Plaintiffs home for defaulting allege loan obligation of Loan #29875273.

175. Defendants actions of listing Plaintiffs property for non-judicial foreclosure constitutes a threat to deprive Plaintiff of her property is a clear violation of 15 U.S.C § 1692(e)(5).

176. Defendants Brock & Scott's indifference to the lack of validity of the allege debt is and has been unconscionable. Plaintiff having spent an enormous amount of time and money faxing, and sending certified mail to the Defendants documents to dispute the allege debt, went to the offices of Brock & Scott in person and reviewed the documentation with their paralegal staff on January 25, 2017.

177. Plaintiff was told point blank in no uncertain terms " Brock & Scott will not verify a debt" and " If you don't get a lawyer to stop the foreclosure sale we are going to take your house".

## COUNT 7.

## VIOLATIONS OF GEORGIA'S FAIR BUSINESS PRACTICES ACT/ AGAINST ALL DEFENDANTS

178. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

179. The FBPA was created "to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of any trade or commerce." O.C.G.A. § 10-1-391(a).

180. Courts have recognized that violations of the Fair Debt Collection Practices Act ("FDCPA") are also violations of Georgia's Fair Business Practices Act, O.C.G.A. § 10-1-390 et seq.

181. Defendants actions in violation of the FDCPA, and therefore in violation of Georgia's FBPA, were intentional in nature, as all Defendants were given an opportunity to abide by the statutory laws designed to protect consumers but instead chose to continue, undeterred against Plaintiff and the public at large.

178. All Defendants continue to avail themselves of the channels of consumer commerce within this state and continue to be a detriment and financial drain to the people of this state and local municipalities of this state.

## COUNT 8.

## UNJUST ENRICHMENT-DISGORGEMENT/AGAINST ALL DEFENDANTS

[ 33 ]

179. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

180. Unjust enrichment is an equitable concept that applies when there is no actual legal contract, but yet there has been a benefit conferred for which there deserves to be some compensation given to the party delivering the benefit.

181. Defendant Chase with the intent to deceive represented to Plaintiff they acquired ownership of her alleged obligation to Washington Mutual FA when in fact Chase did not.

182. Under the threat of losing her home and relying on Chases fraudulent misrepresentation Plaintiff paid Defendants thousands of dollars under duress.

183. The contract between Plaintiff and Washington Mutual FA was void by operation of law in 2006.

184. Defendants have collected payments from Plaintiff by fraudulent and deceptive means they were not entitled to and should not benefit from their wrong doings.

185. The payments were accepted and retained by Defendants under circumstances such that it would not be equitable for Defendants to retain the benefits of those payments from Plaintiffs.

186. As a result of Defendants unjust enrichment, Plaintiff has sustained damages in an amount to be shown with more particularity at a later date. Further, Plaintiff seeks restitution and disgorgement of profits realized by Defendants as a result of their willful, unlawful and deceptive practices.

## COUNT 9.

## THEFT BY EXTORTION//THEFT BY DECEPTION//THEFT BY-CONVERSION//THEFT BY TAKING-AGAINST ALL DEFENDANTS

187. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

188. Defendants committed many separate acts of theft on a monthly basis over years by collecting, retaining, and converting to their own use, in whole or in part, Plaintiffs payments.

189. Defendants refused to acknowledge the alleged debt was void and unenforceable.

[ 34 ]

190. Defendants Chase and Fannie Mae have availed themselves of financial remedies for their purported losses from the fraudulent acts of WAMU through court actions where they themselves enumerate the many acts of fraud by WAMU in originating loans such as Plaintiffs loans.

191. Defendants have known at all times that the fraudulent tactics WAMU employed in originating their loans were evident by the omissions, and forgeries in the Plaintiffs files.

192. Defendant Chase and Seterus have provided with the aid of the remaining Defendants and over the years other employees, agents, and contractors many different versions of Notes, loan applications, and various other critical elements to a loan transaction file that are fraudulent trying to conceal and profit from the fraud that originated with WAMU.

193. Defendants used these fraudulent documents to extort funds from the Plaintiff.

194. Defendants refused to return the payments to Plaintiff when she submitted a written request outlining their wrongful acts and requested the return of the funds Defendants were not entitled to.

195. Defendants' actions have caused Plaintiff anxiety and stress, and have resulted in actual and direct harm including lost wages due to the stress and anxiety and the additional decline in health to Plaintiff in an amount to be shown with more particularity at a later date.

196. Defendants are liable for damages and Plaintiff requests relief and restitution under OCGA § 17-14-2(2)

*Georgia Law allows a judge to "make a finding as to the amount of restitution due any victim and order an offender to make full restitution."*

*"Offender" means any natural person, firm, partnership, association, public or private corporation, or other legal entity that has been sentenced for any crime or any juvenile who has been adjudged delinquent.*

*("[t]he maximum amount of restitution recoverable in a criminal case is that which would be recoverable in a civil action")*

*(citations and punctuation omitted)*

*For purposes of restitution, damages are defined as "all special damages which a victim could recover against an offender in a civil action, . . . based on the same act or acts for which the*

[ 35 ]

*offender is sentenced, except punitive damages and damages for pain and suffering, mental*

*anguish, or loss of consortium." OCGA § 17-14-2(2).*

**(O.C.G.A. § 17-14-2 IN RELEVENT PART)**

*(6) "Relief" means any parole or other conditional release from incarceration; the awarding*

*of earned time allowances; reduction in security status; or placement in prison rehabilitation*

*programs, including, but not limited to, those in which the offender receives monetary*

*compensation.*

*(7) "Restitution" means any property, lump sum, or periodic payment ordered to be made by any*

*offender or other person to any victim by any ordering authority. Where the victim is a public*

*corporation or governmental entity or where the offender is a juvenile, restitution may also be in*

*the form of services ordered to be performed by the offender.*

*(8) "Restitution order" means any order, decree, or judgment of an ordering authority which*

*requires an offender to make restitution.*

*(9) "Victim" means any:*

*(A) Natural person or his or her personal representative or, if the victim is deceased, his or her*

*estate; or*

*(B) Any firm, partnership, association, public or private corporation, or governmental entity*

*suffering damages caused by an offender's unlawful act; provided, however, that the term*

*"victim" shall not include any person who is concerned in the commission of such unlawful act as*

*defined in Code Section 16-2-20.*

**COUNT 10.**

**WRONGFUL ATTEMPTED FORECLOSURE/AGAINST ALL DEFENDANTS**

197. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

198. Defendants willfully, with malice and intent did publish untrue and derogatory information

concerning Plaintiffs financial condition and as a result Plaintiff and her daughter have sustained

damages. Plaintiff's property has sustained damages in the way of diminished value.

[36]

1    199. Defendants have willfully ignored the 2006 extinguishment of the allege debt listed in the

2    publications dated September 6, 2016 and January 10, 2017. *(See attached Plaintiffs exhibits 19A-*

3    *19B)*

4    200. Despite the aforementioned fact, the published alleged default references the transaction

5    Originated by WAMU with **LOAN TRANSACTION ID # 3010145575.** The very same Loan that Chase

6    indicated had a remaining balance of some undisclosed misc. fee for $28.00 when they transferred the

7    servicing of the loan to Seterus.

8    201. Defendant Seterus refused to accept a payment with #3010145575 on it when offered by

9    Plaintiff.

10   202. Plaintiff sent the payment of $28.00 to Chase and Defendant Chase returned the payment.

11   203. Plaintiff is not in and has not been in default.

12   204. Plaintiff has no obligation for the fraudulently created, unrecorded Loan bearing a

13   transaction number of #29875273. Therefore, Plaintiff cannot and is not in default of an agreement she

14   was and never has been a party to.

15                                    **COUNT 11.**

16        **MALICIOUS USE AND ABUSE OF PROCESS/ AGAINST ALL DEFENDANTS**

17   205. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

18   206. Plaintiff has nearly 30 years of federal service with the Department of the Treasury.

19   207. Defendant JP Morgan Chase has continuously failed to comply with consent orders issued

20   by the Department of the Treasury Comptroller of the Currency.

21   208. Defendants efforts to circumvent consent orders and various settlements such as the

22   National Mortgage Settlement have led to financial institutions such as Chase rebranding existing and/or

23   no longer enforceable loans with new loan numbers being issued upon a transfer of servicing.

24   209. There are no provisions within the Deed ¶ 20. "Sale of Note; Change of Loan Servicer" that

25   provides for the unilateral creation of a new contract that is legally binding.

26   210. Defendants have devised this illegal contract scheme and are using it to abuse the non-

27   judicial foreclosure process in the most **reprehensible unconscionable way.**

28

[ 37 ]

211. Plaintiff has objected to this fraudulent contract for more than a year and a half to all Defendants.

212. The non-judicial process allows for the taking of a property simply by following an administrative process without any judicial oversight by way of contract terms that include a "Power of Sale Clause".

213. In order to stop a non-judicial foreclosure, the burden is on the homeowner to seek an injunction and raise legal claims and defenses by initiating an affirmative action. Alternatively, a homeowner may file a petition for bankruptcy and obtain a stay of the foreclosure sale. Either of these methods may prove to be out of reach for most homeowners without proper representation allowing this kind of fraud to go unabated.

## COUNT 12.

## SLANDER OF TITLE/AGAINST ALL DEFENDANTS

214. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

215. O.C.G.A 51-9-11. Slander or libel concerning title to land

216. Defendants violates O.C.G.A 51-9-11 by filing 2 written notices **"_NOTICE OF FORECLOSURE SALE UNDER POWER"_** and by filing fraudulent assignment of Deeds encumbering Plaintiffs title.

217. Defendants prolonged, unrelenting pursuit of their fraudulent scheme against Plaintiff has caused Plaintiff excessive anxiety and stress which physically impaired Plaintiff leaving her unable to work causing a loss of wages.

218. Plaintiff is a Federal Employee and vastly trained.  Plaintiff had to turn down assignments that required additional security verification and clearance by DHS, assignments that Plaintiff is fully trained for and has performed in the past.

219. These are all quantifiable actual damages as noted by Supreme Court case:

_Gertz v. Robert Welch, Inc._, 418 U.S. 323, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974)

"It is necessary to restrict defamation plaintiffs who do not prove knowledge of falsity or reckless disregard for the truth to compensation for actual injury. We need not define "actual injury," as trial courts

[ 38 ]

have wide experience in framing appropriate jury instructions in tort actions. ***Suffice it to say that actual***

***injury is not limited to out-of-pocket loss. Indeed, the more customary types of actual harm***

***inflicted by defamatory falsehood include impairment of reputation and standing in the***

***community, personal humiliation, and mental anguish and suffering***. Of course, juries must be

limited by appropriate instructions, and all awards must be supported by competent evidence concerning

the injury, although there need be no evidence which assigns an actual dollar value to the injury." ***418***

***U.S. at 350-1, 94 S.Ct. at 3012.***

### COUNT 13.

### FRAUDULENT IN THE CONCEALMENT/AGAINST ALL DEFENDANTS

220. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

221. Defendants have active conceal their own prior knowledge of the fraud involved with

WAMU's loans as enumerated in their own pleadings against WAMU.

222. Defendants were aware of the fraud and devised the scheme to profit from it.

223. Defendants concealed the disposition of the allege loan #3010145575 to facilitate the

creation of loan #29875273.

224. Defendants have misrepresented to Plaintiff she has an obligation she has not met and as a

result she will lose her home.

225. As a direct and proximate result of the fraudulent misrepresentations and the concealment of

the unenforceability of the alleged obligation Plaintiff was damaged.

226. Plaintiff and her daughter have suffered damages including physical and emotional distress,

additional medical expenses, damage to financial security, lost earnings for time away from work,

substantially diminished quality of life.

227. Defendant Chase misrepresenting ownership of an alleged obligation and provided

fraudulent documents to support the deception.

228. Defendant Fannie Mae concealing the disposition of the alleged obligation when asked

directly and remained silent to do so.

[39]

229. Defendant Seterus concealing the origins of their loan #29875273 and refusing to provide the related contracts with that include a power of sale related to the allege unseen contracts against Plaintiffs property.

230. Defendant First American concealing the underlying transactions of alleged loan #3010145575, which upon information and belief also discloses the misappropriation of Plaintiffs funds at closing and the lack of Washington Mutual FA funds to Community Trust Bank in 2006.

231. Defendants Brock and Scott had knowledge of the full scheme and has conceal that information from the Plaintiff and the court. Defendants Brock & Scott also violated the Georgia Rules of Professional Conduct. *RULE 3.3 CANDOR TOWARD THE TRIBUNAL (a) A lawyer shall not knowingly: (1) make a false statement of material fact or law to a tribunal; (2) fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client; (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures. (b) The duties stated in paragraph (a) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6. (c) A lawyer may refuse to offer evidence that the lawyer reasonably believes is false. (d) In an ex parte proceeding, other than grand jury proceedings, a lawyer shall inform the tribunal of all material facts known to the lawyer that the lawyer reasonably believes are necessary to enable the tribunal to make an informed decision, whether or not the facts are adverse.*

*"Concealment of material facts may amount to fraud when direct inquiry is made, and the truth evaded, or where the concealment is of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover (Code § 96-203); and misrepresentation may be perpetuated by acts as well as words, and by artifices designed to mislead." Batey v. Stone, 127 Ga. App. 81, 82 (192 SE2d 528) (1972).*

[40]

*"Where the basis of an action is actual fraud, the mere silence of the party committing it is treated as a continuation of the original fraud and as constituting a fraudulent concealment."*

*American Nat. Bank v. Fidelity & Deposit Co., 131 Ga. 854 (68 SE 622) (1908).*

232. Defendants acted with malice, fraud and oppression. Defendant's actions were malicious and done willfully in conscious disregard of the rights of Plaintiff and her daughter in that they were calculated to injure Plaintiff. As such Plaintiff requests entitlement to recover in addition to actual damages, punitive damages and/or any nominal damages the court may determine is appropriate to deter Defendants from engaging in future misconduct.

### COUNT 14.

### QUIET TITLE/AGAINST ALL DEFENDANTS PER O.C.G.A. 23-3-40 *et seq*

233. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

234. Plaintiff is in possession of and the owner of the subject property by way of Warranty Deed granting Plaintiff fee simple ownership. **(See attached Plaintiff exhibit 20 for a formal legal description)**

235. Plaintiff seeks to quiet title against the claims of all Defendants and any unknown agents or assigns that would claim an ownership interest in Plaintiffs property.

236. Plaintiff seeks the equitable action for the purpose of "causing to be delivered and canceled any instrument which has answered the object of its creation or any forged or other iniquitous deed or other writing which though not enforced at the time, either casts a cloud over the complainants' title or otherwise subjects him to future liability or present annoyance, and the cancellation of which is necessary perfect protection. To include all fraudulently recorded documents tied to Plaintiffs property such as fraudulent assignments.

237. The claims of all Defendants herein constitute a cloud on Plaintiffs title to property.

238. Plaintiff requests the decree that permanently enjoins Defendants, each of them and any and all current and future successors/ and or assigns, from asserting any adverse claim to Plaintiffs title to property.

[ 41 ]

239. Enjoin Defendants permanently thereafter, from instituting, prosecuting, or maintaining a security interest in the Property from recording any deeds or mortgages regarding the Property or from otherwise taking any steps to deprive Plaintiff of ownership of the Property.

240. Plaintiff request the court award Plaintiff costs of this action, and such other relief as the court may deem proper. *(See Johnson, 333 Ga. App. at 542. Citing in relevant part:*

*"the fact that Johnson was not a party to the assignments that he challenges does not destroy his standing to assert that those assignments are clouds upon his title."*

## COUNT15.

## TRUE AND ACCURATE ACCOUNTING

241. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

242. Plaintiff requests a true and accurate accounting of all sums paid by Plaintiff and all sums applied to Loan Transaction Number #3010145575 and #0734948896 post WAMU takeover.

243.  Defendant Chase by means of deception and misrepresentation accepted payments from Plaintiff for years they were not entitled to and have applied those payments to various suspense accounts shrouded with various fee and interest.

## COUNT16.

## DECLARATORY RELIEF/AGAINST ALL DEFENDANTS

## 28 U.S.C. § 2201 et. seq.

244. Plaintiff incorporates each paragraph set forth above as if fully stated herein.

245. An actual controversy has arisen and now exists between Plaintiff and the Defendants concerning their respective rights regarding the Note and Deed and any related interest in Plaintiffs property.

246. Plaintiff contends that pursuant to the unenforceability of the void contracts that once existed between Plaintiff and Washington Mutual FA identified by Loan ID #'s 3010145575 and #0734948896 there is no longer a secured interest outstanding against her property.

[42]

247. Plaintiff further contends that there has never been an agreement between herself and any other party whereby she has pledged an interest in her property to secure a loan or anything else of value from the Defendants.

248. Plaintiff is informed and believes and upon that bases alleges that Defendants disputes Plaintiffs contention and instead contend they may properly foreclose upon Plaintiffs property for defaulting on allege contract securing her property identified by contract loan # 29875273.

249. Plaintiff requests a determination of the validity of the assignment of void instrument identified by Loan No. 3010145575, location BK 3395 PG 116-117 Recorded 6/14/2016 and assignment of void instrument location BK 3395 PG 112-113 in the Douglas County Georgia register of deeds.

250. Plaintiff requests a determination of the validity and enforceability of the unknown contract for a Loan identified by loan # 29875273.

251. Plaintiff requests the decree declare and adjudge that Plaintiff is entitled to the exclusive possession of the property.

252. Plaintiff requests the decree declare and adjudge that plaintiff owns in fee simple, and is entitled to the quiet and peaceful possession of, the described real property evidenced by her attached fee simple Warranty Deed.

253. Plaintiff requests the decree declare and adjudge that Defendants, and each of them, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the real property or any part of the property.

## PRAYER FOR RELIEF

**WHEREFORE** Plaintiff, respectfully request that the Court enter judgment against Defendants, jointly and severally in all matters contained within. Plaintiff prays that she recover the following:

A. Declaratory and injunctive relief as set forth herein;

B. An order requiring Defendants to return all sums obtained from Plaintiff as a result of its unlawful, fraudulent, deceptive, misleading, and unfair business practices;

C. Compensatory and treble damages pursuant to OCGA § 16-14-6(c);

[43]

D. Award Plaintiff actual damages in an amount to be shown with more particularity at a later date.

E. Find Defendants liable for intentional violations of Georgia's Fair Business Practices Act;

F. Find Defendants jointly and severally liable for violations of the Fair Debt Collection Practices Act;

G. Award Plaintiff the full statutory damages for each of Defendants' FDCPA violations;

H. Award Plaintiff Restitution as allowed by law;

I. Declaratory Relief, including but not limited to the following Decrees of this Court that:

    1. Plaintiff is entitled to the exclusive possession of the property;

    2. Plaintiff owns in fee simple, and is entitled to the quiet and peaceful possession of the real property at issue;

    3. Defendants, and each of them, and all persons claiming under them, have no estate, right, title, lien, or interest in or to the real property or any part of the property.

J. Nominal Damages that may apply;

K. Ordering Defendants to make restitution and/or disgorge the full extent to which Defendants were unjustly enriched by their deliberate, unlawful and inequitable conduct alleged herein against Plaintiff;

L. Order an accounting of Plaintiffs loan accounts;

M. Punitive damages pursuant to OCGA § 51-12-5.1 in an amount of $250,000.00 plus any additional amount deemed proper exceeding the statutory limit on the grounds that Defendants' actions have shown willful misconduct, malice, fraud, wantonness, oppression, or such entire want of care which would raise the presumption of conscious indifference to consequences, and because Defendants have acted with specific intent to cause harm, the statutory limitation on punitive damages is not applicable;

N. Grant such other relief as this Court may deem just and proper under the circumstances.

[ 44 ]

1    I declare under penalty of perjury under the laws of the United States of America that the

2    foregoing is true and correct.

3

4                                            Dated this 26th day of June, 2017

5

6                                            _Leslie Hughes_

7                                            **Leslie D. Hughes**

8                                            2270 Charleston Place

9                                            Lithia Springs GA 30122

10                                           (770) 639-9727

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[45]

# EXHIBIT

# 1

```
************************
***    TX REPORT    ***
************************


TRANSMISSION OK

TX/RX NO                4341
CONNECTION TEL                  96789457894
CONNECTION ID
ST. TIME                11/01 12:25
USAGE T                 00'44
PGS. SENT               3
RESULT                  OK
```

*AHN: Dionne*

**Washington Mutual**
HOME LOANS

P.O. Box 3139
Milwaukee, WI 53201-3139

October 19, 2006                                ES:.08

Leslie D Hughes
6570 Coventry Pt
Austell, GA 30168-0000


RE: Loan Number: 3010145575
    Property Address: 2270 Charleston Pl
                      Lithia Springs GA 30122

Dear Leslie D Hughes :

Washington Mutual is committed to providing you with responsive and
helpful loan service. As part of that commitment, we are writing to
inform you about a change to your escrow account.

We are adjusting your monthly escrow payment to reflect a change in
your property tax or property insurance premiums. Beginning
12/01/2006 your new monthly payment will be $1301.55. An
Escrow Statement detailing this change will be mailed to you shortly.

If you have any questions, please contact one of our friendly
Customer Service Specialists toll free at 1-866-926-8937. If you
prefer, you may visit us online at www.wamu.com, where you'll find a
wealth of home loan information at your fingertips.

Thank you for choosing Washington Mutual. It's our pleasure to serve
you.

Sincerely,


Escrow Department
Washington Mutual Bank

November  1, 2006


Property Address:

2270 Charleston Place
Lithia Springs, Ga 30122
Loans:  3010145575 and 0734948896

Washington Mutual, FA
Attention:  Ms. Dionne Gajadhar

Ms. Gajadhar
This is being sent to you as a follow-up to our previous conversations regarding the misrepresentations
if not borderline deceptive manner in which Washington Mutual has handled the processing of the
above listed loans.  The transactions have not produced what you and I discussed in your branch office
in great detail.  The missing documents, late submission of other loan documents and now this latest
unwelcome surprise from Washington Mutual is too much to take.  There is no justification for this
ridiculous excuse for increasing my monthly payment to 1,301.55 nearly $500.00 more than the last
unexpected increase; due to an escrow increase more than 90 days after a closing.  I pulled multiple
years of the property taxes myself before writing the contract and there have been no increases and I
prepaid the property insurance a year in advance and turned the letter in to the closing attorney, I have
had the same insurance agent for more than a decade.  Washington Mutual had 45 days to submit any
changes to escrow.  I have not received all required paper work from these two loan transactions to find
the true reason for this madness, but there is something that is yet to be disclosed.  I have sent you a
copy of that ridiculous letter so that you will understand my stating again in writing.  I do not wish to
continue this business relationship, cancel the contracts as they have been wrought with errors and
deception.  I wish the full return of all funds that I have paid into this disaster and I will seek financing
elsewhere and if need be find another home.  Washington Mutual is not as advertised...


Leslie Hughes

# EXHIBIT

# 2

Paying Agent—Rust Consulting, Inc.
P.O. Box 8056
Faribault, MN 55021-9456

**Independent Foreclosure Review**

**IMPORTANT PAYMENT AGREEMENT INFORMATION ENCLOSED**

April 19, 2013

J

```
*  1  6  0  1  3  5  3  1  3  7  -  3  3  5  6  2  4  6  *
```

**Your payment is enclosed.**

LESLIE D HUGHES
2270 CHARLESTON PL
LITHIA SPRINGS, GA 30122-4004

Reference Number: 1601353137

Property Address:

2270 CHARLESTON PL

LITHIA SPRINGS GA 30122

*Si usted habla español, tenemos representantes que pueden asistirle en su idioma.*



Dear Leslie D Hughes,

You were recently sent a notice that you are eligible to receive a payment as a result of an agreement between federal banking regulators and JPMorgan Chase in connection with an enforcement action related to deficient mortgage servicing and foreclosure processes.

**This letter includes your check.** It also explains the amount of the payment, why you are receiving a payment, how to cash the check, and other important information and disclosures.

## Your payment is: $500.00.

### Why you are receiving a payment

Earlier this year, JPMorgan Chase entered into an agreement with federal banking regulators—the Office of Comptroller of the Currency and the Board of Governors of the Federal Reserve System. This agreement resolved the Independent Foreclosure Review required by the regulators. Additional information about this agreement can be found at www.occ.gov and www.federalreserve.gov.

Regulators determined your payment amount based on the stage of your foreclosure process and other considerations related to your foreclosure.

### How to cash the check

**You must cash or deposit the check within 90 days, or the check will be void.** All borrowers listed on the check must sign it to cash it.

**The payment amount is final.**

**There is no process to appeal the payment.**

*Continued on reverse side*

OCC2013

A 12J1 000072856

## Important information

- By cashing or depositing the check, you do not waive any legal claims against your servicer and you may pursue additional actions related to your foreclosure.

- Cashing or depositing the check may affect your taxes or public assistance benefits. Neither the paying agent —Rust Consulting, Inc., nor the regulators can advise you on tax liability or any effect on public assistance. If you have questions, you may consult a tax advisor or qualified individual or organization. You may also visit www.independentforeclosurereview.com/taxinfo for information about potentially taxable components of your payment. If required, tax documentation, such as a Form 1099, will be sent to you in January 2014.

- You may be eligible for foreclosure prevention assistance. To explore your options, contact a JPMorgan Chase specialist at 1-877-496-9919.

- If you need additional help with foreclosure prevention, please contact the Homeowner's HOPE Hotline at 1-888-995-HOPE (4673) (or at www.makinghomeaffordable.gov) and they can put you in touch with a U.S. Department of Housing and Urban Development approved nonprofit organization that can provide **free assistance.**

- Please refer this letter to your attorney or authorized representative, if you are represented by an attorney or other authorized third-party representative regarding a foreclosure, bankruptcy case involving this mortgage loan, or the Independent Foreclosure Review.

- This payment does not mean that you necessarily suffered financial injury or harm.

## Other disclosures

This letter is not an attempt to collect a debt or to impose personal liability for any obligation, including, without limitation, any obligation that was discharged, or is subject to an automatic stay in bankruptcy under Title 11 of the United States Code.

Information you provided as part of the Independent Foreclosure Review may not be used for any other purpose. If you would like JPMorgan Chase's internal records to include updated contact or personal information for future correspondence or notices, then you must separately provide your new contact or personal information directly to the servicer by calling 1-877-496-9919.

If you have any questions, please call the paying agent—Rust Consulting, Inc.—at 1-888-952-9105, Monday through Friday, 8 a.m. - 10 p.m. ET or Saturday, 8 a.m. - 5 p.m. ET.

Si tiene preguntas, puede llamar al número de teléfono 1-888-952-9105 para hablar con un representante.

Assistance is also available from the toll-free number in more than 200 languages, including Chinese, Korean, Vietnamese, Tagalog, Hmong, and Russian.

| 提供中文實助。 | Trợ giúp hiện có bằng tiếng Việt. | Peb muaj cov neeg hais lus Hmoob pab nej. |
| 한국어 도움을 제공합니다. | Available ang tulong sa wikang Tagalog. | Помощь на русском языке. |

Sincerely,

Paying Agent—Rust Consulting, Inc.

A 12J1 000072856

# EXHIBIT

# 3

Page 1 of 2

After recording return to:
PETERSONPATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75144-4505



Doc ID:  010318680002 Type: ASGN
Recorded: 06/14/2016 at 09:00:00 AM
Fee Amt: $7.00 Page 1 of 2
Douglas County Georgia
TAMMY M HOWARD Clerk Superior Court
BK3395 PG112-113

—————————————[Space Above This Line For Recording Data]—————————————

Loan No.: 3010145575
FNMA Loan No.: 1702040017

# GEORGIA ASSIGNMENT OF SECURITY DEED

For Value Received, **THE FEDERAL DEPOSIT INSURANCE CORPORATION, A CORPORATION ORGANIZED AND EXISTING UNDER AN ACT OF CONGRESS (FDIC), WHOSE ADDRESS IS 1601 BRYAN STREET, DALLAS, TX 75201, AND ACTING IN ITS RECEIVERSHIP CAPACITY AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA,** the undersigned holder of a Security Deed (herein "Assignor") has this day transferred, sold, assigned, conveyed and set over to JPMorgan Chase Bank, National Association, (herein "Assignee"), whose address is 700 Kansas Lane, MC 8000, Monroe, LA  71203, as Assignee, its successors, representative and assigns, all its rights, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by LESLIE D HUGHES to WASHINGTON MUTUAL BANK, FA, dated July 5, 2006 and recorded on July 24, 2006.

Property Address: 2270 CHARLESTON PL, LITHIA SPRINGS, GA 30122

such Security Deed having been given to secure payment of  One Hundred Forty  Thousand Five Hundred Twenty Five and 00/100ths ($140,525.00) which Security Deed is of record in Book, Volume or Liber No. 2401, at Page 965-981 (or as No. N/A) in the Office of the Superior County Clerk for DOUGLAS COUNTY, State of Georgia, and all rights accrued or to accrue under such Security Deed.

This Assignment is intended to further memorialize the transfer that occurred by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. §1821(d)(2)(G)(i)(II).

Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #1-866-570-5277, which is responsible for receiving payments.

Georgia Assignment of Security Deed
JPMorgan Chase Bank N.A. Project 9:3240        Page 1 of 2        L.73106GA 01/12 Rev. 02/14

* 2 - 3 2 5 5 9 8 *        * 3 0 1 0 1 4 5 5 7 5 *

# EXHIBIT

# 4

After recording return to:
FERRIS & PATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75244-4505

Doc ID: 010316800002 Type: ASGN
Recorded: 08/14/2018 at 09:00:00 AM
Fee Amt: $7.00 Page 1 of 2
Douglas County Georgia
TATTY M HOWARD Clerk Superior Court
BK 3395 PG 116-117

_____ [Space Above This Line For Recording Data] _____

Loan No.: 3010145975
FNMA Loan No.: 1702040017

# GEORGIA ASSIGNMENT OF SECURITY DEED

For Value Received, JPMorgan Chase Bank, National Association, the undersigned holder of a Security Deed (herein "Assignor") has this day transferred, sold, assigned, conveyed and set over to FEDERAL NATIONAL MORTGAGE ASSOCIATION, ITS SUCCESSORS OR ASSIGNS, (herein "Assignee"), whose address is 14221 Dallas Parkway, Suite 1000, Dallas, TX 75254, as Assignee, its successors, representative and assigns, all its rights, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by LESLIE D HUGHES to WASHINGTON MUTUAL BANK, FA, dated July 5, 2006 and recorded on July 24, 2006.

Property Address: 2270 CHARLESTON PL, LITHIA SPRINGS, GA 30122

such Security Deed having been given to secure payment of  One Hundred Forty  Thousand Five Hundred Twenty Five and 00/100ths ($140,525.00) which Security Deed is of record in Book, Volume or Liber No. 2401, at Page 965-981 (or as No. N/A) in the Office of the Superior County Clerk for DOUGLAS County, State of Georgia, and all rights accrued or to accrue under such Security Deed.

Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #1-866-570-5277, which is responsible for receiving payments.

* 1 - 3 0 8 6 1 5 *          * 3 0 1 0 1 4 5 5 7 5 *

# EXHIBIT

# 5



# SHAPIRO & SWERTFEGER, LLP

ATTORNEYS AT LAW

Gerald M. Shapiro*
L. Jack Swertfeger, Jr.
David S. Kreisman**
William C. Cobb
Denise R. Griffin
Philip A. Hasty
James J. LaRotonda, Jr.
Christina U. Lee
Julie D. Mehelic
Sean R. Quirk

*FL and IL only
**IL only

Of Counsel:
T. Keller Cobb
H. Raiford Hodges
Eugene S. Taylor
Patrick F. Henry (1952-1997)

September 12, 2011

Leslie Hughes
2270 Charleston Place
Lithia Springs, GA  30122

WE ARE A DEBT COLLECTOR. THIS IS AN ATTEMPT TO COLLECT A DEBT.

HOWEVER, IF YOU ARE IN BANKRUPTCY OR HAVE BEEN DISCHARGED IN BANKRUPTCY, THIS LETTER IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT INTENDED AS AN ATTEMPT TO COLLECT A DEBT OR AS AN ACT TO COLLECT, ASSESS, OR RECOVER ALL OR ANY PORTION OF THE DEBT FROM YOU PERSONALLY.

Re:  Full Reinstatement

> Chase Loan Number:      3010145575
> Mortgagor(s):           Leslie Hughes
> Property Address:       2270 Charleston Place, Lithia Springs, GA  30122
> Attorney/Trustee File No.: 09-009554

This firm represents **Chase Home Finance** as servicer for JP Morgan Chase Bank, NA.
This letter responds to your request for a reinstatement amount of the above delinquent loan.

As of the date of this letter, the amount required to cure your loan delinquency is **$7,728.41**. However, if you are not prepared to tender the full reinstatement amount today, then the amount that you owe may increase between the date of this letter and the date you reinstate the loan. The reinstatement amount may increase because of additional interest and late charges as well as legal fees and costs that are incurred as additional steps in the foreclosure proceed.

This reinstatement quote is good through 9/15/11 the "Good Through Date." If you reinstate this loan in full by the Good Through Date, we estimate the reinstatement amount to be itemized as follows:

---

2872 Woodcock Boulevard, Duke Building, Suite 100 • Atlanta, Georgia 30341 voice: (770) 220-2535 • fax: (770) 220-2665

Douglasville
76°F
AccuWeather.com
Weather Forecast

westganews.com | times-georgian | douglas co. sentinel | villa rican | tallapoosa journal | gateway-beacon | bowdon bulletin | paulding co. sentinel

home    columns    letters    westga marketplace    **classifieds**    subscribe    about us    contact us    submit    my content    chamber matters

jobs    cars    real estate for sale    real estate for rent    professional services    home services

ads        legalscat                    search                                                        sign

Continuing to build
"A Legacy of Automotive Excelle
...since 1968

CARROLLTON, GA        A LEGACY OF EXCELLENCE

posted by rstille

## 9/8,15,22,29/hughes/09-009554 STATE OF GEORGIA COUNTY OF DOUGLAS NOTICE OF SALE UNDER POWER Because of a default in the payment of the indebtedness secured by a Security Deed executed by Leslie D

West Georgia 30117

9/8,15,22,29/hughes/09-009554
STATE OF GEORGIA

COUNTY OF DOUGLAS
NOTICE OF SALE UNDER POWER

Because of a default in the payment of the indebtedness secured by a Security Deed executed by Leslie D. Hughes to Washington Mutual Bank, FA dated July 5, 2006, and recorded in Deed Book 2401, Page 965, Douglas County Records, securing a Note in the original principal amount of $140,525.00, the holder thereof pursuant to said Deed and Note thereby secure has declared the entire amount of said indebtedness due and payable and, pursuant to the power of sale contained in said Deed, will on the first Tuesday, October 4, 2011, during the leg hours of sale, before the Courthouse door in said County, sell at public outcry to the highest bidder for cash, the property described in said Deed, to-wit:

All that tract or parcel of land lying and being in Land Lot 430 of the 18th District and 2nd Section of Douglas County, Georgia, and being Lot 23 of Heritage Square Subdivision, Unit Thre as shown by plat of said subdivision recorded in the real property records of Douglas County, Georgia in Plat Book 15, Pages 150,151 and 152; said plat being made a part hereof by this reference being made thereto for a more complete description of the metes and bounds, courses and distances of said property.

Said property is known as **2270 Charleston Place, Lithia Springs, GA 30122**, together with all fixtures and personal property attached to and constituting a part of said property, if any.

Said property will be sold subject to any outstanding ad valorem taxes (including taxes which are a lien, whether or not now due and payable), the right of redemption of any taxing autho any matters which might be disclosed by an accurate survey and inspection of the property, any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matt of record superior to the Security Deed first set out above.

The sale will be conducted subject (1) to confirmation that the sale is not prohibited under the U.S. Bankruptcy Code and (2) to final confirmation and audit of the status of the loan with th holder of the security deed.

Notice has been given of intention to collect attorney's fees in accordance with the terms of the Note secured by said Deed.

Said property will be sold as the property of Leslie D. Hughes, the property, to the best information, knowledge and belief of the undersigned, being presently in the possession of Leslie I Hughes, and the proceeds of said sale will be applied to the payment of said indebtedness and all the expenses of said sale, including attorney's fees, all as provided in said Deed, and t balance, if any, will be distributed as provided by law.

JPMorgan Chase Bank, National Association successor in interest by purchase from the Federal Deposit Insurance Corporation, as Receiver of Washington Mutual Bank f/k/a Washingto Mutual Bank, FA as Attorney-in-Fact for Leslie D. Hughes

File no. 09-009554
SHAPIRO & SWERTFEGER, LLP*
Attorneys and Counselors at Law
2872 Woodcock Blvd., Duke Building, Suite 100

# EXHIBIT

# 6

After recording return to:
PEIRSONPATTERSON, LLP
ATTN: RECORDING DEPT.
13750 OMEGA ROAD
DALLAS, TX 75244-4505

Doc ID: 010316560002 Type: ASGN
Recorded: 06/14/2016 at 09:00:00 AM
Fee Amt: $7.00 Page 1 of 2
Douglas County Georgia
TAFFY M HOWARD Clerk Superior Court
BK **3395** PG **112-113**

---

[Space Above This Line For Recording Data]

Loan No.: 3010145575
FNMA Loan No.: 1702040017

# GEORGIA ASSIGNMENT OF SECURITY DEED

For Value Received, THE FEDERAL DEPOSIT INSURANCE CORPORATION, A CORPORATION ORGANIZED AND EXISTING UNDER AN ACT OF CONGRESS (FDIC), WHOSE ADDRESS IS 1601 BRYAN STREET, DALLAS, TX 75201, AND ACTING IN ITS RECEIVERSHIP CAPACITY AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA, the undersigned holder of a Security Deed (herein "Assignor") has this day transferred, sold, assigned, conveyed and set over to JPMorgan Chase Bank, National Association, (herein "Assignee"), whose address is 700 Kansas Lane, MC 8000, Monroe, LA 71203, as Assignee, its successors, representative and assigns, all its rights, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by LESLIE D HUGHES to WASHINGTON MUTUAL BANK, FA, dated July 5, 2006 and recorded on July 24, 2006.

Property Address: 2270 CHARLESTON PL, LITHIA SPRINGS, GA 30122

such Security Deed having been given to secure payment of One Hundred Forty Thousand Five Hundred Twenty Five and 00/100ths ($140,525.00) which Security Deed is of record in Book, Volume or Liber No. 2401, at Page 965-981 (or as No. N/A) in the Office of the Superior County Clerk for DOUGLAS County, State of Georgia, and all rights accrued or to accrue under such Security Deed.

This Assignment is intended to further memorialize the transfer that occurred by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(i)(II) of the Federal Deposit Insurance Act, 12 U.S.C. §1821(d)(2)(G)(i)(II).

Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #1-866-570-5277, which is responsible for receiving payments.

---

Georgia Assignment of Security Deed
JPMorgan Chase Bank N.A. Project WX240                 Page 1 of 2                 L73108GA 01/12 Rev. 02/14





Page 2 of 2

BK3395PG0113

IN WITNESS WHEREOF, the undersigned Assignor has hereunto set its hand and seal this 1st day
of march 2014

SIGNED, SEALED AND DELIVERED IN THE PRESENCE OF:

_Brittany Williamson_
Unofficial Witness        Brittany Williamson

Assignor:
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION, AS ATTORNEY IN FACT
FOR THE FEDERAL DEPOSIT INSURANCE
CORPORATION AS RECEIVER OF
WASHINGTON MUTUAL BANK F/K/A
WASHINGTON MUTUAL BANK, FA

_Jaunise Gordon_
(Printed Name)      Jaunise Gordon

Notary Public   Notary Bar Number —28375
My Commission Expires: lifetime

By: _Feisha C. Merrell_
        Feisha C Merrell

Ouachita
County

Its:   Vice President

Louisiana
State

SCANNED

JUL 05 2016
Teresa M. Howard
Clerk Superior Court
Douglas County GA

Georgia Assignment of Security Deed
JPMorgan Chase Bank N.A. Project WX240      Page 2 of 2      L73169GA 01/12 Rev. 02/14

*2-325598*        *30101455575*

Book: 3395  Page: 112  Seq: 2

# EXHIBIT

# 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| S&A CAPITAL PARTNERS, INC., MORTGAGE RESOLUTION SERVICING, LLC; and 1ST FIDELITY LOAN SERVICING, LLC, <br><br> Plaintiffs <br><br> v. <br><br> JPMORGAN CHASE BANK, N.A., JP MORGAN CHASE & COMPANY, and CHASE HOME FINANCE LLC <br><br> Defendants. | No. 1 :15-cv-00293-LTS-JCF <br><br> **FOURTH AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs S&A Capital Partners, Inc. ("S&A"), Mortgage Resolution Servicing, LLC ("MRS"), and 1st Fidelity Loan Servicing, LLC ("1st Fidelity")(together, the "Plaintiffs"), for their fourth amended complaint against JPMorgan Chase Bank, N.A., JPMorgan Chase & Company, and Chase Home Finance LLC (together "Chase" or the "Defendants"), allege as follows:

### NATURE OF THIS ACTION

This action arises out of the Defendants failure to service loans in a manner consistent with its legal obligations under: i) the Real Estate Settlement Procedures Act (RESPA – particularly Title X); ii) the Truth in Lending Act (TILA); iii) the Federal Trade Commission Act (FTC); iv) The Fair Debt Collection Practices Act (FDCPA); v) The Dodd Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank); vi) the Equal Credit Opportunity Act (ECO); vii) the Fair Housing Act (FHA); and viii) all other applicable state and federal usury, consumer credit

protection and privacy, predatory and abusive lending laws (collectively "the Acts"). Rather than comply with the costly and time consuming legal obligations Defendants faced under the Acts, Defendants warehoused said loans in a database of charged-off loans known as RCV1 and intentionally and recklessly sold these liabilities to unaware buyers such as the Plaintiffs. To accomplish the transfer of these obligations Defendants:

(i)     Intentionally prevented Plaintiffs from conducting normal and customary due diligence by failing to provide the required information and by constantly changing the terms of the transaction, including after consummation.

(ii)    Fraudulently induced Plaintiffs to sign a Mortgage Loan Purchase Agreement ("MLPA") without conducting appropriate due diligence by appealing to the longstanding relationship between Plaintiffs and Defendants; promising Plaintiffs that the required data was available; and by promising to provide such data as they had in the past and according to an existing Master Mortgage Loan Sale Agreement ("MMLSA") between Plaintiffs and Defendants.

(iii)   Negligently misrepresented to the Plaintiffs the quality and character of the loans.

(iv)    Knowingly breached every representation they made in the MLPA, including failing to legally transfer 3,529 closed-end 1st lien mortgages worth $156,324,399.24 to the Plaintiffs, and to provide Plaintiffs with the information required by both RESPA and the MMLSA so that Plaintiffs could legally service said loans.

(v)     Took numerous actions post-facto that tortiously interfered with Plaintiffs' relationships with borrowers including illegally sending borrowers debt forgiveness letters and releasing liens. These actions not only resulted in specific damage to said

lien's value, it caused Plaintiffs reputational harm with borrowers, loan sellers, investors, lenders and regulators.

(vi)    Created a "racketeering enterprise" whose purpose was to evade legal duties owed to borrowers, regulators and Plaintiffs, among others, to appropriately service federally regulated mortgage loans.

## THE PARTIES

**Plaintiffs:**

1.    S&A is a Florida corporation located at 6810 N. State Rd. 7, Coconut Creek, Florida 33073, whose President is Laurence Schneider. S&A has been acquiring mortgage loans and pools of loans from numerous lenders, servicers and mortgage insurance companies since 2005. From 2005-2010, S&A purchased approximately 650 first lien and second lien residential mortgage loans from the Defendants.

2.    MRS is a Florida limited liability company located at 6810 N. State Road 7, Coconut Creek, Florida 33073, whose managing member is Real Estate and Finance, Inc., a Florida corporation whose President is Laurence Schneider. On February 25, 2009, MRS entered into a purchase agreement to purchase a pool of 3,529 first lien residential mortgage loans from the Defendants and paid full consideration for the loans.

3.    1st Fidelity is a Florida limited liability company located at 6810 N. State Rd. 7, Coconut Creek, Florida 33073, whose managing member is Real Estate and Finance, Inc., a Florida corporation whose President is Laurence Schneider. 1st Fidelity has been acquiring mortgage loans and pools of loans from numerous lenders, servicers and mortgage insurance companies since 2008. From 2008 to 2010, 1st Fidelity purchased approximately 350 first lien and second lien residential mortgage loans from the Defendants.

**Defendants:**

4.       JPMorgan Chase Bank, N.A. (the "Bank") is a national banking association and a wholly-owned subsidiary of JPMorgan Chase & Company. The Bank's principal place of business is at 270 Park Avenue, New York, New York. On September 25, 2008, the Bank purchased substantially all of the assets and assumed substantially all of the liabilities of Washington Mutual Bank, F.S.B. pursuant to a Purchase and Assumption Agreement with the Federal Deposit Insurance Corporation (FDIC) as Receiver for Washington Mutual Bank, F.S.B.

5.       JPMorgan Chase & Company ("Chase") is a Delaware corporation with its principal place of business at 270 Park Avenue, New York, New York. In July 2004, Chase merged with Bank One. One or more of the Plaintiffs acquired from Chase residential mortgage loans that Chase had acquired from Bank One loans. As owner of the loans sold to the Plaintiffs, Chase is liable for all of the damages sought herein.

6.       Chase Home Finance, LLC was a Delaware limited liability company that offered mortgage and loan services, with its principal place of business at 343 Thornall Street, Edison, New Jersey 08837. Prior to May 1, 2011, Chase was qualified to do business in New Jersey. Effective May 1, 2011, Chase merged into the Bank which now owns and services the residential mortgage loans previously owned by Chase. The Bank stands in the shoes of Chase and is liable for all of the damages sought herein.

## JURISDICTION AND VENUE

7.       This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 with respect to the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c); diversity jurisdiction with respect to all of the claims pursuant to 28 U.S.C. § 1332; and supplemental jurisdiction of the state law claims under 28 U.S.C. § 1367(a).

8.      This Court has personal jurisdiction over the Defendants pursuant to New York

C.P.L.R. §§ 301 and 302 because the Defendants are registered to do business in the State of New

York and regularly conduct business in the State of New York, including in this District, and

because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred

in this District.

9.      Venue is proper under 28 U.S.C. § 1391(b) and (c) because two of the Defendants

maintain their principal place of business in the Southern District of New York.

10.     The MLPA has a New York forum selection clause, which the Court noted in its

Order on Defendant's Motion to Transfer (DE 75, 87), "is a significant factor disfavoring transfer

of this action. See Atlantic Marine Const. Co., Inc. v. U.S. District Court for the Western Dist. of

Tx., 134 S.Ct. 568, 582 (2013) ('[F]orum selection clauses should control except in unusual

cases.')." See Exhibit 4.

## ALLEGATIONS COMMON TO ALL CLAIMS

### Legal and Regulatory Duties Related to Mortgage Servicing

11.     According to the Real Estate Settlement Procedures Act ("RESPA"), also known

as Regulation X, *12 U.S.C. § 2601 et seq.* a "federally related mortgage loan" means any loan that

is secured by a first or subordinate lien on residential real property, including a refinancing of any

secured loan on residential real property, upon which there is either: occupancy of from one to

four families, is made in whole or in part by any lender that is either regulated by or whose deposits

or accounts are insured by any agency of the Federal Government[1]; is made in whole or in part, or

is insured, guaranteed, supplemented, or assisted in any way by the Secretary or any other officer

or agency of the Federal Government or under or in connection with a housing or urban

---

[1] *available at* https://www5.fdic.gov/idasp/advSearchLanding.asp, and https://www.chase.com/personal-banking/fdic-coverage

development program administered by the Secretary or housing or related program administered by any other such officer or agency, or is intended to be sold to Fannie Mae, Ginnie Mae, FHA, or

(iv) is made in whole or in part by any "creditor", as defined in section 1602(f) 1 of Title 15, who makes or invests in residential real estate loans aggregating more than $1,000,000 per year, except that for the purpose of this chapter, the term "creditor" does not include any agency or instrumentality of any State. 12 U.S.C. § 2602.

12.     This includes the Secretary of the Department of Housing and Urban Development (HUD) or any other officer or agency of the Federal Government or in connection with a housing or urban development program administered by the Secretary of HUD or a housing or related program administered by any other officer or agency of the Federal Government.[2]

13.     Also according to RESPA, "servicing" means receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan, including amounts for escrow accounts under section 10 of RESPA (12 U.S.C. § 2609), and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract.

14.     At all times applicable, Defendants have been subject to the Real Estate Settlement Procedures Act 12 U.S.C. §§2601-2617 (RESPA) as servicers of federally related mortgage loans.

15.     At all times applicable, Defendants have been subject to the Truth in Lending Act 15 U.S.C. 1601, (TILA) as servicers of federally related mortgage loans obligated upon a borrower's request to provide the name, address, and telephone number of the owner of the obligation.

---

[2] *available at* https://www.fdic.gov/regulations/laws/rules/6500-2800.html

16.    At all times applicable, Defendants have been subject to the Federal Trade Commission Act, 15 U.S.C. 41 et seq (FTC) as federally regulated and insured institutions prohibiting unethical, unfair and deceptive business practices against consumers.

17.    At all times applicable, Defendants have been subject to the Fair Debt Collection Practices Act 15 U.S.C. 1692 (FDCPA), prohibiting the collection of debt not owned, using names other than its own which would indicate that a third person is collecting or attempting to collect such debts, using false, deceptive, or misleading representations of the character, amount, legal status of such debt in connection with the collection of such debt 15 U.S.C. §1692e, prohibiting unfair or unconscionable means to collect under 15 U.S.C. §1692f, failing to validate debt and failing to cease collection of such disputed debt until legal verification is made, unlawfully furnishing deceptive forms under 15 USC 1692j.

18.    At all times applicable, Defendants have been subject to the Dodd Frank Wall Street Reform and Consumer Protection Act, 12 U.S.C. §5301 *et seq* (Dodd-Frank), requiring for example, mandatory servicer participation in HAMP, requiring escrow and settlement procedures for people who are in trouble repaying their mortgages, imposing more stringent requirements for risk management and stress testing, requiring banks, lenders, and others, whenever they securitize an asset, to hang on to a portion of the credit risk, requiring further loss mitigation procedures under RESPA, and establishing the Consumer Financial Protection Bureau.

19.    At all times applicable, Defendants have been subject to the Equal Credit Opportunity Act, 15 U.S.C. . §1691 *et seq.* (ECOA) prohibiting discrimination/disparate treatment by a lender in any aspect of a credit transaction including failing to provide information or services or providing different information or services regarding any aspect of the lending process, using

different standards to evaluate collateral, treating a borrower differently in servicing a loan or invoking default remedies.

20.     At all times applicable, Defendants have been subject to the Fair Housing Act, 42 U.S.C. § 3601 prohibiting discrimination in all aspect of "residential real-estate related transactions".

**RCV1 Evades Regulatory Standards and Servicing Requirements**

21.     The damage caused to Plaintiffs arises from Defendants' violations of law whereby Defendants routinely and illicitly sought to avoid costly and time-consuming servicing of federally related mortgage loans. Since 2000, Defendants maintained loans on various mortgage servicing Systems of Records ("SOR") which are required to meet servicing standards and regulatory mandates. However, Defendants installed RCV1, an off-the-books system of records to conduct illicit practices outside the realm of regulation or auditing. Defendants' scheme involves flagging defaulted and problem federally related loans on the legitimate SOR and installing a subsequent process to then identify and transfer the loan records from the legitimate SOR to RCV1. The process could be disguised as a reporting process within the legitimate SOR and the data then loaded to the RCV1 repository on an ongoing basis undetected by federal regulators.

22.     Defendants inactivated federally related mortgage loans from their various SORs such as from the Mortgage Servicing Platform ("MSP") and Vendor Lending System ("VLS"). MSP is an SOR that "maintains up to date information… and is used by approximately 75% of the mortgage servicing industry"[3] for first lien mortgages. VLS is used to service home equity lines

---

[3] *In the Matter of Residential Mortgage Pleading and Document Irregularities*, Affidavit of Michael R. Zarro Constituting JPMorgan Chase Bank, N.A.'s and Chase Home Finance LLC's prima Facie Showing, *available at* http://www.judiciary.state.nj.us/superior/f_59553_10_jp_morgan/jp_morgan_2_of_21.pdf;
Exhibits to the Affidavit of Michael R. Zarro, Volume One *available at*
https://www.judiciary.state.nj.us/superior/f_59553_10_jp_morgan/jp_morgan_1_of_21.pdf

of credit in accordance with federal regulations. These systems of records allow Chase to ensure servicing guidelines are met by allowing maintenance and data reporting mechanisms within regulatory requirements. Chase houses its Recovery Unit as part of its Operations unit and it is charged with the collection processes for various lines of Defendant-owned debts, including Defendants' automobile financing and credit card debt, which do not have the same regulatory obligations as mortgages.

23.     RCV1's design and functionality does not meet any servicing standards or requirements under applicable federal, state, and local laws pertaining to mortgage servicing or consumer protection. Instead, the practices implemented by Defendants on the RCV1 population are focused on debt collection.

24.     Defendants seek to maximize revenue through a scheme of flagging, inactivating, and then illicitly housing charged-off problematic residential mortgage loans in the vacuum of RCV1, improperly converting these problematic residential mortgage loans into purely debt collection cases that are akin to bad credit card debt, and recklessly disregarding virtually all servicing obligations in the process. In order to maximize revenue, Defendants used unscrupulous collection methods on homeowners utilizing third-party collection agencies and deceptive sales tactics on unsuspecting note sale investors, all the while applying for governmental credits and feigning compliance with regulatory standards.

25.     In short, the RCV1 is where mortgage loans and associated borrowers are intentionally mishandled in such a manner that compliance with any regulatory requirements is impossible. In derogation of the RESPA, which requires mortgage servicers to correct account errors and disclose account information when a borrower sends a written request for information, the information for loans in RCV1 remains uncorrected and is sent as an inventory list from one

collection agency to another, progressively resulting in further degradation of the loan information. In dereliction of various regulations related to loan servicing, loans once in RCV1 are not verified individually and the identity of the true owner of the note per the Truth in Lending Act (TILA) is often concealed. Regulatory controls regarding grace periods, crediting funds properly, charging correct amounts are not followed.

26.    More specifically, a borrower sending a qualified written request under Section 6 of RESPA concerning the servicing of his/her loan or request for correction under 12 U.S.C. §2605(e), 12 CFR §1024.35 could not obtain resolution because RCV1 is a repository for housing debt rather than a platform for housing and servicing federally related loans. RCV1 contains no functionalities for accounting nor escrow management in contravention of §10 of RESPA, Regulation X, 12 CFR §1024.34. Borrowers whose loans are housed in RCV1 fail to receive any notices of transfer of loan servicing pursuant to Regulation X, 12 CFR §1024.33(b). Chase's inactivation of these loans in the regulated systems of records has allowed Chase to then make the technical argument that the loans are no longer federally related mortgage loans. In contravention of 12 CFR §1024.39, Chase failed to inform Borrowers whose loans were flagged, inactivated, and housed in RCV1, about the availability of loss mitigation options, and in contravention of 12 CFR §1024.40. Chase also failed to make available to each Borrower personnel assigned to him/her to apprise the Borrower of the actions the Borrower must take, status of any loss mitigation application, circumstances under which property would be referred to foreclosure, or applicable loss mitigation deadlines in careless disregard of any of the loss mitigation procedures under Reg X 12 CFR § 1024.41.

27.    Once a loan is placed in RCV1, there is no oversight, and the Recovery Department itself has explicitly stated that Defendants do not provide any loan modification programs to loans

housed in RCV1. Chase habitually "writes off" these problematic mortgage loans, avoiding costs inherent in servicing such as pre-foreclosure loss mitigation processes, foreclosure proceedings, and related property costs associated with acquisition of title. However, RCV1 allows Defendants a back door to continue generating revenue on the debt.

28.    Unbeknownst to Plaintiffs and regulatory agencies, Chase has systematically used RCV1 to park flagged loans inactivated in the MSP, VLS, and other customary SORs to (1) eschew Regulatory requirements while publicly assuring compliance, (2) request credits and insurance on the charge-offs., (3) continue collection, and (4) sell-off these problematic loans to unsuspecting investors to maximize profit/side-step liability, all with the end of maximizing profit.

29.    The Federal Housing Administration (FHA) found that between 2002 through February 2014, Chase concealed from FHA that the loans did not meet underwriting requirements, Chase stopped self-reporting on such FHA-insured loans to HUD. Chase then made insurance claims on those defaulted loans. That sole misconduct has been settled.[4]

**Specifics of Defendants' RICO Scheme and Conduct**

30.    Since at least 2000, Defendants evaded their legal obligations and liabilities with respect to the proper servicing of federally related mortgages, causing Plaintiffs damage through Defendants' misconduct from their scheme to violate:

- The Real Estate Settlement Procedures Act (RESPA);
- The Truth in Lending Act (TILA);
- The Federal Trade Commission Act (FTC);
- The Fair Debt Collection Practices Act (FDCPA);
- The Dodd Frank Wall Street Reform and Consumer Protection Act (Dodd-Frank);

---

[4] Kimberly Randall, Joint Civil Fraud Division, GAW *Final Civil Action Memorandum No: 2014-CF-1807 See also,* U.S. v JPMorgan, Dist. Court, SD New York 13 Civ. 0220, Stipulation and Order of Settlement and Dismissal Feb 4, 2014 *available at* https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/U.S.%20%20v%2C%20%20JPMorgan%2013%20Civ%20%200220%20--%20Executed%20Stipulation%20of%20Settlement%20and%20Judgment.pdf

- The Equal Credit Opportunity Act; and
- The Fair Housing Act.

31.    Defendants' unsafe and unsound practices related to mortgage servicing have been

the focus of several consent orders issued by its "Prudential Regulators," including:

- the Comptroller of the Currency (OCC);
- the Board of Governors of the Federal Reserve Board (FRB);
- the Federal Deposit Insurance Corporation (FDIC);
- the Securities and Exchange Commission (SEC); and
- the Consumer Financial Protection Bureau (CFPB).

32.    After years of federal scrutiny and concomitant lawsuits condemning the unfair

mortgage practices of various national banks including Defendants, the United States Department

of Justice ("DOJ") and state governments entered into certain consent orders, settlements and

agreements with Defendants, including but not limited to the National Mortgage Settlement

Agreement ("NMSA") in 2012 and the Residential Mortgage Backed Security Settlement

("RMBS") in 2013 (the "Lender Settlements").

33.    As part of their continued misconduct to evade scrutiny of their illegal mortgage

practices beginning in at least 2000, Defendants sought to hide their defective mortgage loans from

state and federal agencies by charging them off and transferring them to a hidden set of records

(RCV1) and then offloading them on Plaintiffs and other unwitting investors beginning in 2003

and continuing to do through at least 2009.

34.    After Plaintiffs acquired mortgage loans from Defendants, during the period 2011

through at least 2016, Defendants released thousands of liens related to RCV1 loans, including

RCV1 loans Defendants no longer owned, to avoid detection of non-compliance with the Lender

Settlements.   These lien releases caused harm to the Plaintiffs and to numerous other note sale

investors.

**Scheme to Sell Illegally Non-Serviced Loans to Plaintiffs and Others**

35.    Though Defendants have regularly rid themselves of loans from RCV1 since 2000,
Defendants' need to shed the loans in the RCV1 became more pronounced after Chase acquired
EMC Mortgage Corporation and Bear Stearns Companies LLC (collectively, "EMC") and
WAMU- Henderson in 2008. In September 2008, the Federal Trade Commission ("FTC") filed a
complaint against EMC asserting improper residential lending and loan servicing practices. To
settle the charges, EMC ultimately agreed to pay $28 million, abide by servicing and foreclosure
standards, and establish and maintain a comprehensive data integrity program. Though the FTC's
complaint stated that the alleged activities predated Chase's acquisition of EMC, Chase realized
that it had been, and was still, engaging in similar large scale mishandling of its own mortgage
loans and was therefore exposed to significant potential liability. [5]

36.    Similarly, in September 2008, Chase Bank entered into an agreement with the FDIC
as receiver for WAMU-Henderson. Chase Bank made a number of representations in its agreement
with the FDIC, including that Chase Bank and its subsidiaries were in compliance with all
applicable federal, state and local laws. However, at the time of execution and delivery of the
agreement, Chase owned thousands of loans with respect to which, through its improper servicing
and other misconduct relating to the RCV1, it was in violation of many federal and state laws.
These circumstances created a further motive for Chase Bank to participate in the scheme to
transfer thousands of noncompliant loans to Plaintiffs and others. [6]

**2008 and 2009 Legislation Compounds Chase's Problems; HAMP and MHA**

37.    Moreover, Chase has sought to, and still seeks to, benefit from incentive payments

---

[5] https://www.ftc.gov/news-events/press-releases/2008/09/bear-stearns-and-emc-mortgage-pay-28-million-settle-ftc-charges
[6] https://www.fdic.gov/about/freedom/Washington_Mutual_P_and_A.pdf

bank would release liens on all of their charged off second lien portfolio, whether they would forgive debt at the time of a lien release or continue collecting on the loan, and the procedures for lien releasing first mortgages in abandoned low value blighted properties. Such joint discussions allowing the banks to determine what was compliance under the Settlements was in derogation of the duty of the Monitor and the Professionals to maintain their independence. The Monitor and his Professionals provided illusory insurance of compliance with the Settlements: in reality, they were in the pockets of all of these banks since their compensation was solely provided by the parties they were supposed to be watching.

88.    Other knowing participants in the conspiracy include third party title clearing agencies, such as Nationwide Title Clearing Company (NTC), Pierson Patterson, and LCS Financial Services, who were directed by Defendants to prepare and then file fraudulent lien releases and other documents affecting interests in property. Either these entities were hired to verify liens and successively failed to properly validate the liens before creating documents and lien releases containing false information, or these entities were directed by Chase to create the documents with the information provided by Defendants. In either case, these title clearing agencies which recorded fraudulent releases of liens and related documents in the public record, had independent and separate duty from Defendants to file, under various state laws, all relevant documents only after a good faith proper validation of the liens. Instead these entities deliberately violated their duty of care by knowingly or recklessly filing false lien releases and false documents on properties not owned by Defendants.

89.    In many states, the act of creating these documents is considered the unauthorized practice of law. In Florida, where NTC is organized, there is a small exception for title companies who are only permitted to prepare documents and perform other necessary acts affecting the legal

c.    *Chase sold MRS loans it did not own*

156. Despite its representation and warranty that Chase "is the owner of the Mortgage Loans and has full right to transfer the Mortgage Loans," a significant portion of the loans listed on Exhibit A were not directly owned by Chase.

157. Upon information and belief, some of the loans sold to MRS were RMBS trust loans which Chase was servicing. Chase had transferred these to MRS in order to avoid non-reimbursable advances and expenses. The unlawful transfer of these loans to MRS as part of the portfolio of loans sold under the MLPA aided the Defendants in concealing Regulatory non-compliance and fraud while increasing the liabilities of MRS.

158. When Schneider discovered this, he immediately reported it to Chase.

159. Chase refused to take any action to remedy this breach.

d.    *Chase failed to comply with applicable law*

160. Contrary to its representation and warranty that "Each Mortgage Loan complies in all material respects with all applicable federal, state, or local laws," MRS discovered that Chase had failed to comply with nearly all such laws. MRS later discovered that Chase's desire to escape the consequences of its long-running violations was the primary motivation for Chase to off-load these loans onto MRS.

161. Chase committed, *inter alia*, the following violations of law with respect to the loans sold to MRS:

a.    Chase transferred the servicing of the mortgage loans to and from multiple unlicensed and unregulated debt collection agencies which lacked the mortgage servicing platforms to account for or service the borrowers' loan with any accuracy or integrity.

b.    Chase knowingly provided collection agencies with false and misleading information about the borrowers.

c.    Chase failed to provide proper record keeping for escrow accounts.

d.    Chase stripped loan files of most origination documentation, including federal disclosures and good faith estimates, thus putting MRS in a position where it was unable to respond to borrower or regulatory inquiries.

e.    Chase failed to provide any accurate borrower payment histories for any of the loans in the MLPA.

f.    Chase knowingly executed assignments of mortgage to MRS for mortgage loans that Defendants knew had been foreclosed and sold to third parties.

g.    Chase circumvented its own operating procedures and written policies in connection with servicing federally-related mortgage loans by removing the loans from its primary record-keeping platform and creating an entry in its RCV1 repository. This had the effect of denying the borrowers their rights concerning federally related mortgages yet allowed Chase to retain the lien and the benefit of the security interest,

h.    Chase included on Exhibit A loans that it had previously sold to third parties and loans that it had never owned.

i.    Chase knowingly and deliberately changed the loan numbers of numerous valuable loans sold to MRS after the MLPA had been fully executed and in force. This allowed Chase to accept payments from borrowers whose loans had been sold to MRS without its own records disclosing the wrongful acceptance of such payments.

*e. Chase misrepresented the quantity and value of sold loans*

162. The MLPA specifies that Chase sold to MRS 3,259 closed-end first lien mortgage loans with a total principal balance of $156,324,613.80 as set forth on Exhibit A.

163. However, Exhibit A shows different amounts owed for the same loan.

164. MRS has attempted to painstakingly reconcile the information on the corrupted Exhibit A to determine the correct information for loans it was to have purchased and to date, Defendants have not provided full information on all the loans that it purchased.

*f. Chase misrepresented the principal balance of the sold loans*

The MLPA states that the aggregate principal balance of the sold loans was $156,324,613.80 as set forth on the corrupted Exhibit A Chase provided. However, the Corrupted List totaling $156,324,613.80 did not reveal the principal balance of each loan. Instead, it listed the amount Chase charged off, which included the principal balance, the unpaid interest, late fees, property tax advances, and customary default servicing fees.

*g. Chase failed to provide MRS with assignments of the notes and mortgages*

165. Chase breached the MLPA, and exercised exclusive control of the loans purportedly sold to Plaintiffs, by failing to provide MRS with assignments of the notes and mortgages for each of the loans listed on Exhibit A.

166. By refusing to provide assignments of the notes and mortgages, Chase prevented MRS from realizing the value of the purchased loans, and allowed Chase to offload the loans when it was convenient for them to do so.

167. Chase's failure to provide the assignments of the notes and mortgages was not an act of negligence. As events unfolded, it became clear that Chase failed to provide the assignments of the notes and mortgages because it wanted, in selective instances, to continue to treat the sold loans as its own property.

*h.    Chase converted payments from borrowers whose loans it had sold*

168.    On December 19, 2009, Solomon emailed Schneider informing him of Payments

due to the MRS Sale, stating in pertinent part:

> *I have pulled a report of the pmts due to you since the Feb sale. There are issues due to*
> *dupe acct # project or something Larry Sandra says you know about? So some of these*
> *accts your groups can't find under certain acct #'s because we changed them???*
> *Anyway. I'm going thru to see what is valid and what is not - I will send updates as I*
> *know. For your benefit, I'm going thru the largest pmts first to get them going. Here is*
> *your first one I just ordered  ACCOUNT NUMBER . 19044379   XXXXXX    $20,000*
> *pmt on 5/26/09, this was a settlement negotiated.* [Borrower Name Redacted by Plaintiff]

169.    On December 19 2009, Chase employee, Solomon, sent a list of payments which

she claimed were owed to MRS which included for example:

- Jimmy Bell 2,500.00 for payments received between February and September 2009
- Randolph Johnson $3,350.00 for payments from April through December 2009
- Millie Arnold $3,565.36 for a payment on May 2009
- Litteton Organ $1,259.30 for payment on May 2009
- Ryan Fisher $1,023.10 for payment on May 2009
- James Piester $1,576.70 for April 2009
- Ida Smith for $320.00 for payment February 18, 2009
- Angela Overdorf $337.00 for payments in February 2009
- Sandra Tynan $500.00 for payment on March 2, 2009
- Cindel Phillips $4,426.65 for payment March through November 2009
- Judith Sanders $4,600 for payments March through October 2009
- David Wisenbaugh $4,237.42 for payments February through August 2009

170.    However, on December 29, 2009, Solomon emailed Schneider informing him that

some payments would not be coming because a code was changed and it was "not reversible."

171.    Specifically, according to the December 19, 2009 email, MRS was to expect a

$20,000.00 payment for a settlement which Defendants negotiated with the buyer on the loan sold

to and owned by MRS, without MRS' knowledge.  Defendants chose to keep the monies due MRS

and changed the coding to "Corporate Advance", effectively converting the proceeds and

interfering with the possessory rights of MRS.

# Exhibit J

# CHAITMAN LLP
### 465 PARK AVENUE
### NEW YORK, NY 10022
### (888) 759-1114
TELEPHONE & FAX

*SUZAN ARDEN*
*sarden@chaitmanllp.com*

March 1, 2016

**VIA EMAIL AND UPS**

Christian Pistilli, Esq.
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956

> **Re:** **Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.,** *et al.*
> **Civil Action No. 15-CV-293 (LTS) (JCF)**

Dear Chris:

This letter is Plaintiffs' first step in the meet and confer process regarding our review of Defendants' Objections and Responses to Plaintiffs' First Request for the Production of Documents to All Defendants (the "Responses"), which we received from you on February 24, 2016.

The Responses are unsatisfactory and do not come close to meeting Defendants' obligations under the Federal Rules of Civil Procedure or otherwise. The problems with the Responses are so large on a global scale that it is virtually impossible to tell what categories of documents your clients are intending to withhold and for what reasons. Accordingly, Plaintiffs request a 30(b)(6) deposition, prior to document discovery, of a representative of Defendants who can testify to the contents of the various files and location of the categories of requested documents. This is vital so that Plaintiffs can understand the full impact of Defendants' refusal to produce documents outside of those to be found in the files of 8 people, locatable by 11 search terms (eight of which terms are mere variations of Plaintiffs' names.) The following is a non-exclusive list of global problems which render Chase's responses impenetrable.

Our first global objection impacts every issue of the case and makes your discovery responses largely incoherent in terms of what documents will be produced and what will be withheld. It appears that, no matter how relevant the document sought, if it cannot be found within the electronic files of the eight persons listed on your Appendix A, and does not contain one of the eleven terms on Appendix B, Chase will not even search for it, let alone produce it. This is grossly unreasonable for many reasons, not least because it simply cannot be determined what documents are in those files and what documents are not. Moreover, the vast majority of the documents we have requested are unlikely to include a version of Plaintiffs' names, which comprise eight out of the eleven terms you have agreed to search.

{00018853 1 }

# CHAITMAN LLP

Christian Pistilli, Esq.
Civil Action No. 15-CV-293 (LTS) (JCF)
March 1, 2016
2

Similarly, in General Objection Number 2, you have stated that Chase objects to each request on the grounds that they might seek "electronic information from sources that are not reasonably accessible because of undue burden or cost." What sources? What is the undue burden or cost and why is that burden or cost "undue" in each particular case? Which requests does this apply to? We simply cannot tell.

Our second global objection is that Chase has completely ignored the Court's instructions to co-ordinate the discovery in this action with discovery in the *qui tam* case pending in the District of Columbia, now captioned *United States of America et al ex rel. Lawrence Schneider v. J.P. Morgan Chase Bank, National Association, et al.*, 114-CV-01047-RMC (the "*qui tam* Case"). Both in the Initial Pre-Trial Order and in the Court's decision denying Defendants' motion to transfer (Docket 75), the Court ordered the parties to coordinate discovery with the *qui tam* Case to avoid duplication, both in terms of the production of documents and in terms of depositions.

As you know, discovery is not yet under way in the *qui tam* Case. We anticipate that if a witness is deposed first in this case, Defendants will argue that this witness cannot be re-deposed in the *qui tam* Case. If the parties are generally to coordinate depositions to ensure that they are not duplicated, it is of course essential to ensure that the parties have access to all the documents they will need in order to prepare. In fact, Defendants have themselves requested, in their initial document demands, among other things, that Plaintiffs produce documents that are applicable to the *qui tam* Case, such as all documents that Plaintiffs have already provided to the Government.

Many of your General Objections appear to be directed toward resisting the production of documents that are also relevant in the *qui tam* Case although once again we cannot tell what documents you are intending to withhold or why the objection should apply. For example, in General Objection Number 4, you state that Chase objects to production that is "not proportional to the needs of the case, considering the importance of the issues at stake in this action, the amount in controversy, the parties' relative access to relevant information, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Given that Chase clearly has far more access to the relevant information than do Plaintiffs, your blanket refusal to produce any material pursuant to this objection completely dismisses the Court's instructions to co-ordinate discovery.

Our third global objection relates to definitions of Chase. In General Objection Number 10, you object to our Definition Number 5 of "You" "Your" and "Chase" as "overly broad" and refuse to apply it as written. This definition was taken word for word from your definition of "You" and "Your" in Instruction 5 in the document requests Chase served on Plaintiffs in December. What documents are you withholding based on this re-definition and why is it acceptable in Chase's requests but not in Plaintiffs'?

# CHAITMAN LLP

Christian Pistilli, Esq.
Civil Action No. 15-CV-293 (LTS) (JCF)
March 1, 2016
3

Our fourth objection relates to Chase's refusal to provide certain responsive documents to Requests 16, 17, 18, 21 unless Plaintiffs first provide to Chase a list of loan numbers for "loans allegedly purchased by Chase." You then provide Chase with an arbitrary and apparently unreviewable ability to "determine[ ] that a given loan was not purchased by Plaintiffs" before you will agree to query what Chase unilaterally determines is the "appropriate database(s)."

As Chase is aware, among the allegations Plaintiffs have made is that Chase failed to meet its obligation to provide Plaintiffs with a proper Exhibit A to the MLPA (e.g. TAC ¶¶ 46-49; 61-63), sought to recall some loans (e.g. TAC ¶ 71-74), and changed the loan numbers of particular loans (e.g. TAC ¶ 86-87). It is Chase's obligation to provide the list of loan numbers that it believes it sold to Plaintiffs, not the reverse.

As you know, we have agreed upon a relatively short time frame to conduct fact discovery. In order to be able to move forward, and so that we can reasonably present all ripe document disputes to the Court promptly, we would like to schedule the 30(b)(6) deposition shortly, ideally within the next three weeks. Please advise what dates would be most convenient.

Very truly yours,

*/s/ Suzan Arden*

Suzan Arden

SA/sh

cc:    Robert Wick, Esq. (via email and UPS)
       Michael Maya, Esq. (via email)

{00018853 1 }

# Exhibit K

# COVINGTON

BEIJING  BRUSSELS  LONDON  LOS ANGELES
NEW YORK  SAN FRANCISCO  SEOUL
SHANGHAI  SILICON VALLEY  WASHINGTON

Christian J. Pistilli

Covington & Burling LLP
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
T  +1 202 662 5342
cpistilli@cov.com

March 16, 2016

**VIA EMAIL**

Suzan Arden, Esq.
Chaitman LLP
465 Park Ave.
New York, NY 10022
sarden@chaitmanllp.com

Re:    *S&A Capital Partners, Inc., et al. v. JPMorgan Chase Bank, N.A., et al.,*
       *No. 15-cv-00293-LTS-JCF (S.D.N.Y.)*

Dear Suzy:

I write on behalf of Defendants in response to your letter dated March 1, 2016, regarding Defendants' Objections and Responses to Plaintiffs' First Request for the Production of Documents to All Defendants, served on February 24, 2016 (the "Responses").

You request a Rule 30(b)(6) deposition of a representative of Defendants sometime this month. As you are aware, on February 23, 2016, the Court entered a scheduling order specifying that "[n]o deposition discovery may be taken before April 15, 2016." If and when you notice a Rule 30(b)(6) deposition that complies with the Court's scheduling order, we will respond.

Your letter also objects to the fact that, in response to certain requests, Defendants intend to search only the electronic files of those custodians who have a material connection to the well-pleaded allegations in the Complaint. As you are aware, Chase has tens of thousands of employees. All but a few of these employees have nothing to do with Plaintiffs or their claims in this lawsuit. Under these circumstances, it is both necessary and appropriate to limit the scope of electronic discovery to those custodians who are likely to be in the possession of non-cumulative, responsive materials. We believe that the list of custodians provided in our response fulfills our obligations under Rule 26. However, we would be happy to discuss with you whether there are other custodians who are likely to possess non-cumulative documents relevant to Plaintiffs' breach of contract claims.

You also appear to object to our use of search terms. However, the eight custodians listed in our document responses collectively had over 3.5 million electronic documents between them (during the time-period set forth in Appendix A to our responses). Especially under these

**COVINGTON**

Page 2

circumstances, the use of search terms to isolate potentially responsive documents is entirely appropriate. We believe that the list of search terms provided in Appendix B of our Responses fulfills our obligations under Rule 26. However, we would be happy to discuss with you whether there are other practicable search terms relevant to Plaintiffs' breach of contract claims that could be added.

You next object to the fact that Defendants have not agreed to produce documents that are relevant only to claims made by Relator Lawrence Schneider in a separate action entitled, *United States of America et al ex rel. Lawrence Schneider v. J.P. Morgan Chase Bank, National Association, et al.*, 114-CV-01047-RMC (the "*qui tam* Case"). We flatly disagree with any assertion that the pendency of the *qui tam* Case in any way entitles Plaintiffs to *greater* document discovery in this case than would otherwise be appropriate under Rule 26, especially given that Chase has moved to dismiss all claims asserted in the *qui tam* Case.

Your letter also objects to Defendants' Responses to Requests 16, 17, 18, and 21. In those responses, Defendants commit to provide Plaintiffs with responsive information regarding loans purchased by Plaintiffs from Chase. In order for Chase to do so, however, Plaintiffs must first provide Chase with the loan numbers for the loans they purchased. Notably, your letter does not suggest that Plaintiffs are unable to do so with more than minimal burden. By contrast, it is impossible for Chase to provide loan-specific data like that sought in Requests 16, 17, 18, and 21, without a loan number, and there is no remotely feasible way for Chase to compile a list of loans numbers for loans that were purchased by Plaintiffs from Chase.

Finally, you take issue with Defendants' General Objection to Plaintiffs' definitions of "You," "Your," and "Chase" in the Requests. While we disagree that your complaint has any merit, we are happy to clarify that no documents have been withheld on the basis of that objection.

Sincerely,

Chris Pistilli

cc:    Robert D. Wick, Esq.
       Helen Davis Chaitman, Esq.
       Lance Gotthoffer, Esq.

# Exhibit L

# CHAITMAN LLP
### 465 PARK AVENUE
### NEW YORK, NY 10022
### (888) 759-1114
TELEPHONE & FAX

*SUZAN ARDEN*
*sarden@chaitmanllp.com*

April 20, 2016

**Via Email and Regular Mail**

Christian Pistilli, Esq.
Covington & Burling LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956

      **Re:**    **Mortgage Resolution Servicing, LLC v. JPMorgan Chase Bank, N.A.,** *et al.*
               **Civil Action No. 15-CV-293 (LTS) (JCF)**

Dear Chris:

      This letter responds to yours, dated March 16, 2016, with regard to Defendants' Objections and Responses to Plaintiffs' First Request for the Production of Documents to All Defendants (the "Responses"), which we received from you on February 24, 2016.

      As we explained in my letter dated March 1, 2016, the Responses are unsatisfactory and do not come close to meeting Defendants' obligations under the Federal Rules of Civil Procedure or otherwise.

      First, with regard to your insistence that Plaintiffs "must first provide Chase with the loan numbers for the loans they purchased," it is nonsense for Chase to claim that it does not know what loans it sold. Chase had the obligation to provide Plaintiffs with a proper Exhibit A to the MLPA. As such, it was Chase who had the obligation to provide Plaintiffs with a list of the loans that were encompassed within the MLPA, not Plaintiffs. Further, our clients have on several occasions outside of this lawsuit provided your clients with a list of loans. As such, Chase is certainly well aware of the loans that it sold and the discovery that it is required to make.

      Moreover, it is unconscionable for Chase to contend, as it does in the Responses that, once Plaintiffs provide a complete list of loans that Chase sold it, Chase may still arbitrarily and apparently unreviewably "determine[ ] that a given loan was not purchased by Plaintiffs" before you will agree to query what Chase unilaterally determines is the "appropriate database(s)." This is unacceptable. At a minimum, your clients must provide the requested discovery on all of the loans that our clients have previously identified.

# CHAITMAN LLP

Christian Pistilli, Esq.
April 20, 2016
Page 2

Second, as we have already stated, you have provided a very limited list of custodians and potential search terms. Your agreement to "discuss with us" whether there are other custodians and search terms that could elicit responsive materials is insufficient. We do not know the scope of the custodians' files, the locations your clients store responsive documents, or the methods and expense of conducting searches. Accordingly, we enclose a Rule 30(b)(6) deposition notice that will allow us to explore these areas. Please advise us who your clients will produce for this deposition.

Third, it is clear from your letter that we are at an impasse regarding the scope of discovery. Your refusal to contemplate producing any documents beyond what you consider to be the scope of the breach of contract claims in this case is unacceptable. There has been no stay of discovery in either this case or in the *qui tam* case pending in the District of Columbia, now captioned *United States of America et al ex rel. Lawrence Schneider v. J.P. Morgan Chase Bank, National Association, et al.*, 1 14-CV-01047-RMC (the "*qui tam* Case").

Moreover, you do not articulate how the documents requested (or, indeed, which documents, relate only to the *qui tam* Case, neither do you provide any articulable basis for doing so. You do not dispute that if a witness is deposed first in this case, Defendants will argue that this witness cannot be re-deposed in the *qui tam* Case. If the parties are generally to coordinate depositions to ensure that they are not duplicated, it is of course essential to ensure that the parties have access to all the documents they will need in order to prepare. Moreover, at a minimum, Chase opened the door to production of such documents with Defendants' own request, in their initial document demands, among other things, that Plaintiffs produce documents that are applicable to the *qui tam* Case, such as all documents that Plaintiffs have already provided to the Government.

Finally, we have not received a date from you on which you will commence producing those documents that you do not contest. Even though there are substantial issues to be resolved, we have limited time to conduct fact discovery and there is no reason to delay production of the documents your client has agreed to produce without dispute.

I look forward to hearing from you shortly with regard to these issues, and am available to conduct the next stage in our meet and confer process by telephone on most days this and next week.

Very truly yours,

Suzan Arden

SA:leb

cc:    Robert Wick, Esq.
       Michael Maya, Esq.

{00019530 1 }

# Exhibit M

**From:** Pistilli, Christian
**Sent:** Friday, May 13, 2016 5:32 PM
**To:** 'Suzan Arden'
**Cc:** Maya, Michael
**Subject:** MRS v. Chase

Suzy,

This is to follow up on our meet-and-confer call yesterday regarding discovery and other issues in the MRS case.

1. We told you that Chase is prepared to produce substantially all of the documents it has committed to producing within one week of the entry of an appropriate protective order. You agreed to provide us with a mark-up to Chase's proposed protective order, so that we can determine whether the parties can reach an agreement on its terms.

2. As you know, Chase has offered to provide plaintiff with information from Chase databases regarding loans that plaintiff purchased from Chase if/when plaintiffs provides Chase with a list of loan numbers. To date, plaintiffs have not provided a list of loan numbers to Chase for purposes of beginning that process. In our call, you referenced Exhibits 1 and 2 of the amended complaint. We have reviewed those exhibits, and they do not include loan numbers. Chase remains ready to begin the process of collecting data regarding the loans at issue in this case promptly upon receipt from plaintiffs of a list of loan numbers.

3. You also objected to what you termed Chase's unilateral ability to withhold loan-related data in the event that a loan was not actually sold to plaintiffs by Chase. We suggested that this issue would be best resolved through the meet-and-confer process, if and when an issue arises as to whether plaintiffs are entitled to data for a particular loan. Chase has every intention of producing relevant, reasonably available loan data for loans that are at issue in this litigation. However, Chase needs to have some ability to confirm that a loan has a nexus to this case before it can provide that customer data to plaintiffs. We do not expect this to be a major issue in practice, and again suggest that any issues would be best resolved by meeting and conferring regarding any loans for which there is a disagreement.

4. You will let us know whether plaintiffs agree to move forward with the depositions of Ms. Solomon and Mr. Boyle in Phoenix, where they live and work. If and when we hear from you that the depositions will go forward in Phoenix, we will work to identify deposition dates. If you do not agree to go forward in Phoenix, the court will need to resolve the deposition location issue before we can discuss dates.

5. Chase believes that the email collection and production protocol outlined in its responses to plaintiffs' document requests fully satisfies its obligations under Rule 26. That said, Chase remains willing to meet and confer regarding additional custodians or search terms that plaintiffs believe are appropriate. You did not propose any additional search terms or custodians in our call.

6. Unless substantially modified, we told you that Chase intends to seek a protective order regarding plaintiffs' 30(b)(6) notice. The notice, among other things, is vague, overbroad, unduly burdensome, seeks information

not relevant to plaintiffs' claims, and does not specify the topics for examination with reasonable particularity. You asked us to tell you in writing the topics to which Chase does not object. We will send you a response on that after conferring with our client.

7. We discussed the deadline in the scheduling order to begin settlement talks with the Magistrate. We propose a joint letter to the court seeking to re-set that deadline to sometime in September. Please let us know if you agree.

We look forward to your response.

Regards,

**Christian Pistilli**

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5342 | cpistilli@cov.com
www.cov.com

# COVINGTON

This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

# Exhibit N

-----Original Message-----
From: Suzan Arden [mailto:sarden@chaitmanllp.com]
Sent: Friday, May 20, 2016 5:43 PM
To: Pistilli, Christian
Cc: Helen Chaitman; Lance Gotthoffer; Brent Tantillo
Subject: RE: MRS v. Chase

Chris:

Further to your email below and to our telephone conversation yesterday afternoon:

1. I understand from our discussions that Chase's intention to produce documents subject to a protective order does not encompass all documents, merely those to which Chase has raised no objections. We do not believe that a protective order is necessary or appropriate beyond the scope of information that would otherwise be protected by law, or potentially to cover personally intimate material (although this would only include matters that are truly personal, and not related to any form of business dealings or personal embarrassment that might result from revelations about such business dealings). We have attached a redlined version of your protective order that encompasses those provisions we find acceptable.

2. Your offer to provide Plaintiffs with "information from Chase databases regarding loans that plaintiff purchased from Chase" does not comply with your discovery obligations. You will note that our requests require the production of a variety of information regarding loans, many of which seek information regarding loans set forth on the "Corrupted List" as defined in the TAC (Requests 16-18, 21). Other requests seek loan information regarding all of the loans about which Chase sent debt forgiveness letters (Request 28) and the loans regarding which Chase released liens pursuant to the Post DoJ Lien Release Project (Request 31) . By definition, these do not require a list of loan numbers from the Plaintiffs.

Accordingly, to the extent Plaintiffs have lists of loans available, as with those attached to the TAC, these consist of names, properties, etc. and, most importantly, borrowers' social security numbers. Our claims include allegations that Chase changed certain loan numbers and otherwise did not provide full and complete lists of loans to the Plaintiffs. Chase has acknowledged that it changed certain account numbers, particularly with respect to the loans encompassed in the sale to MRS. As such, even to the extent that Plaintiffs have a list of loan numbers, it would not necessarily pull up all the relevant loans in Chase's databases, due to Chase's actions. We are therefore providing Chase with the social security numbers of the borrowers, as Chase provided them to us, across all the loans, broken out by First Fidelity, S&A Capital, and MRS. Some are partial lists. With respect to the MRS loans, we are providing you with the same list that Eddie Guerrero provided to the Plaintiffs. Chase's should be able to identify the loans from these lists. They are attached. Please advise asap whether you are willing to work with these lists.

1

3. Your statement is hedged in by caveats such as "relevant, reasonably available loan data for loans that are at issue in this litigation." Moreover, to the extent that the ownership of a loan is in dispute, as where the Plaintiffs contend that Chase sold it to them and Chase contends it did not, those loans are very much the subject of this lawsuit. It is therefore mandatory that information regarding those loans be produced.

4. The depositions can be conducted in Phoenix. This is not a waiver of any of Plaintiffs' rights with regard to the location of other depositions.

5. We disagree regarding the email collection and production protocol. We provided a list of custodians and search terms as part of our document demands. We maintain that there are multiple other custodians whose records should be searched and that the appropriate searches should include a much broader area than the very few custodians and terms that you propose. We may be able to make more progress on this issue when we have resolved the question of the scope of discovery.

6. We look forward to receiving your statement regarding what part of the 30(b)(6) notice you deem appropriate. We agree that it makes sense to discuss this with you further so we will set the date for the protective order for June 17 to allow those discussions to play out.

7. We agree that the parties should contact Judge Francis regarding meeting dates. We do not agree that this should be put off until September, since at this point fact discovery is scheduled to close on or around that time. July would be more appropriate.

When we spoke yesterday afternoon, we acknowledged that the question of the scope of discovery will most likely have to be resolved by the Court. We will discuss briefing schedules for a motion and, as necessary, cross-motions.

Suzy

Suzan Arden
Chaitman LLP
465 Park Avenue
New York, New York 10022
sarden@chaitmanllp.com
Phone: (888) 759-1114

_____

From: Pistilli, Christian [cpistilli@cov.com]
Sent: Friday, May 13, 2016 5:32 PM
To: Suzan Arden
Cc: Maya, Michael
Subject: MRS v. Chase

Suzy,

This is to follow up on our meet-and-confer call yesterday regarding discovery and other issues in the MRS case.

1. We told you that Chase is prepared to produce substantially all of the documents it has committed to producing within one week of the entry of an appropriate protective order. You agreed to provide us with a mark-up to Chase's proposed protective order, so that we can determine whether the parties can reach an agreement on its terms.

2. As you know, Chase has offered to provide plaintiff with information from Chase databases regarding loans that plaintiff purchased from Chase if/when plaintiffs provides Chase with a list of loan numbers. To date, plaintiffs have not provided a list of loan numbers to Chase for purposes of beginning that process. In our call, you referenced Exhibits 1 and 2 of the amended complaint. We have reviewed those exhibits, and they do not include loan numbers. Chase

remains ready to begin the process of collecting data regarding the loans at issue in this case promptly upon receipt from plaintiffs of a list of loan numbers.

3. You also objected to what you termed Chase's unilateral ability to withhold loan-related data in the event that a loan was not actually sold to plaintiffs by Chase. We suggested that this issue would be best resolved through the meet-and-confer process, if and when an issue arises as to whether plaintiffs are entitled to data for a particular loan. Chase has every intention of producing relevant, reasonably available loan data for loans that are at issue in this litigation. However, Chase needs to have some ability to confirm that a loan has a nexus to this case before it can provide that customer data to plaintiffs. We do not expect this to be a major issue in practice, and again suggest that any issues would be best resolved by meeting and conferring regarding any loans for which there is a disagreement.

4. You will let us know whether plaintiffs agree to move forward with the depositions of Ms. Solomon and Mr. Boyle in Phoenix, where they live and work. If and when we hear from you that the depositions will go forward in Phoenix, we will work to identify deposition dates. If you do not agree to go forward in Phoenix, the court will need to resolve the deposition location issue before we can discuss dates.

5. Chase believes that the email collection and production protocol outlined in its responses to plaintiffs' document requests fully satisfies its obligations under Rule 26. That said, Chase remains willing to meet and confer regarding additional custodians or search terms that plaintiffs believe are appropriate. You did not propose any additional search terms or custodians in our call.

6. Unless substantially modified, we told you that Chase intends to seek a protective order regarding plaintiffs' 30(b)(6) notice. The notice, among other things, is vague, overbroad, unduly burdensome, seeks information not relevant to plaintiffs' claims, and does not specify the topics for examination with reasonable particularity. You asked us to tell you in writing the topics to which Chase does not object. We will send you a response on that after conferring with our client.

7. We discussed the deadline in the scheduling order to begin settlement talks with the Magistrate. We propose a joint letter to the court seeking to re-set that deadline to sometime in September. Please let us know if you agree.

We look forward to your response.

Regards,

Christian Pistilli

Covington & Burling LLP
One CityCenter, 850 Tenth Street, NW
Washington, DC 20001-4956
T +1 202 662 5342 | cpistilli@cov.com
www.cov.com

[cid:image001.png@01D1AD24.73A92D70]
This message is from a law firm and may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply e-mail that this message has been inadvertently transmitted to you and delete this e-mail from your system. Thank you for your cooperation.

# EXHIBIT 8



# FAX COVER SHEET
## DIVISION OF FINANCIAL REGULATION

To:   Caroline Iacino

From:  Marcia Tonkins
       Financial Examiner

Of:   1st Fidelity Loan Servicing

Of:    Division of Financial Regulation

Phone:

Phone: 410 230-6393

Fax:   561 893 9808

Fax:   410-333-3866 or
       410-333-0475

Pages (Including Cover Sheet):

Date:  December 12, 2012

E-mail: mtonkins@dllr.state.md.us

Subject: Robert and Laurie Warwick
         Complaint# M 13 1150

COMMENTS---Please review this complaint and respond in writing by December 14, 2012.  It is our understanding that Chase Home Finance cancelled this loan.  Therefore, why is 1st Fidelity Loan Servicing collecting on this debt?  Please cease all foreclosure activities until we have completed our investigation.

CONFIDENTIALITY NOTICE

THE INFORMATION IN THIS TRANSMISSION IS INTENDED ONLY FOR THE INDIVIDUAL NAMED ABOVE. IT MAY BE LEGALLY PRIVILEGED AND CONFIDENTIAL. IF YOU HAVE RECEIVED THIS INFORMATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY AND SEND THE ORIGINAL TRANSMISSION TO US BY MAIL. RETURN POSTAGE IS GUARANTEED. IF THE READER OF THIS MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY DISCRIMINATION, DISCLOSURE, DISTRIBUTION AND/OR COPYING OF THIS COMMUNICATION OR ITS CONTENT ARE STRICTLY PROHIBITED.

PHONE: 410.230.6100 • FAX: 410.333.3866/410.333.0475 • TTY USERS, CALL VIA THE MARYLAND RELAY SERVICE
Toll Free: 1-888-784-0136 • WWW.DLLR.STATE.MD.US/FINANCE • E-mail: FINREG@DLLR.STATE.MD.US

MARTIN O'MALLEY, GOVERNOR  •  ANTHONY G. BROWN, LT. GOVERNOR  •  LEONARD J. HOWIE III, SECRETARY

.maryland.gov | Facebook.com /DLLR.Maryland | Twitter @MD_DLLR

---

**om:** Jones, Kristin [mailto:kristin.jones@mlis.state.md.us]
**Sent:** Friday, November 30, 2012 5:45 PM
**To:** Anne B. Norton
**Subject:** Warwick - mortgage issue

Anne – Thank you again for your willingness to help navigate mortgage issues for the Rob & Laurie Warwick.   I've
attached a few relevant documents. Obviously there are many more but I tried to include communications from both
Chase and First Fidelity.   Specifically, I included the (1) notice from Chase indicating that their debt has been cancelled;
(2) followed by an email from someone at S&A Partners / 1ˢᵗ Fidelity Loan Servicing LLC informing Laurie that "upper
management" at Chase has decided that they will not be honoring their letter of cancellation. She indicates that
someone from Chase would call the Warwicks and confirm that – something that never happened; (3) followed by
another email from same individual at 1ˢᵗ Fidelity indicating that if the do not receive at least 2 payments by December
5, 2012 they will initiate foreclosure proceedings; (4) followed by a 2009 "notification of loan transfer" from 1ˢᵗ Fidelity
indicating that they had purchased the Warwick's loan from Chase; and (5) followed by a 2009 letter indicating their
payment arrangement.

I'm afraid based on the notification of loan transfer that Chase sold their loan some years ago.   Even so, why would
Chase cancel their debt and not Fidelity.   Further, I question whether Chase is somehow getting credit for a write-off
they never actually have to honor.

As you can imagine, Rob & Laurie are at their wits' end (in addition to being financially strapped mostly due to the
recession's impact on their small landscaping business) and I know they will appreciate any assistance you are able to
provide.  See their contact information below. If you or anyone in your office needs to reach me, my office contact
shows below and my cell is (443) 852-0308.   Thanks so much again.   – Kristin

Laurie Warwick
443 336-4733 cell
410 695-2977 home

Kristin F. Jones, Chief of Staff
Office of the Speaker
State House, Room H-4
Annapolis, Maryland 21401
(410) 841-3916
(410) 841-3888 fax

2

# EXHIBIT

# 8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.*<br><br>WILLIAM LAWRENCE<br><br>    16321 SE Maple Hill Lane<br>    Happy Valley, OR 97086<br><br><br>        *Plaintiff,*<br><br>v.<br><br>INTERNATIONAL BUSINESS MACHINE<br>CORPORATION<br><br>    1New Orchard Road<br>    Armonk, New York 10504-1722<br><br><br>SETERUS, INC.<br><br>    14523 Southwest Millikan Way<br>    Suite 200<br>    Beaverton, OR 97005<br><br><br>        *Defendants.* | Case No. _____<br><br><br>**Complaint for Violations of the<br>Federal False Claims Act, 31<br>U.S.C. §§ 3729 et seq.**<br><br>**FILED UNDER SEAL**<br><br>**Jury Trial Demanded** |

2

## INTRODUCTION

1.      This is a *qui tam* action brought by relators William Lawrence ("Lawrence" or

"Relator") on his own behalf and on behalf of the United States of America ("United States")

against Defendants International Business Machine Corporation ("IBM") and Seterus, Inc.

("Seterus")(collectively "Defendants,")  to recover damages, penalties, attorneys' fees and other

relief owed to the United States and co-relators for violations of the federal False Claims Act, 31

U.S.C. §§ 3729 et seq., ("FCA" or "False Claims Act").

2.      IBM is one of the most well-known corporations in America. Publically traded

and responsible for the employment of more than 400,000 employees, it is considered a leader in

numerous technology markets.

3.      Seterus is a subsidiary of IBM which, until June 7, 2011, was known as IBM

Lender Business Process Services.

4.      Prior to being acquired by IBM, the company was known as Wilshire Credit

Corporation (WCC).

5.      IBM acquired WCC in October 2009 in order to enter into the subprime mortgage

loan servicing business.

6.      Prior to the IBM acquisition, WCC had been involved in pension fraud. Its CEO

served sixteen months in prison after pleading guilty to the filing of a false tax return and

providing illegal gratuities.

7.      Shortly after the acquisition of WCC, IBM entered into a contract with the

Federal National Mortgage Association ("Fannie Mae") to provide loan servicing support

services on a portfolio estimated to be greater than $10,000,000,000.

3

8.    The Better Business Bureau has received 491 complaints against Seterus in just the past three years, half of which pertain to billing and collection issues.

9.    Employees for IBM and Seterus often work out of the same facility and many IBM employees have transitioned to Seterus and vice versa.

10.    Fannie Mae is a government sponsored enterprise (GSE) commissioned by the United States Congress "to keep money flowing to mortgage lenders, to help strengthen the U.S. housing and mortgage markets, and to support affordable homeownership."

11.    Fannie Mae contracts with loan servicing companies to manage payments from borrowers, and, in the event that payments are not being made, to ensure that property values remain intact during the foreclosure process.

12.    Defendants are loan servicing companies supporting Fannie Mae.

13.    Relator is a Certified Public Account (CPA) employed by Seterus as a Line Business Controls Analyst.

14.    Relator has uncovered numerous fraudulent business practices in regards to Defendants' business relationship with Fannie Mae.

15.    Relator has on multiple occasions brought this fraudulent activity to senior management and, each time, has been rebuffed.

16.    Relator has proactively attempted to implement internal controls that would eliminate the fraudulent activity; however, his recommendations have never been implemented.

17.    Defendants have and continue to engage in fraud related to two Fannie Mae programs.

18.    The first program ("Form 571 Expense Claim Process") relates to the manner in which foreclosure-related expenses are reimbursed to Defendants. The second program is Fannie

4

Mae's Borrower Response Package (BRP) Collection Incentive/Fee Program ("BRP Collection Incentive/Fee Program"), which provides performance bonuses when a loan servicer's BRP collection rate exceeds a specified percentage and compensatory fees when the BRP collection rate falls below a specified percentage.

19.      In connection with Fannie Mae's reimbursement to loan servicers for foreclosure-related expenses ("Form 571 Expense Claim Process") and its program to provide performance bonuses to servicers that meet specified targets in the collection of Borrower Response Packages ("BRP Collection Incentive/Fee Program") , Defendants committed fraud against Fannie Mae by:

(i) knowingly presenting, and causing to be presented to an officer and employee of the United States Government false and fraudulent claims for payment and approval;

(ii) knowingly making, using, and causing to be made and used, false records and statements to get false and fraudulent claims paid and approved by the Government;

(iii) having possession, custody, or control of property or money used, or to be used, by the Government and knowingly delivering, or causing to be delivered, less than all of that money or property;

(iv) knowingly making, using, or causing to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoiding or decreasing an obligation to pay or transmit money or property to the Government; and

(v) conspiring to commit each of the identified violations, in breach of 31 U.S.C. §§ 3729 *et seq.*

servicing mortgages during the foreclosure process. A Form 571 may be submitted when a loan
is at least 90 days delinquent and has been reported to Fannie Mae for three consecutive
reporting cycles.

44.    There is typically a three step process to be completed by a loan servicer in order
to receive payment for a foreclosure-related expense that it has incurred. First, the servicer
completes the Form 571 and submits it via Fannie Mae's Asset Management Network (AMN).
Second, the servicer gathers supporting documentation related to the Form 571 submission and
compiles it in PDF format. Lastly, the servicer attaches the PDF to an e-mail and sends the claim
documents to Fannie Mae.

45.    Fannie Mae will review each expense claim and reimburse the servicer for
foreclosure-related costs incurred every six months, or when the expense for a specific loan is
greater than $500.

46.    Defendants' process for claims reimbursement differs in several important
manners from that which has been described the preceding paragraphs.

47.    Defendants pay for foreclosure-related expenses using Fannie Mae's money, not
their own.

48.    Defendants hold an internal "forecasting" meeting where Defendants identify
their projected cash flow funding needs for foreclosure-related expenses. During this meeting,
they estimate the amount of these expenses that they will incur in a given period.

49.    Cash flow funding needs are reported to Fannie Mae, which in turn makes
available the requested funds in one of its JP Chase Morgan bank accounts.

50.    Defendants have direct access to withdraw funds from this account.

9

51.    When Defendants incur a foreclosure-related expense (i.e., payment of an HOA fee, property preservation, etc.), the Operations Department uses money from this bank account rather than their own to make the necessary payments.

52.    Defendants' accounting practices dictate that these expenses should be recorded as accounting entries.

53.    No accounting records are made when a foreclosure-related expense is incurred and paid from Fannie Mae's bank account.

54.    Fannie Mae relies on Defendants to ensure that all disbursements made by Operations are in accordance with Fannie Mae's policies and guidelines.

55.    When a disbursement is made from the JP Chase Morgan account, Defendants' "Claims Group" is responsible for completing the Form 571 to justify the Operations Department's withdrawal of funds that has already occurred.

56.    The form is submitted to Fannie Mae for "approval," even though the funds have already been disbursed from a Fannie Mae bank account.

57.    If Fannie Mae does not agree with a particular expense claim, it can return the form to Defendants and reduces their future funding levels.

58.    Because of Defendants' poor accounting practices – namely that expenses are not recorded as accounting entries at the time they are incurred – it is incredibly difficult, if not impossible, for the Defendant to manage the repayment process to Fannie Mae.

59.    Though there have been some occasions where Fannie Mae has returned claims to the Defendants, the enormity of Fannie's operations makes it difficult, if not impossible, to identify all of the Defendants' inappropriate expense claims.

10

60.    Further complicating matters is the fact that Defendants are able to pay  for expenses directly from Fannie Mae's bank account as well as the state of disarray of Defendants' expense claims documentation.

### Borrower Response Package Incentive/Fee Program

61.    When a homeowner's property is in jeopardy of foreclosure, the loan servicer is required to send a foreclosure prevention solicitation letter, notifying the borrower of the potential of foreclosure.

62.    In addition to this solicitation letter, the loan servicer must also include a Uniform Buyer Assistance Form (Form 710A) and an IRS Form 4506T-EZ. The foreclosure prevention solicitation letter and these two forms constitute what is referred to as the Borrower Response Package (BRP).

63.    The goal of the BRP is to provide the borrower with the information and resources to avoid further delinquency and mitigate the potential for a foreclosure on her home.

64.    Upon receiving the above described documents, the borrower must complete each of the forms and provide additional "hardship documentation," describing the reasons for missing their mortgage payments.

65.    The completed package will then be sent back to the loan servicing provider who then evaluates the response and makes the necessary foreclosure determinations.

66.    On September 2, 2011, Fannie Mae issued Servicing Guide Announcement SVC-2011-08R: *Delinquency Management and Default Prevention (Reissued),* which introduced new incentives and compensatory fees for BRPs for certain mortgage loans owned by Fannie Mae.

67.    As part of its Servicing Alignment Initiative, this "Carrot and Stick" type program was implemented to promote the collection of these BRPs by the loan service providers.

11

68.     In brief, loan servicing companies have the potential to earn bonuses or incur fees based on their ability to collect a specified percentage of BRPs from borrowers that have been lumped into various pools.

69.     The program operates at three levels: If the servicer produced complete BRPs for at least 60% of a given pool, the servicer would receive a bonus payment from Fannie Mae at $500 per completed BRP.  If the servicer completed BRPs for between 50% and 60% of a given pool, the servicer would not receive a bonus payment, but it would not owe Fannie Mae a fee either.  If the servicer produced less than 50% complete BRPs for a given pool, the servicer would have to pay Fannie Mae a fee for the uncollected BRPs.

70.     Defendant provides BRP collection information to Fannie Mae.

71.     Fannie Mae relies heavily on the accuracy of this data during the BRP review each month.

72.     Incentive payments or the assessment of fees are made based on the BRP collection information provided by the loan servicing companies.

**Uncovering Defendants' Fraud**

**Form 571 Expense Claim Process**

73.     Relator's position as a Line Business Controls Analyst responsible for evaluating and improving the internal controls of Defendants' accounting and claims practices.

74.     Beginning in late 2011, Relator began to suspect that Defendants were engaged in noncompliant accounting practices.

75.     From this time through the first quarter of 2012, Relator states that, on two separate occasions, Christine Dorrance, Seterus's Vice President of Accounting, disclosed to him

12

that Jay Memmott, President and Treasurer of Seterus, placed "extreme pressure" on her to record inappropriate accounting entries.

76.    At a meeting on March 9 of 2012, Lawrence was asked to perform an independent analysis on issues related to Form 571 Claims ("Claims") that were being submitted to Fannie Mae.

77.    At the March 9 meeting were Ms. Dorrance, Vice President of Line Business Control Brian Herzog, and Director of Operations Todd Roark.

78.    Ms. Dorrance was visibly upset during this meeting and stated several times that the accounting for the Claims was not within the scope of the review and urged that such a review of the Claims accounting was not to be performed.

79.    Nonetheless, a decision for Relator to proceed with the review was made.

80.    At the conclusion of the meeting, Lawrence approached Ms. Dorrance and asked her for the Claims files necessary to perform the requested analysis.

81.    Upon hearing Lawrence's request, Ms. Dorrance placed her head in her hands and stated, "It's all going to come out in the end anyway… It is what it is."

82.    From March of 2012 through May of the same year, Lawrence continued his analysis of the Form 571 Expense Claims Process.

83.    Between March and May 2012, he spoke with Jessica Ludlow, a member of the Claims Department.

84.    Ludlow stated that, during the first quarter of 2011, a conscientious decision was made and announced by Kathleen Zadnick of the Claims Department that all claims were to be filed, even when expenses were known to be improper.

13

**Borrower Response Package Incentive/Fee Program**

94.    Garrett Kimball is a contractor with IBM, serving as a Business Analyst to help improve various aspects of Defendants' auditing and reporting processes.

95.    Kimball and Relator Lawrence are members of the same church and, over the past twelve to eighteen months, have had brief interactions regarding the difficulty in working for Seterus.

96.    On or around September 1, 2012, Kimball approached Lawrence regarding a problem with Seterus's participation in the BRP Incentive/Fee Program.

97.    Kimball noted that Seterus was reporting that a significant amount of BRPs were being provided to Fannie Mae as "Complete," when, in fact, they were incomplete or missing altogether.

98.    Using the Defendants' IMPACT system, company employee Rita Biletski (Garrett Kimball's boss) runs a report that identifies the H-5s that are tagged as "Complete." This information is then transmitted to Fannie Mae for payment.

99.    Faulty business logic within the system resulted in Biletski submitting claims to Fannie Mae for payment which were not earned.

100.    In fact, while the information Defendants provided led to Fannie Mae owing Defendants' performance bonuses, in reality, Defendants likely should have been required to pay penalties.

101.    Later in September, a larger problem was uncovered in regards to the BRP Collection Incentive/Fee Program files. During a review of the program, Ms. Rita Biletski of the Claims Department discovered that two loans in the system that appeared to be fictitious.

102.    She relayed these findings in an e-mail to several of her colleagues.

15

103. At this point, Garrett Kimball was tasked to perform a more in depth analysis of the program, during which he discovered that there were potentially thousands of fictitious records that were using a "dummy" loan number of "12345."

104. These records were being represented as "Complete" and sent to Fannie Mae as part of the BRP Collection Incentive/Fee Program files.

105. Kimball provided his findings to Ms. Biletski.

106. Garrett Kimball performed another audit of a statistically significant sampling of H-5s that were submitted to Fannie Mae for payment. He discovered that, of the H-5s in his report that Defendants had identified as being "Complete," only forty-two percent (42%) of the H-5s had actually been completed.

107. Defendants were representing to Fannie Mae that they had successfully collected a grossly inflated amount of H-5s as compared to what had actually been obtained from the borrowers.

108. Lawrence independently performed a similar such analysis that resulted in comparable findings.

109. Using this 42% figure and number of actual H-5s that had been submitted to Fannie Mae, Lawrence performed an analysis to determine the extent to which Defendants had defrauded Fannie Mae.

110. Relator's analysis revealed that from the period of December 2011 through September 2012, Defendants submitted 25,909 H-5s to Fannie Mae.

111. According to the rules of the program, Defendants are due a $500 performance bonus for each submission.

16

## COUNT I
### Defendants Knowingly Presented False or Fraudulent Claims for Payment to the United States in Violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)

139.    Relator realleges and incorporates the allegations set forth in paragraphs 1 through 138 above as though fully alleged herein.

140.    Defendant, by and through its officers, agents, supervisors, and/or employees, knowingly presented or caused to be presented to the United States, false or fraudulent claims, and knowingly failed to disclose material facts, in order to obtain payment or approval pursuant to its contracts with the U.S. government in violation of 31 U.S.C. § 3729(a)(1).

141.    The United States, unaware of the falsity of the claims and/or statements made by Defendant and in reliance on the accuracy thereof, paid Defendant for such false or fraudulent claims.

142.    By reasons of the acts and conduct of Defendant in violation of 31 U.S.C. § 3729(a)(1), the United States has suffered actual damages, including the amounts paid in response to all such fraudulent claims for payment.

143.    Defendant has possession of government funds through its ability to access and withdraw money from Fannie Mae's bank account.

144.    Defendant withdrew funds From Fannie Mae's bank account to pay for Form 571 foreclosure-related expenses.

145.    Defendants submitted foreclosure-related expense claims to Fannie Mae for approval subsequent to withdrawing funds.

146.    The funds that Defendants withdrew from Fannie Mae's bank account and the expense claims that were submitted to Fannie Mae were false, and Defendants knew of such falsity.

20

147.    Senior management had direct, personal knowledge of the claims' falsity and, in fact, instituted a policy to knowingly submit false claims.

148.    The Relator verbally and in writing notified numerous Defendant employees of the false claims including Brian Herzog, Tom Watson, and Christine Dorrance among others.

149.    Other Defendant employees made similar claims, including Jeremy Allen, Garrett Kimball, Jessica Ludlow, Erica Anson, Judy Peterson, and Damian Lynch.

150.    Company President Jay Jemmott even participated in the fraud, pressuring Christine Dorrance, Seterus's Vice President of Accounting, to record inappropriate accounting entries.

151.    Defendants submitted false claims to the government regarding their collection rate of Borrower Response Packages (BRPs) in an effort to obtain unearned performance bonuses.

152.    Defendants submitted false claims to the government regarding their collection rate of BRPs in an effort to avoid paying compensatory fees.

153.    Defendant identified as "Complete," many BRPs that contained missing information.

154.    Defendant identified as "Complete," many BRPs for loans which did not even exist.

155.    E-mail correspondence indicates that Defendant employees Rita Bileski, Tracy Glen, and Nathen Wezal among others were aware of these fraudulently submitted claims.

156.    Fannie Mae has already paid Defendants for many of the fraudulently submitted claims and more payments are in queue for the upcoming months.

# EXHIBIT

# 9

*CFPB
Complaints*

**Date received**
10/27/2016
**Product**

Mortgage
**Sub-product**

Other mortgage
**Issue**

Application, originator, mortgage broker
**Sub-issue**
**State**

OR
**ZIP code**

907XX
**Tags**

Older American
**Consumer consent provided?**

Consent provided
**Submitted via**

Web
**Consumer complaint narrative**

Seterus LLC, a limited liability company Extortion, Racketeering, Bribery and Perjury Conspiracy 18 U.S.C. Section 1506 Altering XXXX XXXX, individually and as an officer of Seterus XXXX XXXX XXXX XXXX XXXX XXXX XXXX XXXX, XXXX [ XXXX ] XXXX XXXX XXXX XXXX XXXX XXXX XXXX XXXX, XXXX XXXX Re : SECOND REQUEST : Fake Loan Number XXXX To Whom It May Concern : This letter is in response to correspondence from your company related to the account number listed herein. This letter is notice that this matter has been filed in the United States District Court XXXX District of XXXX ( XXXX XXXX ). This fake debt has been sold several times by many Banks ' lacking consent and full disclosure! Second demand of consideration of my request for validation of a debt and a corresponding qualified written request validating such debt, pursuant to my rights under the " Fair Debt Collection Practices Act ( FDCPA ), 15 U.S.C. section 1692 ( a ) - ( p ) .I have never consented to a third party Trespasser to enter in this unlawful matter! You are hereby given NOTICE that the XXXX XXXX XXXX neither confirms nor denies any liability for any debt any liability for any debt or alleged debt which you 're false or misleading representations of a fake loan by your company called seterus and/or its affiliates claim may exist are void. Your letter dated XXXX XXXX, 2016 constitutes mail fraud. Mail Fraud is a felony, one that, in some jurisdictions, carries penalties of up to 20 years in prison. XXXX XXXX XXXX, I am entitled under the provisions of the FDCPA to certain information, and you are obligated to produce this information in order to " validate " any alleged debt. Failure to produce all of the information requested may result in your collection practices, unless your fake debt is proven valid. Your failure to produce and verify all of the information requested by the owner of the account XXXX XXXX XXXX shall indicate through your tacit agreement that no valid debt exists between your company seterus and Real Party of Interest Rule 17a XXXX XXXX XXXX. In the event that it is established that no valid debt exists, the XXXX not XXXX XXXX demands : that all negative information relating to the alleged debt be removed immediately from all XXXX XXXX XXXX credit reports : the account be closed as paid in full : and, that you provide to the XXXX written confirmation that no such debt exists. Since the XXXX XXXX XXXX is not in possession of any information indicating you as the original creditor on any account, XXXX XXXX XXXX assumes that you qualify as a " debt collector " under FSCPA. As a " debt collector " you are subject to all federal and state regulations as they exist and as related to debt collection in the State of XXXX, including but not limited to FDCPA, Consumer Protection Act, and possibly others. In the event that NO valid debt exists, further collection attempts would be in violation of said regulations and may affect the alleged " original creditor ", which you claim to represent, from receiving future funding of loans or facilitation of loans the basis of misrepresentation and fraud. You will also be liable for the same. Therefore, in order to establish

that a valid debt exist between your company and XXXX XXXX XXXX, the XXXX XXXX XXXX requests the following information in the form of a " Qualified Written Request " 1 ) All future contact between you and the XXXX XXXX XXXX shall be in writing only at the address of : 2 ) Please provide the full name, address and telephone number for a duly authorized representative from your company assigned responsibility for this account.

**Company public response**
**Company**

Seterus, Inc.
**Date sent to company**

10/31/2016
**Company response to consumer**

Closed with explanation
**Timely response?**

Yes
**Consumer disputed?**
**Complaint ID**

2181878

**Date received**

09/30/2016
**Product**

Mortgage
**Sub-product**

Conventional fixed mortgage
**Issue**

Loan servicing, payments, escrow account
**Sub-issue**
**State**

FL
**ZIP code**

336XX
**Tags**
**Consumer consent provided?**

Consent provided
**Submitted via**

Web
**Consumer complaint narrative**

I just received a 'notice ' from Seterus stating, " Thank you for your recent request for assistance ..., while your request was carefully considered, your loan could not be approved ... ". I would simply like any sort of proof that I ever asked for any sort of such assistance from Seterus. I have asked to provide information and validation and authorization that Seterus is the servicer of my loan, and those many requests are well documented but after approximately 6 months, Seterus still has not provided anything legitimate or legal but yet continues to harass me.

**Company public response**
**Company**

Seterus, Inc.
**Date sent to company**

09/30/2016
**Company response to consumer**

Closed with explanation

**Timely response?**

Yes

**Consumer disputed?**

Yes

**Complaint ID**

2139386

**Date received** 05/14/2016

**Product** Mortgage

**Sub-product** Conventional fixed mortgage

**Issue**

Loan servicing, payments, escrow account

**Sub-issue**

**State** CA

**ZIP code** 958XX

**Tags**

**Consumer consent provided?**

Consent provided

**Submitted via** Web

**Consumer complaint narrative**

This is my second complaint. My previous complaint involved the failure of Seterus to credit my mortgage payments for XX/XX/XXXX and XX/XX/XXXX. After you contacted them they corrected the issue. They stated the reason my payments were n't credited was because my account was flagged due to a pending loan modification and trial payment offer. I never requested a loan modification. However, they credited the account and sent me a statement reflecting my payments. They also sent me paperwork stating my loan modification offer was cancelled at my request. Great! I never requested a modification nor did I request it be cancelled. Since they credited my account appropriately I thought all was fine. Today, I attempted to log onto the website to make my payment and my login is redirected. The screen I am redirected to says, " thank you for applying for hardship assistance " and I am directed to complete paperwork for a modification. I have not requested hardship assistance and I believe it is less than honest to redirect the website upon login to make it look as though I have. To be clear, i do not want a modification and I am not requesting any hardship assistance. Today when I arrived home a package was waiting that stated Congratulations your modification has been approved. What modification?. This company is either really confused or they are playing games. Is this the modification that was cancelled at my request? If so, why is it now approved? I just want to make my payment and have it appropriately credited to my account without all of this nonsense. After the last issue was resolved in XX/XX/XXXX, I somehow ended up with a {$200.00} plus dollar over-payment sitting in my suspense account which is odd since I paid the amount my statement showed was due.

**Company public response**

**Company** Seterus, Inc.

**Date sent to company** 05/14/2016

**Company response to consumer**

Closed with explanation

**Timely response?** Yes

**Consumer disputed?** No

**Complaint ID** 1924077

*CFPB*

**Date received** 05/20/2016

**Product** Mortgage

**Sub-product** FHA mortgage

**Issue** Settlement process and costs

**Sub-issue**

**State** MI

**ZIP code** 481XX

**Tags** Older American

**Consumer consent provided?**
Consent provided

**Submitted via** Web

(CFPB)

**Company** JPMORGAN CHASE & CO.

**Date sent to company** 05/26/2016

**Company response to consumer**
Closed with explanation

**Timely response?** Yes

**Consumer disputed?** No

**Complaint ID** 1934637

**Consumer complaint narrative**

This is my second complaint. Chase/XXXX denied any wrong doings in regard to my home modification/servicing my home modification. The response was expected since banks have paid billions in fines already. With that being said, I have documentation that Chase forgave over several thousands ( Dodd-Frank Certification ) meeting all criteria for the ( MHA ) signed by Chase. This reduction was never incorporated in my home modification. What is not clear is why Chase " deferred " XXXX as part of the loan modification. Any intelligent banker reviewing my modification would respond " you call this a loan modification? During this period, I was informed by Chase/Seterus to quit making payments so I could qualify for some federal assistance program. Boy, was that a mistake. Every time I discussed my issues especially with Chase they gave different and conflicting info. They never provided their full name or phone number. I talked with several reps across the country and they never took notes or returned my phone call. Soon, that became the norm. I wanted to talk with the same rep on a regular basis who was familiar with my situation. I would like to see/verify the additional following responses : Who has the deed to my location? Chase filed a discharge in XXXX 2014 almost three years after modification..Why is that and does Chase still have any involvement or are they working with XXXX? What did XXXX pay for the loan transfer from Chase? Also, Chase utilized attorneys from XXXX, Michigan ( XXXX XXXX XXXX ) to strong arm me utilizing tactics to foreclose rather than make arrangements for me to keep my house. Again, the numbers from Chase/XXXX XXXX XXXX are completely different and do not match. Why is that? I went thru a modification and it ended up costing me more and destroyed any credit rating I could have obtained. Did XXXX review any of the loan modification paperwork prior to purchasing/servicing same? Since XXXX does not make loans, it is more convenient for them to foreclose and make more money. If XXXX does own the loan, why is Chase still on all documents? I am current on my payments presently but I can not guarantee that will continue in the near future unless I get assistance, a principal reduction and a lower interest rate. I retained an attorney to look into this matter but he was " stonewalled " at all inquiries. He was also very expensive. I am thinking about notifying my XXXX to look into this matter and resolve these issues to my satisfaction and ensure that all processes were legal. I also want to inspect at least XXXX document from Chase in reference to my modification. XXXX had me fill out these apps in detail and always requested something else. With each app submitted the numbers always changed. The final document which was signed was under duress and with a sense of urgency by Chase. I never knew from one moment to the next if that would be expected. Again, I standby my initial accusation that both XXXX & XXXX ( active participant ) and Seterus ( passive participant ) both committed collusion/fraud and I can prove it. Thank you and I will be awaiting your timely response.

**Company public response**

**Date received** 09/30/2016

**Product** Mortgage

**Sub-product** Conventional fixed mortgage

**Issue**
Loan servicing, payments, escrow account

**Sub-issue**

**State** FL

**ZIP code** 336XX

**Tags**

**Consumer consent provided?**
Consent provided

**Submitted via** Web

**Consumer complaint narrative**
I just received a 'notice ' from Seterus stating, " Thank you for your recent request for assistance ..., while your request was carefully considered, your loan could not be approved ... ". I would simply like any sort of proof that I ever asked for any sort of such assistance from Seterus. I have asked to provide information and validation and authorization that Seterus is the servicer of my loan, and those many requests are well documented but after approximately 6 months, Seterus still has not provided anything legitimate or legal but yet continues to harass me.

**Company public response**

**Company** Seterus, Inc.

**Date sent to company** 09/30/2016

**Company response to consumer**
Closed with explanation

**Timely response?** Yes

**Consumer disputed?** Yes

**Complaint ID** 2139386

CFPB

**Date received** 10/27/2016

**Product** Mortgage

**Sub-product** Other mortgage

**Issue**
Application, originator, mortgage broker

**Sub-issue**

**State** OR

**ZIP code** 907XX

**Tags** Older American

**Consumer consent provided?**
Consent provided

**Submitted via** Web



**Consumer complaint narrative**

Seterus LLC, a limited liability company Extortion, Racketeering, Bribery and Perjury Conspiracy 18 U.S.C. Section 1506 Altering XXXX XXXX, individually and as an officer of Seterus XXXX XXXX XXXX XXXX XXXX XXXX XXXX XXXX, XXXX [ XXXX ] XXXX XXXX XXXX XXXX XXXX XXXX XXXX XXXX, XXXX XXXX Re : SECOND REQUEST : Fake Loan Number XXXX To Whom It May Concern : This letter is in response to correspondence from your company related to the account number listed herein. This letter is notice that this matter has been filed in the United States District Court XXXX District of XXXX ( XXXX XXXX ). This fake debt has been sold several times by many Banks ' lacking consent and full disclosure! Second demand of consideration of my request for validation of a debt and a corresponding qualified written request validating such debt, pursuant to my rights under the " Fair Debt Collection Practices Act ( FDCPA ), 15 U.S.C. section 1692 ( a ) - ( p ) .I have never consented to a third party Trespasser to enter in this unlawful matter! You are hereby given NOTICE that the XXXX XXXX XXXX neither confirms nor denies any liability for any debt any liability for any debt or alleged debt which you 're false or misleading representations of a fake loan by your company called seterus and/or its affiliates claim may exist are void. Your letter dated XXXX XXXX, 2016 constitutes mail fraud. Mail Fraud is a felony, one that, in some jurisdictions, carries penalties of up to 20 years in prison. XXXX XXXX XXXX, I am entitled under the provisions of the FDCPA to certain information, and you are obligated to produce this information in order to " validate " any alleged debt. Failure to produce all of the information requested may result in your collection practices, unless your fake debt is proven valid. Your failure to produce and verify all of the information requested by the owner of the account XXXX XXXX XXXX shall indicate through your tacit agreement that no valid debt exists between your company seterus and Real Party of Interest Rule 17a XXXX XXXX XXXX. In the event that it is established that no valid debt exists, the XXXX not XXXX XXXX demands : that all negative information relating to the alleged debt be removed immediately from all XXXX XXXX XXXX credit reports : the account be closed as paid in full : and, that you provide to the XXXX written confirmation that no such debt exists. Since the XXXX XXXX XXXX is not in possession of any information indicating you as the original creditor on any account, XXXX XXXX XXXX assumes that you qualify as a " debt collector " under FSCPA. As a " debt collector " you are subject to all federal and state regulations as they exist and as related to debt collection in the State of XXXX, including but not limited to FDCPA, Consumer Protection Act, and possibly others. In the event that NO valid debt exists, further collection attempts would be in violation of said regulations and may affect the alleged " original creditor ", which you claim to represent, from receiving future funding of loans or facilitation of loans the basis of misrepresentation and fraud. You will also be liable for the same. Therefore, in order to establish that a valid debt exist between your company and XXXX XXXX XXXX, the XXXX XXXX XXXX requests the following information in the form of a " Qualified Written Request " 1 ) All future contact between you and the XXXX XXXX XXXX shall be in writing only at the address of : 2 ) Please provide the full name, address and telephone number for a duly authorized representative from your company assigned responsibility for this account.

**Date received** 12/09/2015

**Product** Mortgage

**Sub-product**
Conventional adjustable mortgage (ARM)

**Issue** Credit decision / Underwriting

**Sub-issue**

**State** OH

**ZIP code** 443XX

**Tags** Older American

**Consumer consent provided?**
Consent provided

**Submitted via** Web

**Company** Seterus, Inc.

**Date sent to company** 12/09/2015

**Company response to consumer**
Closed with explanation

**Timely response?** Yes

**Consumer disputed?** No

**Complaint ID** 1688960

**Consumer complaint narrative**
When I originally took out a refinance mortgage, XXXX XXXX the underwriter for XXXX XXXX required that I pay some creditors on my credit that did not belong to me. The title company cut checks to each of these creditors. They gave me the checks, when I called the creditors to get mailing address they stated that they did not have an account for me. I explained about them being on my credit reporting and again they stated that there was no where to apply funds because they do not have an account for me. I tried for years to get some one to help me I could not afford an attorney ... .I am XXXX years old XXXX would not help me. I have asked Seterus repeatedly to prove ownership of the loan the copies of the loan docs prior to this transfer, my good faith estimate, my truth in lending document, they will not mail it ... .then stated that it would be XXXX per page ... I agreed but they never sent anything. I am receive XXXX per month, my mortgage is XXXX. I am paying for money that I never received ... .please help.

**Company public response**

**Date received**  12/09/2015

**Product**  Mortgage

**Sub-product**  Conventional fixed mortgage

**Issue**
Loan servicing, payments, escrow account

**Sub-issue**

**State**  OR

**ZIP code**  974XX

**Tags**

**Consumer consent provided?**
Consent provided

**Submitted via**  Web

**Consumer complaint narrative**
Sent my payments back and said could n't locate account. Its the same account I 've always used. Charged me late fee and ruined my credit report so I can ' refinance. They said they would remove late fee but ca n't fix my credit raiting.

**Company public response**

**Company**  Seterus, Inc.

**Date sent to company**  12/09/2015

**Company response to consumer**
Closed with explanation

**Timely response?**  Yes

**Consumer disputed?**  No

**Complaint ID**  1689209

# EXHIBIT

# 10

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FEDERAL HOUSING FINANCE AGENCY,
AS CONSERVATOR FOR THE FEDERAL
NATIONAL MORTGAGE ASSOCIATION
AND THE FEDERAL HOME LOAN
MORTGAGE CORPORATION,

               Plaintiff,

        -against-

JPMORGAN CHASE & CO.; JPMORGAN
CHASE BANK, N.A.; J.P. MORGAN
MORTGAGE ACQUISITION
CORPORATION; J.P. MORGAN
SECURITIES LLC (f/k/a J.P. MORGAN
SECURITIES INC.); J.P. MORGAN
ACCEPTANCE CORPORATION I; EMC
MORTGAGE LLC (f/k/a EMC MORTGAGE
CORPORATION); BEAR STEARNS & CO.,
INC.; STRUCTURED ASSET MORTGAGE
INVESTMENTS II INC.; BEAR STEARNS
ASSET BACKED SECURITIES I LLC;
WAMU ASSET ACCEPTANCE
CORPORATION; WAMU CAPITAL
CORPORATION; WASHINGTON
MUTUAL MORTGAGE SECURITIES
CORPORATION; LONG BEACH
SECURITIES CORPORATION;
CITIGROUP GLOBAL MARKETS, INC.;
CREDIT SUISSE SECURITIES (USA) LLC;
GOLDMAN, SACHS & CO.; RBS
SECURITIES, INC.; DAVID M. DUZYK;
LOUIS SCHIOPPO, JR.; CHRISTINE E.
COLE; EDWIN F. MCMICHAEL; WILLIAM
A. KING; BRIAN BERNARD; MATTHEW
E. PERKINS; JOSEPH T. JURKOWSKI, JR.;
SAMUEL L. MOLINARO, JR.; THOMAS F.
MARANO; KIM LUTTHANS; KATHERINE
GARNIEWSKI; JEFFREY MAYER;
JEFFREY L. VERSCHLEISER; MICHAEL
B. NIERENBERG; RICHARD CAREAGA;
DAVID BECK; DIANE NOVAK; THOMAS

\_\_\_ CIV. \_\_\_ (\_\_\_)

**COMPLAINT**

**JURY TRIAL DEMANDED**

GREEN; ROLLAND JURGENS; THOMAS
G. LEHMANN; STEPHEN FORTUNATO;
DONALD WILHELM; MICHAEL J. KULA;
CRAIG S. DAVIS; MARC K. MALONE;
MICHAEL L. PARKER; MEGAN M.
DAVIDSON; DAVID H. ZIELKE; THOMAS
W. CASEY; JOHN F. ROBINSON; KEITH
JOHNSON; SUZANNE KRAHLING;
LARRY BREITBARTH; MARANGAL I.
DOMINGO; TROY A. GOTSCHALL; ART
DEN HEYER; AND STEPHEN LOBO

Defendants.

**TABLE OF CONTENTS**

Page

NATURE OF ACTION ...........................................................................................................2

PARTIES ...........................................................................................................................12

    *The Plaintiffs and the GSEs* .........................................................................................12

    *The JPMorgan Entities* .................................................................................................13

    *The WaMu Entities* .......................................................................................................19

    *The Long Beach Entities* ...............................................................................................23

    *The Other Underwriter Defendants* ...............................................................................27

    *The Non-Party Originators* ...........................................................................................29

JURISDICTION AND VENUE ..........................................................................................29

FACTUAL ALLEGATIONS ..............................................................................................30

I.     The Securitizations...................................................................................................30

    A.     Residential Mortgage-Backed Securitizations In General .....................................30

    B.     The Securitizations At Issue In This Case .............................................................32

    C.     The Securitization Process .....................................................................................37

          1.     J.P. Morgan Acquisition, EMC, WaMu Bank, WaMu Securities,
               and Long Beach Mortgage Transfer The Mortgage Loans To
               Special Purpose Trusts...............................................................................37

          2.     The Trusts Issue Securities Backed by the Loans.......................................40

II.    The Defendants' Participation in the Securitization Process.............................................48

    A.     The Role of Each of the JPMorgan Defendants.....................................................48

          1.     J.P. Morgan Acquisition ............................................................................49

          2.     J.P. Morgan Acceptance .............................................................................49

          3.     J.P. Morgan Securities ...............................................................................50

          4.     JPMorgan Chase and JPMorgan Bank.......................................................50

5.     The JPMorgan Individual Defendants .......................................................51

B.    The Role of Each of the Bear Stearns Entities....................................................53

    1.     EMC....................................................................................................54

    2.     SAMI and BSABS .............................................................................55

    3.     BSC and J.P. Morgan Securities as Successor to BSC .............................56

    4.     JPMorgan Chase as Successor to BSI....................................................56

    5.     The Bear Stearns Individual Defendants ....................................................57

C.    The Role of Each of the WaMu Entities.........................................................60

    1.     JPMorgan Bank as Successor to WaMu Bank..........................................61

    2.     WaMu Securities................................................................................62

    3.     WaMu Acceptance.............................................................................64

    4.     WaMu Capital....................................................................................64

    5.     The WaMu Individual Defendants.................................................65

D.    The Role of Each of the Long Beach Entities.........................................................68

    1.     JPMorgan Bank as Successor to WaMu Bank and Long Beach Mortgage .........................................................................................69

    2.     Long Beach Securities ...................................................................71

    3.     The Long Beach Individual Defendants ....................................................71

E.    The Other Underwriter Defendants ........................................................74

F.    Defendants' Failure To Conduct Proper Due Diligence........................................75

    1.     The JPMorgan Defendants..............................................................77

    2.     The Bear Stearns Entities.................................................................80

    3.     The WaMu Entities ...........................................................................81

    4.     The Long Beach Entities..................................................................86

G.    Liability of JPMorgan Chase and JPMorgan Bank as Successors in Interest........90

Johnson, Suzanne Krahling, Larry Breitbarth, Marangal I. Domingo, Troy A. Gotschall, Art Den

Heyer, and Stephen Lobo (the "Individual Defendants") (together with the JPMorgan

Defendants, the Bear Stearns Defendants, the WaMu Defendants, Long Beach Securities, and the

Other Underwriter Defendants, the "Defendants") alleges as follows:

## **NATURE OF ACTION**

1.      This action arises out of Defendants' actionable conduct in connection with the

offer and sale of certain residential mortgage-backed securities to Fannie Mae and Freddie Mac

(collectively, the "Government Sponsored Enterprises" or "GSEs"). These securities were sold

pursuant to registration statements, including prospectuses and prospectus supplements that

formed part of those registration statements, which contained materially false or misleading

statements and omissions. Defendants falsely represented that the underlying mortgage loans

complied with certain underwriting guidelines and standards, including representations that

significantly overstated the ability of the borrowers to repay their mortgage loans. These

representations were material to the GSEs, as reasonable investors, and their falsity violates

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, Sections

13.1-522(A)(ii) and 13.1-522(C) of the Virginia Code, Sections 31-5606.05(a)(1)(B) and 31-

5606.05(c) of the District of Columbia Code, and constitutes negligent misrepresentation,

common law fraud, and aiding and abetting fraud.

2.      Between September 7, 2005 and September 19, 2007, Fannie Mae and Freddie

Mac purchased over $33 billion in residential mortgage-backed securities (the "GSE

Certificates") issued in connection with 103 securitizations sponsored by J.P. Morgan

Acquisition, EMC, Washington Mutual Bank ("WaMu Bank"), WaMu Securities, and Long

Beach Mortgage Company ("Long Beach Mortgage") and/or underwritten by J.P. Morgan

Securitizations. CHF also originated a significant number of the mortgage loans underlying the

JPALT 2005-A2 Securitization. CHF is a wholly-owned subsidiary of JPMorgan Bank.

JPMorgan Bank directed and controlled the business operations of CHF as part of its plan to

originate and securitize an increasingly larger volume of mortgage loans.

401.    JPMorgan abandoned its underwriting standards and condoned fraud by

encouraging its employees to ignore and manipulate JPMorgan's automated underwriting

system, called "ZiPPY." "Chase mortgage memo pushes 'Cheats & Tricks,'" *The Oregonian*

(March 27, 2008). CHF went so far as to explicitly instruct loan originators to falsify loan

information in order to elicit approval from the ZiPPY automated underwriting system for stated

income loans of poor quality. At internal memorandum circulated by CHF in its Portland,

Oregon office titled "Cheats & Tricks" gave originators tips on how to circumvent the

underwriting system, including exhortations that a mortgage should "Never Fear!!" because

ZiPPY "can be adjusted" to "get the findings you need." The memorandum encouraged brokers

to game the ZiPPY system because "[i]t's super easy! Give it a try!" It provided the following

"handy steps" in order to gain approval for an otherwise rejected Stated Income / Stated Asset

loan application:

> (1) In the income section of your 1003, make sure you input all income in base income. **DO NOT break it down by overtime, commissions or bonus.**
>
> (2) NO GIFT FUNDS! If your borrower is getting a gift, add it to a bank account along with the rest of the assets. Be sure to remove any mention of gift funds on the rest of your 1003.
>
> (3) If you do not get Stated/Stated, **try resubmitting with slightly higher income. Inch it up $500 to see if you can get the findings you want.** Do the same for assets.

(emphasis added).

158

JPMorgan Certificates, relying on JPMorgan's representations that the mortgage loans were underwritten in accordance with JPMorgan's purported underwriting standards.

405.    JPMorgan waived a significant (over 51 percent) number of the loans rejected by its third-party due diligence firm into loan pools for securitization. JPMorgan also abandoned its underwriting standards in directing its employees to enter untrue and misleading information into its automated underwriting system in order to generate approvals for loans that would otherwise be rejected. Finally, JPMorgan CEO Jamie Dimon himself knew that subprime positions were risky and dangerous; all the while JPMorgan continued to originate, acquire and securitize defective and credit-impaired loans for inclusion in its securitizations. These loans collateralized the certificates issued in connection with such securitizations, which were sold to investors like the GSEs. These facts demonstrate that JPMorgan knew its representations were false but nonetheless was willing to, and in fact did, profit from such knowledge to the detriment of the GSEs.

**C.    Bear Stearns Knew Its Representations Were False And Was Willing to Capitalize On Its Unique Knowledge At The Expense of Investors**

406.    The evidence discussed above not only shows that the representations were untrue, but also that Bear Stearns knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates. As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed Bear Stearns that significant percentages of loans in the pools did not adhere to underwriting guidelines. For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 16 percent of the mortgage

160

### D. WaMu and Long Beach Knew Their Representations Were False And Were Willing to Capitalize On Their Unique Knowledge At The Expense of Investors

424. The evidence discussed above not only shows that the representations were untrue, but also that WaMu and Long Beach knew, or was reckless in not knowing, that it was falsely representing the underlying origination and securitization process and the riskiness of the mortgage loans that collateralized the GSE Certificates. As discussed above, such evidence includes:

- The pervasive misrepresentations relating to basic information about the underlying mortgage loans, such as owner occupancy and LTV ratios, and knowledge of inaccurate and misleading credit ratings;

- Third-party due diligence providers such as Clayton and Bohan informed WaMu that significant percentages of loans in the pools did not adhere to underwriting guidelines. For example, Clayton admitted that in the period from the first quarter of 2006 to the second quarter of 2007, 27 percent of the mortgage loans WaMu Bank submitted to Clayton to review in RMBS loan pools were rejected by Clayton as falling outside the applicable underwriting guidelines.

- Of the 27 percent of mortgage loans that Clayton found defective, 29 percent were subsequently waived in by WaMu without proper consideration and analysis of compensating factors and included in securitizations such as the ones in which Fannie Mae and Freddie Mac invested here. WaMu's waiver of nearly a third of the defective loans shows that WaMu knew of or recklessly disregarded the systemic failure in underwriting and the fraudulent misrepresentations in the offering materials received by the GSEs.

425. Like JPMorgan and Bear Stearns, WaMu and its Long Beach subsidiaries also systematically abandoned their underwriting standards in pursuit of greater volumes of mortgage loans to securitize and sell to investors. As part of its strategy to grow and become a vertically integrated origination and securitization operation, WaMu acquired Long Beach Mortgage in 1999, thereby securing an in-house subprime originator, and also acquired WaMu Capital, thereby giving WaMu an in-house underwriter that could control the underwriting process and retain securitization underwriting fees. By virtue of their control over each step in the

169

430.    In a 2005 internal memorandum, Mr. Vanasek described WaMu's own loan sales team as "infectious and dangerous," "aggressive, and often times abusive" in response to his attempts to enforce a "more disciplined underwriting approach." *PSI Report*, p. 143. Mr. Vanasek further testified to the Senate PSI that if an underwriter rejected a loan application, "the loans were always escalated up, so if they declined a loan, it was escalated to a higher level, a marketing officer who would ultimately approve." *PSI Hearing*, April 13, 2010. Keysha Cooper, a WaMu Senior Mortgage Underwriter from 2003-2007 stated in a November 1, 2008 *New York Times* article, "I swear 60 percent of the loans I approved I was made to." "At WaMu, a loan factory," *The New York Times* (Nov. 2, 2008).

431.    In addition, contrary to its guidelines and prudent standards of underwriting, WaMu used the starter interest rate as the qualifying rate as opposed to the eventual, higher interest rate, thereby resulting in a "payment shock" if the interest rate increased. WaMu also focused on borrower credit scores in originating loans, as opposed to verifying borrower income and assets.

432.    WaMu encouraged its employees to avoid investigating red flags. According to a December 27, 2008 *New York Times* article, John D. Parsons, a WaMu mortgage processing supervisor, stated that he "was accustomed to seeing baby sitters claiming salaries worthy of college presidents, and schoolteachers with incomes rivaling stockbrokers," but that WaMu "was all about saying yes." "Saying Yes, WaMu Built Empire on Shaky Loans," *The New York Times* (December 27, 2008). Nancy Erken, a former WaMu loan consultant in Seattle, told the *Seattle Times* in December 2009, that "[t]he big saying was 'A skinny file is a good file.'" "Part One: Reckless Strategies Doomed WaMu," *The Seattle Times* (October 25, 2009). She would "take

the files over to the processing center in Bellevue and they'd tell me 'Nancy, why do you have all this stuff in here? We're just going to take this stuff and throw it out." *Id.*

433.    A PSI hearing exhibit details admissions by several WaMu employees to falsifying loan documentation in order to approve more loans. *PSI Hearing*, Ex. 30. A Westlake Village loan office sales associate stated that sales team members would "cut and paste the current borrower's name and address" onto the old bank statements. *PSI Hearing*, Ex. 31.

434.    Karen Weaver, a former Long Beach underwriter, acknowledged that brokers "were making up pay stubs and presenting that." "At Top Subprime Mortgage Lender, Policies Were An Invitation To Fraud," *Huffington Post* (Dec. 21, 2009). Anoinette Hendryx, a former Long Beach manager and underwriter, said that account executives would "offer kickbacks of money" to underwriters to get bad loans approved. *Id.*

435.    WaMu's strategy of approving virtually every loan was successful in increasing its volume of loans originated at the sacrifice of quality. This has been confirmed by WaMu employees and insiders. In the same *New York Times* article, WaMu senior underwriter Keysha Cooper acknowledged that "[a]t WaMu it wasn't about the quality of the loans; it was about the numbers . . . . They didn't care if we were giving loans to people that didn't qualify. Instead, it was how many loans did you guys close and fund?" A former WaMu senior home consultant told the *Seattle Times* in the October 25, 2009 article discussed above that WaMu employees were subject to "total blanketing – emails, memos, meetings set up so people understood that this was what the company wanted them to do."

436.    WaMu senior management was aware that its personnel ignored WaMu's stated underwriting standards, and even sought to benefit from this asymmetrical knowledge. The minutes of a December 2006 WaMu Risk Committee Meeting reflect that "delinquency behavior

173

Beck, wrote in a February 2007 e-mail that "[t]he performance of newly minted option arm loans is causing us problems. Cheryl can validate but my view is our alt a (high margin) option arms [are] not performing well. We should address selling 1Q as soon as we can before we loose [sic] the [opportunity]." Cheryl Feltgen, the Chief Risk Officer for WaMu Home Loans, confirmed her acceptance of this strategy, stating "[t]here is a meltdown in the subprime market which is creating a 'flight to quality.' . . . This seems to me to be a great time to sell as many Option ARMs as we possibly can. [CEO] Kerry Killinger was certainly encouraging us to think seriously about it at the MBR last week." WaMu was particularly concerned about the Long Beach loans as they had the highest rates of default. To help offset that risk, WaMu COO Stephen Rotella told WaMu CEO Kerry Killinger that he "asked the guys to work with Beck's group to see if we could package and sell any of the bad portfolio product flat."

439. WaMu knew that the loans it was securitizing and selling to investors had fraudulent information. One internal report "WaMu Risk Mitigation and Mortgage Fraud 2008 Targeted Review," completed in September 2008, confirmed that WaMu had sold loans to investors after WaMu's internal controls had identified loans as fraudulent. "The controls that are intended to prevent the sale of loans that have been confirmed by Risk Mitigation to contain misrepresentations or fraud are not currently effective. There is not a systematic process to prevent a loan in the Risk Mitigation Inventory and/or confirmed to contain suspicious activity from being sold to an investor. ... Of the 25 loans tested, 11 reflected a sale date after the completion of the investigation which confirmed fraud. There is evidence that this control weakness has existed for some time." A 2008 study by WaMu's Corporate Credit Review team confirmed that WaMu's had allocated far too few resources to monitoring and combating fraud.

mortgage loans purchased from others, namely Ameriquest, were retained on the balance sheet. They tended to be higher quality subprime loans and they were monitored very closely." Senator Coburn asked for confirmation: "So basically, you were buying higher quality subprime loans from competitors than you were selling to the market." Mr. Vanasek responded, "Correct."

443.    WaMu falsely overstated appraisals in order to secure low LTV ratios for mortgages, thereby making the loans more attractive to prospective purchasers of certificates. WaMu utilized two appraisal management companies, eAppraiseIT and Lender's Service, Inc. ("LSI"), to oversee the appraisals of its loans.  Documents produced in the New York Attorney General's suit against eAppraiseIT and its parent First American, *New York v. First American Corp. (eAppraiseIT)*, reveals that WaMu selected individual appraisers who were willing to produce false, inflated appraisals and refused to hire appraisers who maintained their independence. *New York v. First American Corp and First American eAppraiseIT*, No. 1:2007cv10397 (NY. Sup. Ct. 2007).  WaMu rebuked any sign of independence in its appraisers, returning appraisals it deemed too low to eAppraiseIT for "reconsideration" and shifting its business to a competitor of eAppraiseIT when one regional office refused to compromise its independence.

444.    eAppraiseIT's management was initially resistant to this pressure from WaMu but eventually was pressured into sacrificing its independence to meet WaMu's demands. eAppraiseIT's President complained in an August 9, 2006 e-mail to WaMu that "[t]he Wamu internal staff . . . admonish us to be certain we solve the [requests for reconsideration of appraisal] issue quickly or we will all be in for some pretty rough seas."  An August 15, 2006 e-mail to eAppraiseIT's president reflects an eAppraiseIT Executive Vice President complaining because WaMu's loan officers demanded that eAppraiseIT's appraisers "tell them specifically

President then forwarded the e-mail to First American executives, noting: "I need to clamp down, especially since we warrant appraisals. It's pure pressure to commit fraud." In spite of these concerns, eAppraiseIT continued its work for WaMu, conducting over 260,000 appraisals for WaMu, until the fall of 2007 when the New York Attorney General brought its action.

453.    WaMu also developed a series of internal practices that directly led to the origination and securitization of fraudulent loans. First, as discussed above, WaMu tied bonuses to the number of loans closed by a loan officer, thereby encouraging employees to be more concerned with volume than quality. Second, WaMu adopted a plan to pay for "overages," which were payments to loan officers who sold mortgages to clients at a higher rate of interest than the rate for which the client was qualified. A 2008 WaMu internal study titled "AIG/UG and OTS Allegation of Loan Frauds Originated by [redacted employee]" found that these compensation practices lead to unsound underwriting. The memorandum concluded that because volume was emphasized above all else, "the temptation to advise the borrower on means and methods to game the system may occur. Our compensation and reward structure is heavily tilted for these employees toward production of closed loans."

454.    WaMu's Chief Risk Officer, Mr. Vanasek, confirmed these findings in his testimony to the Senate PSI. "Because of the compensation systems rewarding volume versus quality and the independent structure of the originators, I am confident at times borrowers were coached to fill out applications with overstated incomes or net worth to meet the minimum underwriting requirements. Catching this kind of fraud was difficult at best and required the support of line management. Not surprisingly, loan originators constantly threatened to quit and go to Countrywide or elsewhere if the loan applications were not approved." *PSI Report*, p. 103.

468.     The false statements of material facts and omissions of material facts in the
Registration Statements, including the Prospectuses and Prospectus Supplements, directly caused
Fannie Mae and Freddie Mac to suffer billions of dollars in damages, including without
limitation depreciation in the value of the securities.  The mortgage loans underlying the GSE
Certificates experienced defaults and delinquencies at a much higher rate than they would have
had the loan originators adhered to the underwriting guidelines set forth in the Registration
Statements, and the payments to the trusts were therefore much lower than they would have been
had the loans been underwritten as described in the Registration Statements.

469.     Fannie Mae's and Freddie Mac's losses have been much greater than they would
have been if the mortgage loans had the credit quality represented in the Registration Statements.

470.     Defendants' misstatements and omissions in the Registration Statements
regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and
Freddie Mac's losses relating to their purchase of the GSE Certificates.

471.     Defendants' misstatements and omissions in the Registration Statements
regarding the true characteristics of the loans were the proximate cause of Fannie Mae's and
Freddie Mac's losses relating to their purchases of the GSE Certificates.  Based upon sales of the
Certificates or similar certificates in the secondary market, Defendants proximately caused
billions of dollars in damages to Fannie Mae and Freddie Mac in an amount to be determined at
trial.

191

## FIRST CAUSE OF ACTION

**Violation of Section 11 of the Securities Act of 1933**
**(Against J.P. Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance,**
**Long Beach Securities, J.P. Morgan Securities, BSC, WaMu Capital, Citigroup, Credit**
**Suisse, Goldman Sachs, RBS Greenwich, David Beck, Brian Bernard, Larry Breitbarth,**
**Richard Careaga, Thomas W. Casey, Christine E. Cole, David M. Duzyk, Stephen**
**Fortunato, Katherine Garniewski, Michael J. Giampaolo, Thomas Green, Keith Johnson,**
**Rolland Jurgens, Joseph T. Jurkowski, Jr., William A. King, Suzanne Krahling, Thomas**
**G. Lehmann, Kim Lutthans, Thomas F. Marano, Jeffrey Mayer, Edwin F. McMichael,**
**Samuel L. Molinaro, Jr., Michael B. Nierenberg, Diane Novak, Matthew E. Perkins, John**
**F. Robinson, Louis Schioppo, Jr., Jeffrey L. Verschleiser, Donald Wilhelm, and David H.**
**Zielke)**

472.    Plaintiff realleges each allegation in paragraphs 1 through 380 and paragraphs 460

through 471 above as if fully set forth herein, except to the extent that Plaintiff expressly

excludes any allegation that could be construed as alleging fraud.

473.    This claim is brought by Plaintiff pursuant to Section 11 of the Securities Act of

1933 and is asserted on behalf of Fannie Mae and Freddie Mac, which purchased the GSE

Certificates issued pursuant to the Registration Statements.  This claim is brought against

Defendants J.P. Morgan Securities (both in its own capacity and as successor to BSC), BSC,

WaMu Capital, Citigroup, Credit Suisse, Goldman Sachs, and RBS Greenwich with respect to

each of the Registration Statements.  This claim is also brought against (i) Defendants J.P.

Morgan Acceptance, SAMI, BSABS, WaMu Securities, WaMu Acceptance, and Long Beach

Securities, and (ii) David Beck, Brian Bernard, Larry Breitbarth, Richard Careaga, Thomas W.

Casey, Christine E. Cole, David M. Duzyk, Stephen Fortunato, Katherine Garniewski, Michael J.

Giampaolo, Thomas Green, Keith Johnson, Rolland Jurgens, Joseph T. Jurkowski, Jr., William

King, Suzanne Krahling, Thomas G. Lehmann, Kim Lutthans, Thomas F. Marano, Jeffrey

Mayer, Edwin F. McMichael, Samuel L. Molinaro, Jr., Michael B. Nierenberg, Diane Novak,

Matthew E. Perkins, John F. Robinson, Louis Schioppo, Jr., Jeffrey L. Verschleiser, Donald

Wilhelm, and David H. Zielke (the foregoing Individual Defendants collectively referred to as

# EXHIBIT

# 11

**Chase**
P.O. Box 183222
Columbus, OH 43218-3222

**CHASE** ⬤

March 21, 2017



003551 - 1 of 1 NSP0IF1A-Z1 000000000000
Leslie D. Hughes
2270 Charleston Place
Lithia Springs, GA 30122-4004

**Here's the investor contact information you requested**

Account:            3010145575
Property Address:   2270 Charleston Place
                    Lithia Springs, GA 30122-0000

Dear Leslie D. Hughes:

We've received your request for information about the owner of your loan.

We answer questions and service your mortgage loan on behalf of the investor, which is:

> Fannie Mae
> 3900 Wisconsin Ave NW
> Washington, DC 20016-2892
>
> CONTACT PHONE 800-732-6643

The ownership of your loan may change from time to time during the loan term, but this is the current owner.

If you have questions, please call us at one of the numbers below.

Sincerely,

Dean Cooper
Managing Director
Chase
1-800-848-9136
1-800-582-0542 TTY
www.chase.com

# EXHIBIT

# 12

## MSP® Explorer: Customer Service Workstation (SER1/HIST)

### 659 - SETERUS, INC.

Loan Number: 0029875273                                    Borrower Name: HUGHES, LESLIE D

```
SER1 0029875273                 CUSTOMER SERVICE  INV 269/001  08/17/16  15:38:58
LESLIE D HUGHES                 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 1  TYPE CONV. RES.              MAN F
                                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      IR 6.25000  BR 00   000-000-0000
2270 CHARLESTON PL          LITHIA SPRINGS GA 30122-4004        0 000-000-0000
 _   CGAECR   < ESCALATED CORRESPONDENCE RECEIVED                >: 08/17/16
-----HIST-----------------* END  OF LOAN HISTORY *-----------------(MORE)
PROC-DT  DUE-DT  TRAN  TRAN-DESCRIPTION                  TRAN-EFFECTIVE-DATE
         TRAN-AMT   PRINCIPAL   INTEREST    ESCROW    AMOUNT/CD/DESCRIPTION
12-09-15  00-00  745  CORPORATE ADVANCE ADJUSTMENT
          14.00       0.00        0.00       0.00      14.00   MTGR REC CORP ADV BA
12-07-15  10-15  132  LATE CHARGE ADJUSTMENT
           0.00       0.00        0.00       0.00     369.82-1 LATE CHARGE
12-07-15  10-15  142  LOAN SETUP
           0.00  119,954.20-     0.00       0.00
                 119,954.20
```

```
---* PF2 FOR ADDL MESSAGES *--------------------------------------------------
-=SPOC=-                             ACTIVE FORECLOSURE
COMPLETED LOSS MITIGATION            LOSS MIT IND = 1 LOSS MIT RETENTION
LOAN IS IN FORECLOSURE, F/C STOP = 2  PROC STOP = F  FORECLOSURE
```



**Account Statement - Page 2**

PO Box 1077, Hartford, CT 06143-1077

| | Statement Date | December 14, 2015 |
|---|---|---|
| | Account Number | 29875273 |

| | | |
|---|---|---|
| 💻 Online | www.seterus.com | |
| ☎ Phone | 866.570.5277 | |
| ☎ Fax | 866.578.5277 | |
| 💻 Email | ExternalCommunications@seterus.com | |
| | *Response typically sent by U.S. Mail* | |

9-769-16960-0023731-005-2-010-010-000-000



**Borrower Information**

Property Address    2270 CHARLESTON PL
LITHIA SPRINGS GA 30122 4004

## Activity Since Last Statement *continued from Page 1*

| Date | Description | Principal | Interest | Escrow | Late Charge/ Other Fees | Other | Suspense | Total |
|---|---|---|---|---|---|---|---|---|
| November 16, 2015 | Late Fee | $0.00 | $0.00 | $0.00 | -$43.26 | $0.00 | $0.00 | -$43.26 |
| December 7, 2015 | New Loan Set Up | -$119954.20 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | -$119954.20 |
| December 7, 2015 | Late Fee | $0.00 | $0.00 | $0.00 | -$369.82 | $0.00 | $0.00 | -$369.82 |
| December 9, 2015 | Prop Pres Expense | $0.00 | $0.00 | $0.00 | -$14.00 | $0.00 | $0.00 | -$14.00 |
| December 9, 2015 | Prop Pres Expense | $0.00 | $0.00 | $0.00 | -$14.00 | $0.00 | $0.00 | -$14.00 |
| December 9, 2015 | Adjustment | $0.00 | $0.00 | -$757.17 | $0.00 | $0.00 | $0.00 | -$757.17 |
| December 9, 2015 | Adjustment | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $19.52 | $19.52 |

*NEW Loan SET-UP*

## MSP® Explorer: History of Corporate Advance Tran (DDCH)

### 659 - SETERUS, INC.

Loan Number: 0029875273                              Borrower Name: HUGHES,LESLIE D

```
DDCH 0029875273    CORPORATE ADVANCE HISTORY SCREEN  269/001 08/17/16  15:41:19
LD HUGHES      L:C F:A B:  R:    10/01/15 TYPE CONV. RES.           MAN F
2270 CHARLESTON PL LITHIA SPRINGS GA 30122-4004
------------------------------------------------------------ * END *--------
_____ C/A PAYEE  ___ TRAN  _____ RSN  ___ USR  _____ ESC PAYEE
_ SORT          _ SORT      _ SORT    _ SORT         _ SORT
DATE RANGE:  _____ THRU _____
                                    C/A                       ORIG
TRN USR  ID   DATE    TRAN AMT  ESC PAYEE RSN  DESCRIPTION      DISBDT
633 NIV 0010 081016     25.00  EA50051  39T57 FTSF TECH SUBMISSION
631 NIV 0009 072016     15.00  EB56411  39R57 FPIF PROP INSPECTION
631 NIV 0008 051816     15.00  EB56411  39R57 FPIF PROP INSPECTION
631 NIV 0007 042116     15.00  EB56411  39R57 FPIF PROP INSPECTION
631 NIV 0006 012016     15.00  EB56411  39R57 FPIF PROP INSPECTION
631 NIV 0005 122315     15.00  EB11937  39R57 FPIF PROP INSPECTION
745 52A 0004 120915     25.00  _____  39T57 PXFR PSPERMITSXFERTAX
745 52A 0003 120915     78.00          39T57 PBPO PS BPO COSTS
745 52A 0002 120915     14.00          39R57 PPIF PSPROPINSPECTION
745 52A 0001 120915     14.00          39R57 PPIF PSPROPINSPECTION


** BEGINNING CORP ADV BALANCE:              0.00
** TOTAL OF TRANS DISPLAYED ON DDCH:      231.00
** OUTSTANDING CORP ADV BALANCE:          231.00
```

*Transfer Tax 12/9/2015* (handwritten)

# EXHIBIT

# 13A

# seterus™

PO Box 1077; Hartford, CT 06143-1077

*L628V*

HUGHES, LESLIE D
2270 CHARLESTON PL
LITHIA SPRINGS, GA 30122-4004

---

## Important information regarding your request for assistance.

---

Loan number: 29875273, serviced by Seterus, Inc.

July 6, 2016

Dear HUGHES, LESLIE D:

Thank you for your recent request for assistance with your mortgage loan. While your request was carefully considered, your loan could not be approved for assistance at this time for the following reason(s):

| DECISION DATE | PROGRAM | REASON FOR DENIAL |
|---|---|---|
| 7/6/2016 | Streamlined Fannie Mae Modification | We have not received your initial payment required for your trial period plan offer. As a result, your trial period plan has not been executed, and your loan may no longer be eligible for a permanent modification under this program. |

Because your loan is in default at this time, we may continue with collection efforts.

**You may have other options to avoid foreclosure. If any of the following applies to you, call us today at 866.570.5277 to see how we can help:**
- Your circumstances have changed since your original request for assistance.
- You can provide additional documentation to support your request for help.
- You would like information about other alternatives to foreclosure.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, or age (provided that the applicant has the capacity to enter into a binding contract), because all or part of the applicant's

---

Seterus NMLS ID Number: 787641

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT, BUT NOTICE OF POSSIBLE ENFORCEMENT OF OUR LIEN AGAINST THE COLLATERAL PROPERTY. COLORADO: FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COLORADOATTORNEYGENERAL.GOV/CA. Seterus, Inc. maintains a local office at 355 Union Boulevard, Suite 250, Lakewood, CO 80228. The office's phone number is 888.738.5576. NEW YORK CITY: 1411669, 1411665, 1411662. TENNESSEE: This collection agency is licensed by the Collection Service Board of the Department of Commerce and Insurance. Seterus, Inc. is licensed to do business at 14523 SW Millikan Way, Beaverton, OR.          Page 1 of 2

HUGHES, LESLIE D
July 6, 2016
Loan number: 29875273

income derives from any public assistance program, or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal agency that administers compliance with this law is The Federal Trade Commission, Equal Credit Opportunity, 600 Pennsylvania Avenue, NW, Washington, DC 20580.

Eligibility for assistance is at our discretion and not all applicants qualify. We cannot guarantee that you will receive any assistance or a particular type of assistance. This letter should not be construed as a waiver of our rights or the loan owner's rights under the loan documents and any state or federal laws to collect amount owed on your loan.

The Homeowner's HOPE™ Hotline, 888.995.HOPE (ask for "MHA Help"), provides information on foreclosure prevention*. We urge you to become familiar with options that may be available to you.

If you have any questions, please contact us at 866.570.5277. For borrowers having difficulty making payments, we have loan specialists available Monday-Thursday 5 a.m. to 9 p.m., Friday 5 a.m. to 6 p.m., and Saturday 9 a.m. to 12 p.m. (Pacific time). Saturday hours may vary.

Sincerely,


Seterus, Inc.


\* If the loan is subject to foreclosure protection under the Servicemembers Civil Relief Act or other similar state law for service members, then we will not proceed with foreclosure activity during the length of the foreclosure protection. Any mention of foreclosure-prevention alternatives in this document is for your information only. We encourage you to pursue these programs to assist you with a hardship, even if you are not facing foreclosure in the near future

Seterus, Inc.                                         Business Hours (Pacific Time)
14523 SW Millikan Way, Suite 200                     Monday-Thursday 5 a.m. to 8 p.m.
Beaverton OR 97005                                   Friday 5 a.m. to 6 p.m.

# EXHIBIT

# 13B

# seterus™

PO Box 1077; Hartford, CT 06143-1077

**Important information
regarding your request
for assistance.**

L628V

HUGHES, LESLIE D
2270 CHARLESTON PL
LITHIA SPRINGS, GA 30122-4004

Loan number: 29875273, serviced by Seterus, Inc.

April 8, 2016

Dear HUGHES, LESLIE D:

Thank you for your recent request for assistance with your mortgage loan. While your request was carefully considered, your loan could not be approved for assistance at this time for the following reason(s):

| DECISION DATE | PROGRAM | REASON FOR DENIAL |
|---|---|---|
| 4/7/2016 | Streamlined Fannie Mae Modification | We have not received your initial payment required for your trial period plan offer. As a result, your trial period plan has not been executed, and your loan may no longer be eligible for a permanent modification under this program. |

Because your loan is in default at this time, we may continue with collection efforts.

**You may have other options to avoid foreclosure. If any of the following applies to you, call us today at 866.570.5277 to see how we can help:**
- Your circumstances have changed since your original request for assistance.
- You can provide additional documentation to support your request for help.
- You would like information about other alternatives to foreclosure.

The Federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, or age (provided that the applicant has the capacity to enter into a binding contract), because all or part of the applicant's

Seterus NMLS ID Number: 787641

THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT, BUT NOTICE OF POSSIBLE ENFORCEMENT OF OUR LIEN AGAINST THE COLLATERAL PROPERTY. **COLORADO:** FOR INFORMATION ABOUT THE COLORADO FAIR DEBT COLLECTION PRACTICES ACT, SEE WWW.COLORADOATTORNEYGENERAL.GOV/CA. Seterus, Inc. maintains a local office at 355 Union Boulevard, Suite 250, Lakewood, CO 80228. The office's phone number is 888.738.5576. **NEW YORK CITY:** 1411669, 1411665, 1411662. **TENNESSEE:** This collection agency is licensed by the Collection Service Board of the Department of Commerce and Insurance. Seterus, Inc. is licensed to do business at 14523 SW Millikan Way, Beaverton, OR.

Page 1 of 2

Seterus, Inc.                                                Business Hours (Pacific Time)

HUGHES, LESLIE D
April 8, 2016
Loan number: 29875273

income derives from any public assistance program, or because the applicant has in good faith exercised
any right under the Consumer Credit Protection Act. The Federal agency that administers compliance
with this law is The Federal Trade Commission, Equal Credit Opportunity, 600 Pennsylvania Avenue, NW,
Washington, DC 20580.

Eligibility for assistance is at our discretion and not all applicants qualify. We cannot guarantee that you
will receive any assistance or a particular type of assistance. This letter should not be construed as a
waiver of our rights or the loan owner's rights under the loan documents and any state or federal laws
to collect amount owed on your loan.

The Homeowner's HOPE™ Hotline, 888.995.HOPE (ask for "MHA Help"), provides information on
foreclosure prevention*. We urge you to become familiar with options that may be available to you.

If you have any questions, please contact us at 866.570.5277. For borrowers having difficulty making
payments, we have loan specialists available Monday-Thursday 5 a.m. to 9 p.m., Friday 5 a.m. to 6 p.m.,
and Saturday 9 a.m. to 12 p.m. (Pacific time). Saturday hours may vary.

Sincerely,


Seterus, Inc.


\* If the loan is subject to foreclosure protection under the Servicemembers Civil Relief Act or other
similar state law for service members, then we will not proceed with foreclosure activity during the
length of the foreclosure protection. Any mention of foreclosure-prevention alternatives in this
document is for your information only. We encourage you to pursue these programs to assist you
with a hardship, even if you are not facing foreclosure in the near future

Seterus, Inc.
14523 SW Millikan Way, Suite 200
Beaverton, OR 97005

Business Hours (Pacific Time)
Monday-Thursday 5 a.m. to 8 p.m.
Friday 5 a.m. to 6 p.m.

# EXHIBIT

# 13C



**seterus**™

PO Box 1077; Hartford, CT 06143-1077

**Business Hours (Pacific Time)**
Monday-Thursday 5 a.m. to 8 p.m.
Friday 5 a.m. to 6 p.m.

**Physical Address**
14523 SW Millikan Way; Suite 200; Beaverton, OR 97005

**Payments**
PO Box 54420; Los Angeles, CA 90054-0420

**Correspondence, Inquiries, and Notices**
PO Box 1077; Hartford, CT 06143-1077

**Phone:** 866.570.5277
**Fax:** 866.578.5277
www.seterus.com

*L266AS.1*

HUGHES, LESLIE D
2270 CHARLESTON PL
LITHIA SPRINGS, GA 30122-4004

April 5, 2017
Loan number: 29875273
Serviced by Seterus, Inc.

Dear HUGHES, LESLIE D:

**Important information about your assistance request. Read carefully!**

We are glad you asked us for assistance with your mortgage loan. We are ready to guide you through the process, and we congratulate you for taking the first critical step.

**If you intend to keep the property, we require and will establish an escrow account for payment of taxes and insurance in connection with your request for a mortgage loan modification. If you do not already have an escrow account, continue to pay your taxing authority and/or insurance provider until you receive an escrow account analysis from Seterus. You will be required to maintain this escrow account even if the loan is not modified.**

Contact us immediately if you or your property has been affected by a disaster, or if you are located in a federally declared disaster area. We cannot determine your eligibility for a loan modification or any other foreclosure-prevention assistance until we know the extent of the damage to the property and the hardship created by the disaster.

Please read this letter carefully so that you understand the evaluation process, and contact us if you have any questions.

At this time, your application is incomplete. This notice identifies documents we have received from you as of the date of this letter, and those we still need before we can start our decision-making process. All documents you provide will be acknowledged within five business days of receipt. If any submitted document is incomplete, expired, or invalid, we will notify you.

Seterus NMLS ID Number: 787641. THIS COMMUNICATION IS FROM A DEBT COLLECTOR AS WE SOMETIMES ACT AS A DEBT COLLECTOR. WE ARE ATTEMPTING TO COLLECT A DEBT AND ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. HOWEVER, IF YOU ARE IN BANKRUPTCY OR RECEIVED A BANKRUPTCY DISCHARGE OF THIS DEBT, THIS LETTER IS NOT AN ATTEMPT TO COLLECT THE DEBT, BUT NOTICE OF POSSIBLE ENFORCEMENT OF OUR LIEN AGAINST THE COLLATERAL PROPERTY. **COLORADO:** FOR INFORMATION ABOUT THE COLORADO FAIR

HUGHES, LESLIE D
April 5, 2017
Loan number: 29875273

**Documents we have received**

| Document Name | Expiration Date |
|---|---|
| Settlement statement | No expiration |



**Documents still needed**
To evaluate your request, we need the following. As you submit documentation to us, we will determine
if other items are required to complete your application and will notify you accordingly.

| Document Name/Description |
|---|
| Hardship documentation as indicated in the Uniform Borrower Assistance Form. |
| If you are interested in being evaluated for a Mortgage Release (deed-in-lieu of foreclosure) and the property is subject to a homeowners association, please provide the amount of the monthly association dues and the most recent, itemized statement of all outstanding association dues or charges. |
| Income documentation as indicated in the Uniform Borrower Assistance Form. |
| Interior Broker Price Opinion (BPO). We may need to obtain an interior Broker Price Opinion (BPO) or appraisal to evaluate your request. A local Realtor, acting on our behalf, will contact you or your authorized representative to arrange access to your property. This interior BPO must be completed prior to our review of any offer submitted. |
| IRS form 4506-T (Enclosed. You may also download the form from www.seterus.com.) |
| Listing agreement that includes the following: "Seller may cancel this agreement prior to the ending date of the listing period without advance notice to the broker, and without payment of a commission or any other consideration, if the property is conveyed to the mortgage insurer or the mortgage holder." |
| Multiple Listing Service (MLS) listing history for the collateral property |
| Payoff letter(s) for other lien(s) on the property |
| Recent sales contract |
| Uniform Borrower Assistance Form (Enclosed. You may also download the form from www.seterus.com.) |
| W-9 Request for Taxpayer Identification Number and Certification signed for current year by homeowners association (You may download the form from www.seterus.com.) |

# EXHIBIT

# 14



**First American
Title Insurance Company**
CLAIMS SERVICES

August 18, 2016

Leslie Hughes
2270 Charleston Place
Lithia Springs, GA 30122

| | |
|---|---|
| **Reference No.:** | **GA-1609418536** |
| Your file no.: | 3010145575 |
| Owner/Borrower: | Leslie D Hughes |
| Property: | 2270 CHARLESTON PLACE |
| | LITHIA SPRINGS, GA 30122 |

Dear Leslie Hughes:

Upon review of your communication dated August 12, 2016, we believe your request should be directed to First American Title's Post Closing department at FApostclosing@firstam.com. Please note that your request has been forwarded to that group on your behalf. Please allow at least 30-45 days before following up on your request.

If there is another First American Title claim-related matter we can assist you with, please let us know via email to claims.nic@firstam.com or fax at 877-804-7606.

Thank you,


Claims Services

**First American**
**Title Insurance Company**

August 29, 2016

Leslie D. Hughes
2270 Charleston Place
Lithia Springs, GA 30122

Re:  Policy Nos.: FA-46-465587 & FA-EOS-281761
     Borrower: Leslie D. Hughes
     Property: 2270 Charleston Place, Lithia Springs, GA
     Closing Agent:  William T. Cox, Jr.

Dear Ms. Hughes

Enclosed please the First American Short Form Loan Policy, regarding the
above-referenced property. Unfortunately, we do not handle closings in our
office and would not have any copies of your closing documents. The loan
policy is a stipulation that the lender places when you obtain a loan. You have
to have a loan policy insuring their interest. Please let me know if you need
anything further.

Very truly,

Coetye Kittles Carr
Agency Support Specialist

Enclosures

/ckc



*First American*
*Title Insurance Company*
CLAIMS SERVICES

October 6, 2016


Leslie Hughes
2270 Charleston Place
Lithia Springs, GA 30122

| | |
|---|---|
| **Reference No.:** | **GA-1609418536** |
| Your file no.: | 3010145575 |
| Owner/Borrower: | Leslie D Hughes |
| Property: | 2270 CHARLESTON PLACE |
| | LITHIA SPRINGS, GA 30122 |


Dear Leslie Hughes:

Upon review of your communication dated August 12, 2016, we believe your request should be
directed to First American Title's Post Closing department at FApostclosing@firstam.com.
Please note that your request has been forwarded to that group on your behalf.  Please allow at
least 30-45 days before following up on your request.

If there is another First American Title claim-related matter we can assist you with, please let us
know via email to claims.nic@firstam.com or fax at 877-804-7606.

Thank you,



Claims Services

| ☐ AN POLICY | NEW HOME SALE | **RESALE** | 2ND MORTGAGE ☐ | REFINANCE ☐ |

RATE: Metro ☐    NAT'L ☐    SPECIAL@ $_____ /$1.000 ☐

REISSUE? PRIOR POLICY #_____ AMOUNT $_____ SIMUL. POLICY NO.  **FA-EOS-281761**

## SHORT FORM RESIDENTIAL LOAN POLICY
## ONE-TO-FOUR FAMILY

**FA-46-465587**

# *First American Title Insurance Company*

### SCHEDULE A

Amount of Insurance:     **$140,525.00**

File No.: **0606-226**

Mortgage Date:  **07/05/2006**

Mortgage Amount:  **$140,525.00**

Loan Number: **3010145575**

Date of Policy: **07/05/2006**
(Or the date of recording of the
Insured Mortgage, whichever is later)

**FATIC
COPY**

Name of Insured: **WASHINGTON MUTUAL BANK, FA, its successors and/or it's assigns, as their interest may appear.**

Name(s) of Borrower(s): **LESLIE D. HUGHES**

Property Address: **2270 CHARLESTON PLACE, LITHIA SPRINGS, GA 30122**

County and State: **DOUGLAS COUNTY, GEORGIA**

The estate or interest in the land identified in this Schedule A and which is encumbered by the insured mortgage is fee simple and is at Date of Policy vested in the borrower(s) shown in the insured mortgage and named above.
The land referred to in this Policy is described as set forth in the insured mortgage and is identified as the property address shown above.
This policy consists of one page, including the reverse side hereof, unless an addendum is attached and indicated below:

☐     Addendum attached                                   ✓     No Addendum attached

The ALTA endorsements indicated below are incorporated herein:

| | | | |
|---|---|---|---|
| ☐ | Endorsement 4 (Condominium) | ☐ | Endorsement 6 (Variable Rate) |
| ☐ | Endorsement 4.1 (Condominium) | ☐ | Endorsement 6.2 (Variable Rate-Negative Amortization) |
| ☐ | Endorsement 5 (Planned Unit Development) | ☐ | Endorsement 7 (Manufactured Housing) |
| ☐ | Endorsement 5.1 (Planned Unit Development) | ✓ | Endorsement 8.1 (Environment Protection Lien) referring to the following state statute(s): |

NOTICES, WHERE SENT: All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company, Attention: Claims Department, 114 East Fifth Street, Santa Ana, California 92701, or to the office which issued this policy.

POLICY

### SHORT FORM RESIDENTIAL LOAN POLICY
### ONE-TO-FOUR FAMILY

Issued by

**FA-46-465587**

# *First American Title Insurance Company*

Subject to the exceptions from coverage contained in Schedule B below, and any addendum attached hereto, First American Title Insurance Company, A California Corporation, herein called the "Company," hereby insures the insured in accordance with and subject to the terms, exclusions, conditions and stipulations set forth in the American Land Title Association Loan Policy (10-17-92), all of which are incorporated herein. All references to Schedules A and B shall refer to Schedules A and B of this policy.

## SCHEDULE B

### EXCEPTIONS FROM COVERAGE AND
### AFFIRMATIVE ASSURANCES

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of the matters set forth below, except to the extent that the Company does insure in accordance with and subject to its terms against loss or damage which the Insured shall sustain by reason of any inaccuracies in the affirmative assurances set forth below, except as limited in any addendum attached hereto:

1. Those taxes and special assessments which become due and payable subsequent to Date of Policy.

2. Covenants, conditions and restrictions, if any, appearing in the public records. This policy insures that the same have not been violated, except that such affirmative assurance does not extend to covenants, conditions and restrictions relating to environmental protection unless a notice of a violation thereof has been recorded or filed in the public records and is not referenced in an addendum attached hereto. Further, this policy insures that future violation of any covenants, conditions and restrictions appearing in the public records, including any relating to environmental protection, will not result in a forfeiture or reversion of title and that there are no provisions therein under which the lien of the insured mortgage can be extinguished, subordinated or impaired.

3. Any easements or servitudes appearing in the public records. This policy insures that none of the improvements encroach upon the easements and that any use of the easements for the purposes granted or reserved will not interfere with or damage the improvements, including lawns, shrubbery and trees.

4. Any lease, grant, exception or reservation of minerals or mineral rights appearing in the public records. This policy insures that the use of the land for residential one-to-four family dwelling purposes is not, and will not be, affected or impaired by reason of any lease, grant, exception or reservation of minerals or mineral rights appearing in the public records and this policy insures against damage to existing improvements, including lawns, shrubbery and trees, resulting from the future exercise of any right to use the surface of the land for the extraction or development of the minerals or mineral rights so leased, granted, excepted or reserved. Nothing herein shall insure against loss or damage resulting from subsidence.

5. This policy insures against loss or damage by reason of any violation, variation, encroachment or adverse circumstance affecting the title that would have been disclosed by an accurate survey. The term "encroachment" includes encroachments of existing improvements located on the land onto adjoining land, and encroachments onto the land of existing improvements located on adjoining land.

This policy consists of Schedule A and Schedule B.

*NOTICES, WHERE SENT: All notices required to be given the Company and any statement in writing required to be furnished the Company shall include the number of this policy and shall be addressed to the Company, Attention: Claims Department, 1 First American Way, Santa Ana, California 92707, or to the office which issued this policy.*

*First American Title Insurance Company*

WILLIAM T. COX, JR.

(Insert above line name of Agent)

BY: *Gary L. Kennard*   PRESIDENT

By: _____
     Authorized Signatory

ATTEST: *Mark R. Arneson* SECRETARY

IASII 1G97



# EXHIBIT

# 15

Document Prepared By:    GACSD-S    04/28/06
RONALD E. MEHARG
When recorded return to:
DOCX, LLC
1111 ALDERMAN DR., SUITE 350
ALPHARETTA, GA 30005
770-753-4373

Doc ID: 001489990001 Type: GLR
Filed: 06/19/2006 at 04:45:00 PM
Fee Amt: $10.00 Page 1 of 1
Douglas County Georgia
Cindy Chaffin Clerk Superior Court
BK 2380 PG 497

Project #: R043NMACC
Reference #: 685-7662311

* 6 8 5 - 7 6 6 2 3 1 1 *
Secondary Reference #: 20060629 (R045)
PIN/Tax ID #:
Property Address:
2270 CHARLESTON PL.
LITHIA SPRINGS, GA 30122

## AUTHORITY TO CANCEL DEED TO SECURE DEBT

THE INDEBTEDNESS referred to in that certain Deed to Secure Debt described below, having been paid in full, and the undersigned, **Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.**, whose address is **2701 WELLS FARGO WAY, MAC X9901-026, MINNEAPOLIS, MN 55467**, being the present owner of such secured interest by virtue of being the original Grantee, or the heir, assign, transferee, or devisee or the original Grantee, the clerk of such Superior Court is authorized and directed to cancel that Deed of record as provided in Code Section 44-14-4 of the O.C.G.A. for other mortgage cancellations.

Grantor(s):  **RICK D. MORROW AND LISA M. MORROW**
Original Grantee:  **SUN AMERICA MORTGAGE CORPORATION**
Loan Amount: **$130,000.00**              Date of Security Deed: **4/14/1999**
Date Recorded: **5/6/1999**      Book: **1252**      Page: **0167**
Comments:
same being recorded in the Office of the Clerk of Superior Court of **Douglas** County, State of Georgia affecting Real Property and more particularly described in said Deed to Secure Debt referred to herein.

IN WITNESS WHEREOF, the undersigned has caused these presents to be executed on this date of **06/13/2006**.

Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.

*[handwritten: 1 Signature]*

*Linda Green*
LINDA GREEN
VICE PRES. LOAN DOCUMENTATION

*Jeeti*
JESSICA LEETE
VICE PRES. LOAN DOCUMENTATION

Signed, sealed, and delivered on the date above shown
in the presence of:

*Rita Knowles*
Unofficial Witness:
RITA KNOWLES

*Mary Kelly*
Notary Public

MARY L. KELLY
Notary Public - Georgia
Fulton County
My Comm. Expires Oct. 14, 2007

Unofficial
Document

MAR

2007-
151 OF 203

Document Prepared By:
**Ronald E Meharg,** PH#: 888-362-9638
When Recorded Return To:
**DOCX**
1111 Alderman Drive
Suite 350
Alpharetta, GA 30005
Property Address:
**29005 NORTH 82ND STREET**
**SCOTTSDALE, AZ 85262**

*This Space for Recorder's Use Only*

| WELLS | 708 | 0055214159 |

CRef#:07/22/2007-PRef#:R089-POF
Date:06/22/2007-Print Batch ID:28137
Recording Requested By:
**Wells Fargo Bank, N.A.**
AZdrsm-eR2.0  06/26/2007      Copyright (c) 2007 by DOCX LLC

## DEED OF RELEASE/SATISFACTION OF MORTGAGE

**WHEREAS, Wells Fargo Bank, N. A.,** whose address is **2701 WELLS FARGO WAY, X9901-11R, MINNEAPOLIS, MN 55467,** being the current Beneficiary or Mortgagee, the present legal owner and holder of the indebtedness secured by that certain Deed of Trust or Mortgage (the "Security Instrument") described below; and,

**WHEREAS,** the current Beneficiary or Mortgagee acknowledges payment and satisfaction in full of all sums and indebtedness secured by said Security Instrument;

**NOW THEREFORE,** the Beneficiary does hereby release and reconvey, without warranty, to the persons legally entitled thereto, all of its right, title, and interest in and to the real estate described in the Deed of Trust, forever discharging the lien, or the Mortgagee does hereby release, satisfy, and discharge said Mortgage in full and does hereby consent that the same be canceled and discharged forever. Beneficiary or Mortgagee does hereby certify that the same has been paid in full and the lien therein created and retained is hereby released.

Original Borrower(s): **STEVEN S. SORAYA, A MARRIED PERSON**
Original Trustee: **FIRST AMERICAN TITLE INS CO**
Original Beneficiary/Mortgagee: **WELLS FARGO BANK, N.A.**
Date of Mortgage: **07/22/2005**            Loan Amount: **$980,500.00**
Recording Date: **08/01/2005**   Book: N/A Page: N/A Document #: **20051087641**
and recorded in the official records of the **County of Maricopa,** State of Arizona affecting Real Property and more particularly described on said Mortgage referred to herein.

**IN WITNESS WHEREOF,** the undersigned has caused these presents to be executed on this date of **07/03/2007.**

Wells Fargo Bank, N. A.

*Linda Green*
2 Signature
Linda Green
Vice Pres. Loan Documentation

State of GA
County of Fulton
     On this date of **07/03/2007,** before me, the undersigned authority, a Notary Public duly commissioned, qualified and acting within and for the aforementioned State and County, personally appeared the within named **Linda Green,** known to me (or identified to me on the basis of satisfactory evidence) that he or she is the **Vice Pres. Loan Documentation** of Wells Fargo Bank, N. A. and was duly authorized in his or her respective capacity to execute the foregoing instrument for and in the name and in behalf of said corporation and that said corporation executed the same, and further stated and acknowledged that they had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

     Witness my hand and official seal on the date hereinabove set forth.

Notary Public:

DIANNE MISKELL
Notary Public - Georgia
Fulton County
My Comm. Expires June 14, 2008

FILED FOR RECORD
POTTAWATTAMIE CO. IA

2006 SEP 27 AH 9: 30

JOHN SCIORTINO
RECORDER

INST # ___005405___

RECORDING FEE ___5.00___

AUDITOR FEE _____

RMA FEE _1.00_ ECOM _1.00_

This space for Recorder's use only

Document Prepared By: **RONALD E. MEHARG**
**1111 ALDERMAN DR., SUITE 350, ALPHARETTA, GA 30005**
Telephone #: 770-753-4373

When recorded return to:
**DOCX, LLC**
**1111 ALDERMAN DR., SUITE 350**
**ALPHARETTA, GA 30005**
770-753-4373    RETURN ENVELOPE

Property Address:
**303 N. 2ND ST.**
**COUNCIL BLUFFS, IA 51503**

IAMRSD-5     08/29/05
Project #: 708WFHM
Reference #: 708-0022480693

* 7 0 8 - 0 0 2 2 4 8 0 6 9 3 *

Secondary Reference #: 20061011 (R045)
PIN/Tax ID #: 000035132006884000000

## MORTGAGE RELEASE, SATISFACTION, AND DISCHARGE

IN CONSIDERATION of the payment and full satisfaction of all indebtedness secured by that certain Mortgage described below, the undersigned, **Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.,** whose address is, **2701 WELLS FARGO WAY, MAC X9901-026, MINNEAPOLIS, MN 55467,** being the present legal owner of said indebtedness and thereby entitled and authorized to receive said payment, does hereby release, satisfy, and discharge said Mortgage in full and does hereby consent that the same be canceled and discharged of record.

Borrower(s): **JOHN R. GIBSON AND NORA M. GIBSON, HUSBAND AND WIFE**

Original Mortgagee: **WELLS FARGO HOME MORTGAGE, INC., A CORPORATION**

Loan Amount: **$58,262.00**     Date of Mortgage: **4/1/2003**

Date Recorded: **7/25/2003**     Book: **104**     Page: **01907**     Instrument Number: **1862**

Legal Description (if required):

Comments:

and recorded in the official records of **Pottawattamie County**, State of Iowa affecting Real Property and more particularly described on said Mortgage referred to herein.

IN WITNESS WHEREOF, the undersigned has caused these presents to be executed on this date of **09/19/2006.**

Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc.

Witness: RITA KNOWLES

LINDA GREEN
VICE PRES. LOAN DOCUMENTATION

Witness: JESSICA OHDE

JESSICA LEETE
VICE PRES. LOAN DOCUMENTATION

State of **GA**
County of **FULTON**

On this date of **09/19/2006**, before me, the undersigned authority, a Notary Public duly commissioned, qualified and acting within and for the aforementioned State and County, personally appeared the within named **LINDA GREEN** and **JESSICA LEETE**, known to me (or identified to me on the basis of satisfactory evidence) that they are the **VICE PRES. LOAN DOCUMENTATION** and **VICE PRES. LOAN DOCUMENTATION** respectively of Wells Fargo Bank, N.A., successor by merger to Wells Fargo Home Mortgage, Inc., and were duly authorized in their respective capacities to execute the foregoing instrument for and in the name and on behalf of said corporation and that said corporation executed the same, and further stated and acknowledged that they had so signed, executed and delivered said instrument for the consideration, uses and purposes therein mentioned and set forth.

Witness my hand and official seal on the date hereinabove set forth.

Notary Public

RODGER HARPSTER
Notary Public - Georgia
Fulton County
My Comm. Expires Oct. 14, 2007

BK I 07PG05383



*Commonwealth of Massachusetts*

**Southern Essex District Registry of Deeds
Shetland Park
45 Congress Street
Suite 4100
Salem, Massachusetts 01970**

**JOHN L. O'BRIEN, JR.**
**Register of Deeds**
Phone: 978-542-1704
Fax: 978-542-1706
website: www.salemdeeds.com

## NEWS

### FOR IMMEDIATE RELEASE
Salem, MA
June 9th, 2011

Contact:
Kevin Harvey, 1st Assistant Register
978-542-1724
kevin.harvey@sec.state.ma.us
Marie McDonnell, President McDonnell Property Analytics, Inc.
508-694-6866
marie@mcdonnellanalytics.com

**Massachusetts Register of Deeds John O'Brien and Forensic Mortgage Fraud
Examiner Marie McDonnell find former Vice-Presidential candidate Sarah Palin is
victim of potential mortgage fraud; expert says chain of title to new Arizona home
clouded by robo-signers.**

In what is an ironic twist of fate today Register of Deeds John O'Brien and nationally

renowned mortgage fraud examiner Marie McDonnell, President of McDonnell Property

Analytics, Inc., announce that former Alaska Governor and Vice-Presidential nominee

Sarah Palin is an unwitting victim of mortgage fraud and has purchased a home in

Arizona that contains flaws in the chain of title.

Register O'Brien said, "If fundamental property principles still matter in this country,
Sarah Palin may have legal issues that could affect the ownership of her home. Through
no fault of her own, Sarah Palin has become a victim like thousands of others across the
country that have the same problem with their chain of title. I feel bad for Governor
Palin and all the homeowners who have been victimized by this scheme, it just goes to
show you that no one is immune from this type of fraud and irresponsible behavior that
these banks participated in."

Marie McDonnell added, "Sarah Palin's chain of title has been swept up into the eye of
the 'perfect storm' where robo-signer Linda Green's fraudulent Deed of Release on
behalf of Wells Fargo Bank, N.A. is eclipsed by robo-signer Deborah Brignac's
fraudulent foreclosure documents. Brignac, a Vice President of California Reconveyance
Company (a subsidiary of JPMorgan Chase Bank), assigned the homeowner's Deed of
Trust to JPMorgan Chase Bank in her capacity as a Vice President of Mortgage
Electronic Registration Systems, Inc. ("MERS"); in the same breath, Brignac executed a
document appointing California Reconveyance Company (her real employer) as
Substitute Trustee in her alleged capacity as a Vice President of JPMorgan Chase."

Sound confusing? McDonnell explained, "This is a shell game where Brignac purports to
be Vice President of three (3) different entities so that she can manufacture the paperwork
necessary for JPMorgan Chase Bank to hijack the mortgage and then foreclose on the
property. This is an excellent example of how MERS is being used by its Members to
perpetrate a fraud. I have laid out a timeline that illustrates the defects in Sara Palin's

chain of title which shows that it is seriously, if not fatally impaired." McDonnell whose

firm performed the extensive forensic analysis. (*See* McDonnell's Mortgage Map)

O'Brien, who recently announced that he found 6047 fraudulent Linda Green documents

recorded in the Essex Southern District Registry of Deeds which had 22 different

variations of a Linda Green signature has been the National Leader in blowing the whistle

on banks such as Bank of America, J.P. Morgan Chase, Wells Fargo for their business

practices. O'Brien said "These banks have participated in a national epidemic of fraud

that has clouded or damaged the chain of title of hundreds of thousands of American

homeowners all across the country". O'Brien further said "Sadly, Sarah Palin's

misfortune will however, hopefully shine the national spotlight on this issue. Given her

position in the country, I am sure that she will use her influence to stand up for

homeowners and their property rights".

# Mortgage Guide

Lenders    Types of Loans    Calculators    Loans By State    Get a Quote

MAY 25TH, 2017

## Sun America Mortgage

Sun America Mortgage is a division of SunTrust Mortgage, Inc., which is one of the nation's largest bank-owned mortgage companies. They in turn are owned by SunTrust Banks, Inc. which has a long and storied history going back to 1811. Farmers Bank of Alexandria, VA was chartered in February of 1811 and became SunTrust's earliest precursor, as an ancestor of the Crestar Financial Corporation which was acquired by SunTrust in 1998. By 1999 the corporation had acquired 27 different bank charters and decided to consolidate them all under the Georgia chartered SunTrust Brand. They also own 48.3 million shares of the CocaCola Company!

The SunTrust Corporation is based out of Atlanta. As well as supplying mortgage services through SunTrust branches, the telephone, and Internet, SunTrust Mortgage, Inc. originates loans through more than 170 locations in SunTrust markets and adjacent states and services loans nationally. As of March 31, 2006, SunTrust's mortgage servicing portfolio was more than $112.2 billion. In 2005, SunTrust closed nearly 48,000 loans totaling approximately

**GET A FREE QUOTE**

| | |
|---|---|
| Type of Loan | REFINANCE |
| Home Type | SINGLE FAMILY |
| Credit Status | GOOD |
| State | STATE |

GET A QUOTE!

**MORTGAGE CALCULATORS**

APR Online Calculator

Bimonthly Mortgage Online Calculator

Discount Point Mortgage Online Calculator

Interest Only Monthly Payment Online Calculator

Mortgage Affordability Online Calculator

Mortgage Payment Online Calculator

Mortgage Qualification Online Calculator

Mortgage Refinance Online Calculator

Mortgage Tax Deduction Online Calculator

$6.5 billion to provide housing in low-to-moderate-income areas. In addition, almost 51,000 loans totaling $5.3 billion were made to families with low-to-moderate-income to purchase or modernize their homes.

## Loans offered by Sun America Mortgage

Sun America Mortgage has been funding loans for the past decade. Bringing their customers the best in quality, service and experience, they fund a variety of loan programs tailored to their customers needs. Some of their programs are outlined below:

- First Time Buyers Program
- Jumbo Loans
- 15 or 30 Year Fixed Rate Loans
- Adjustable Rate Loans
- FHA, VA and Rural Housing Loans
- Interest Only Loans
- Construction to Permanent Loans
- Investment Property Loans
- No Doc Loans
- 100% Purchase Financing
- LIBOR Loans (London Interbank Offered Rate)

Sun America Mortgage offers its services by phone on the internet or in person. Their website lists a number of mortgage originators for the potential customer's convenience. They will guide the customer through the funding process from application to closing. Sun America includes an application checklist on their website, so the customer will be prepared with the

documents he needs from beginning to end. Advice is given on many home buying issues, from points to PMI (Private Mortgage Insurance). Many calculators are included on Sun America's website to enable the customer to familiarize himself with his options. Having done so, his discussions with the Sun America Loan Professional will be more to the point. The customer will be able to make an informed decision regarding his loan alternatives and make a funding choice which is the perfect fit for his circumstances. This is Sun America's goal.

*Mortgage Guide is not directly affiliated with any mortgage broker or lender and cannot make any guarantee as to the lender affiliation of any broker or agent which contacts you. Company information on our site is for informational purposes only.*

*This site is not a broker and does not collect or solicit mortgage applications. Content is for informational or comparison purposes only. Services are not available in New York. Products and services may not be available in all other states.*

RETURN TO TOP OF PAGE

COPYRIGHT © 2017  PRIVACY POLICY · DISCLAIMER · HOME

# EXHIBIT

# 16

April 29, 2017

Federal National Mortgage Association
3900 Wisconsin Avenue NW
Washington, DC 20016-2892

Property Address:
2270 Charleston Place
Lithia Springs, GA  30122
*FNMA Loan No* # 1702040017
*Original and Only Loan Numbers:*
*#3010145575, #0734948896*

*Certified Mail #  9590 9402 2184 6193 8308 23*

This notice is sent to further *memorialize* the formal written rescission that was confirmed
delivered to Washington Mutual Bank November 1, 2006 at 12:26 pm, of the corresponding
contracts, security deeds, notes and all other related transactions to the above listed loan
numbers.  I exercised my legal right to rescind the related transactions based upon provisions
including but not limited to the relative sections of the Federal Truth In Lending Act (TILA) 15
U.S.C. §1635, Regulation Z, and various violations of the Georgia Fair Lending Act and Fraud.

The rescission of these contracts was both proper and timely. On January 13, 2015, according to
the United States Supreme Court's Ruling in Jesinoski v. Countrywide Home Loans, Inc., the
Note's and Deed's were rescinded and voided by operation of law as of November 1, 2006.
Also, Washington Mutual did not respond nor dispute within 20 days of receipt. Regardless of
whether the lender fulfilled its legal requirement to return all funds paid on the loans and
reflect the termination of the security interest the loans no longer exists the contracts are void
and any acts by any party based on the loan or contracts are illegal.

Further, all subsequent payments made by me on the above listed contracts were made under
duress.

I am requesting the return of all monies paid and to take the necessary and appropriate action
to reflect the termination of the security interests within the public land records.

Sincerely

Leslie Hughes
Loan #3010145575
Loan #0734948896
FNMA#1702040017

April 29, 2017

Brock & Scott PLLC
4360 Chamblee Dunwoody Rd, Suite 310
Atlanta, GA 30341

Property Address:
2270 Charleston Place
Lithia Springs, GA 30122
***Original and Only Loan Numbers:***
***#3010145575, #0734948896***
***SETERUS #29875273 / B&S FILE NO. 16-13209***
***Certified Mail # 9590 9402 2184 6193 8307 62***

This notice is sent to further ***memorialize*** the formal written rescission that was confirmed
delivered to Washington Mutual Bank November 1, 2006 at 12:26 pm, of the corresponding
contracts, security deeds, notes and all other related transactions to the above listed loan
numbers. I exercised my legal right to rescind the related transactions based upon provisions
including but not limited to the relative sections of the Federal Truth In Lending Act (TILA) 15
U.S.C. §1635, Regulation Z, and various violations of the Georgia Fair Lending Act and Fraud.

The rescission of these contracts was both proper and timely. On January 13, 2015, according to
the United States Supreme Court's Ruling in Jesinoski v. Countrywide Home Loans, Inc., the
Note's and Deed's were rescinded and voided by operation of law as of November 1, 2006.
Also, Washington Mutual did not respond nor dispute within 20 days of receipt. Regardless of
whether the lender fulfilled its legal requirement to return all funds paid on the loans and
reflect the termination of the security interest the loans no longer exists the contracts are void
and any acts by any party based on the loan or contracts are illegal.

Further, all subsequent payments made by me on the above listed contracts were made under
duress.

I am requesting the return of all monies paid and to take the necessary and appropriate action
to reflect the termination of the security interests within the public land records.

Sincerely

Leslie Hughes
Loan #3010145575
Loan #0734948896
FNMA#1702040017

April 28, 2017

**Attn: CHASE Customer Service Research**
Mail Code: OH4-7302
P.O. Box 24696
Columbus, OH 43224-0696
Property Address:
2270 Charleston Place
Lithia Springs, GA  30122

Loan Numbers:
#3010145575, #0734948896

*Certified Mail # 9590 9402 2184 6193 8308 47*

This notice is sent to further *memorialize* the formal written rescission that was confirmed delivered to Washington Mutual Bank November 1, 2006 at 12:26 pm, of the corresponding contracts, security deeds, notes and all other related transactions to the above listed loan numbers.  I exercised my legal right to rescind the related transactions based upon provisions including but not limited to the relative sections of the Federal Truth In Lending Act (TILA) 15 U.S.C. §1635, Regulation Z, and various violations of the Georgia Fair Lending Act and Fraud.

The rescission of these contracts was both proper and timely. On January 13, 2015, according to the United States Supreme Court's Ruling in Jesinoski v. Countrywide Home Loans, Inc., the Note's and Deed's were rescinded and voided by operation of law as of November 1, 2006. Also, Washington Mutual did not respond nor dispute within 20 days of receipt. Regardless of whether the lender fulfilled its legal requirement to return all funds paid on the loans and reflect the termination of the security interest the loans no longer exists the contracts are void and any acts by any party based on the loan or contracts are illegal.

Further, all subsequent payments made by me on the above listed contracts were made under duress.

I am requesting the return of all monies paid and to take the necessary and appropriate action to reflect the termination of the security interests within the public land records.

Sincerely

Leslie Hughes
Loan #3010145575
Loan #0734948896

April 29, 2017

Seterus, Inc.
PO Box 1077
Hartford, CT 06143

Property Address:
2270 Charleston Place
Lithia Springs, GA  30122
Seterus Created Loan # 29875273
Original and Only Loan Numbers:
#3010145575, #0734948896

**Certified Mail # 9590 9402 2184 6193 8308 30**

This notice is sent to further **memorialize** the formal written rescission that was confirmed delivered to Washington Mutual Bank November 1, 2006 at 12:26 pm, of the corresponding contracts, security deeds, notes and all other related transactions to the above listed loan numbers.  I exercised my legal right to rescind the related transactions based upon provisions including but not limited to the relative sections of the Federal Truth In Lending Act (TILA) 15 U.S.C. §1635, Regulation Z, and various violations of the Georgia Fair Lending Act and Fraud.

The rescission of these contracts was both proper and timely. On January 13, 2015, according to the United States Supreme Court's Ruling in Jesinoski v. Countrywide Home Loans, Inc., the Note's and Deed's were rescinded and voided by operation of law as of November 1, 2006. Also, Washington Mutual did not respond nor dispute within 20 days of receipt. Regardless of whether the lender fulfilled its legal requirement to return all funds paid on the loans and reflect the termination of the security interest the loans no longer exists the contracts are void and any acts by any party based on the loan or contracts are illegal.

Further, all subsequent payments made by me on the above listed contracts were made under duress.

I am requesting the return of all monies paid and to take the necessary and appropriate action to reflect the termination of the security interests within the public land records.

Sincerely

Leslie Hughes
Loan #3010145575
Loan #0734948896



---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Brock & Scott PLLC
4360 Chamblee Dunwoody Rd
Suite 310
Atlanta, GA 30341

9590 9402 2184 6193 8307 62

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)         C. Date of Delivery
                                      5/1/17

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053         Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Federal Nat'l Mortgage Assoc.
3900 Wisconsin Ave NW
Washington, DC 20016-8912

9590 9402 2184 6193 8308 23

2. Article Number (Transfer from service label)

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)         C. Date of Delivery
                                      5/8

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery (over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form 3811, July 2015 PSN 7530-02-000-9053         Domestic Return Receipt

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Seterus, Inc.
758 Rainbow Rd
Winsor, CT 06095

9590 9402 2184 6193 8308 30

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by (Printed Name)         C. Date of Delivery
Lin Beng                              5/7/17

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:      ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery

**SENDER:** *COMPLETE THIS SECTION*

- ■ Complete items 1, 2, and 3.
- ■ Print your name and address on the reverse so that we can return the card to you.
- ■ Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

CHASE (OH4-7120)
3415 Vision Dr
Columbus, OH 43219-6009

9590 9402 2184 6193 8308 47

2. Article Number *(Transfer from service label)*

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature

X _(signature)_    ☐ Agent
                   ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery

D. Is delivery address different from item 1?    ☐ Yes
   If YES, enter delivery address below:          ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery
  (over $500)
☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Return Receipt for Merchandise
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2015 PSN 7530-02-000-9053    Domestic Return Receipt

# EXHIBIT

# 17

BROCK & SCOTT 16-13209

SETERUS 29875273

Continued dispute to your CFPB response, which was totally misleading.  You still do not explain the creation of a new loan.  Furthermore, how is your loan secured by my home?

Let's keep it simple.  Yet once again as you continue to be deceptive in what you have provided per my request.

SETERUS LOAN NUMBER: 29875273

What is a 'Loan'?

"A loan is the act of giving money, property or other material goods to another party in exchange for future repayment of the principal amount along with interest or other finance charges. A loan may be for a specific, one-time amount or can be available as an open-ended line of credit up to a specified limit or ceiling amount".

The terms of a loan are agreed to by each party in the transaction before any money or property changes hands.

A new loan number would be the identifying number for that transaction.  I have not completed ANY transaction with your company.  There was no notice of SALE only of service.

It is simple.  Provide me with the "Loan Application, a Note signed by Leslie Hughes promising to pay on Loan number 29875273, where is your "Power of Sale" for Loan 29875273.  Explain how Leslie Hughes can be in default on a Loan she has never secured from Seterus.

From SETERUS WEB SITE:

If I have financial difficulties, can Seterus help me?

Will Seterus refinance my existing loan?

No. We cannot refinance any mortgage loan because we are not a loan originator or lender. For refinance options, you may contact your lender of choice.

Why are you initiating new loans and numbers? Why are so many consumers waiting for your special Welcome Packages? The Fed Ex package received yesterday was interesting to say the least. Your version of a note with your hand written Loan number on it, we have never seen before.

Your statement about the letter provided from Chase dated February 12, 2016 evidencing the principal balance has been removed or forgiven is irrelevant as the servicing of the of the "loan" took place in December means nothing if you sent me a letter March 4, 2016 in response to my correspondence stating to remit the payoff amount for Loan number 298752783 to JP Morgan Case Bank, Tampa Florida. Also, I have forwarded to you your letter indicating a new loan and Seterus Inc MSP Explorer print out showing a transaction for a loan set up.

"Chase has satisfied its consumer relief obligation," said Smith. "The servicer has provided more than $4.06 billion to more than 168,000 borrowers before the deadline specified in the settlement."

Is this how Chase managed to meet the its obligation. Principal forgiveness on true account and use Seterus to bully consumers into paying on new loans they have never acquired. For months I have requested the items above to substantiate your claim of interest on this fictional loan. The court case demonstrates that your company is no stranger to committing fraud and creating bogus Loan numbers for profit. As of today you have not provided loan documents for Seterus Loan 29875273 to support your persistent threat of foreclosing on my home come 10/4/2016. I have attached the docs for all to view of a loan I have not secured.



# Seterus

# Frequently Asked Questions

## Search Results: refinance

No. We cannot refinance any mortgage loan because we are not a loan originator or lender. For refinance options, you may contact your lender of choice.

In some circumstances and upon request, we may be able to stop sending periodic statements to a specified borrower. However, a divorce decree does not change the terms of your Note and Mortgage/Deed of Trust. To change liability and remove a borrower from a loan, the loan would need to be refinanced through an outside entity.

Contact Us (/Home/ContactUs) | Privacy Policy (/Home/PrivacyPolicy) | Terms of Use (/Home/TermsOfUse) | About Your Rights (/Home/AboutYourRights) | Licenses (/Home/Licenses)

© 2017 Seterus, Inc. All Rights Reserved    v.6.1.8.2

December 15, 2016

Brock & Scott
Attention: Patrick Taggart
Foreclosure Division
4360 Chamblee Dunwoody Road
Suite 310
Atlanta, GA  30341

Property Address:
2270 Charleston Place
Lithia Springs, GA 30122

B & S File Number:  16-13209
Loan Number:  ******5273

Mail Cert. # 7016 2140 0000 6806 4557

Mr. Taggart:

I am disputing the validity of the current debt you claim that I owe.

Again, please treat this letter of dispute as a "QUALIFIED WRITTEN REQUEST, NOTICE OF ERROR, AND A REQUEST FOR INFORMATION" per the same statutes listed in my previous letter stating the same to both your office as well as your clients.  I did receive the acknowledgement on November 22, 2016, but have yet to receive the response.  Will this be a repeat of your offense of violating the FDCPA, and Slander of Title by posting our home for foreclosure for 28.00 which Seterus would not accept.

Notice of Error, Request for Information, and Qualified Written Request:

1.  Written notice to Chase and written response from Chase stated they transferred the servicing of a 28.00 remaining balance on the allege loan transaction identified by #3010145575 balance to Seterus.  Why have you sent me a letter again threatening to foreclose on my home for $138,185.73? This is a HUGE ERROR.  Please send a detailed list and not a computer printout that explains every dollar that exceeds 28.00.  Really?  $138,157.73 in miscellaneous fees?

2.  Has each sale, transfer or assignment of the above listed mortgage or promissory note or any other instrument related to loan **29875273** been recorded in the county property records in the county and state in which my property is located from the inception of loan **29875273** to the present date?

*16-13209*

3. Please provide the full name of the Trust where the Note Number is trading, or has traded, and the identifying Series of Certificates.
   (Note: If the note number is being traded in a Fannie Mae Trust or Freddie Mac Trust, please provide all information to identify the Trust (i.e. Fannie Mae Pool Number, CUSIP Number, REMIC or SMBS Trust Number and Trust Class/Tranche).

4. Who was the original lender of Loan **29875273?**

5. Who was the previous servicer of Loan **29875273?**

6. **Provide certified copy of note, deed of trust, or whatever legal contractual document that you poses signed by me for Loan 29875273 which includes a Power of Sale Clause and a lien on the above listed property address.**

7. Please provide the full name, address and telephone number of the actual entity that funded the transaction with identifying loan number of **29875273.**

8. **For the record. Loan Transaction #3010145575 was rescinded November 1, 2006 for fraud. That transaction was rescinded in writing and received by Dionne Gajadhar 12:25pm . Fear and the crime of extortion and a true criminal act of concealment have forced me to pay for the last 10 years on the only contract allegedly linked to my home and that is #3010145575.**

Loan numbers are determined by creditors and are unique.  Loan numbers identify specific contractual agreements.  This is a very dangerous circumstance, to have a contract generated and tied to your property without your knowledge.  Statement is fully supported by 12 CFR §1026 (Regulation Z), which by the way is just one of many regulations violated by your clients (Seterus) with respect to this loan they have created from thin air.

The only transaction (3010145575) related to the above referenced address that was to be serviced by Seterus had a stated remaining miscellaneous balance of $28.00.  Myah DuBois of Congressman David Scott's office called Seterus on January 5, 2016 at approximately 11:25 am and conferenced me in while I was at my work and Seterus stated they will not accept a payment from me with ID #3010145575, which made no sense, until I read other complaints on file of homeowners doing as instructed and mailing their payments with the loan ID number on it to insure the proper posting of payment and the payments were returned for not having the new loan number on it.

Mr. Taggart, when I called and spoke with your office on September 23rd of 2016 to verify that your office received the dispute to this Loan previously your response through your Representative Gloria was one of pure fiction.  You stated that my response to your August 5th, 2016 notice was 11 days late and that I was not entitled to the validation of the debt.  My response to the notice was sent certified mail and was received on August 16th, 2016 and not even three days later the notice for power of sale post marked on the 19th of August 2016.  You did not validate the debt before you "slandered the title"

*16-13209*

to my property and caused a great deal of harm to my 11 year old daughter and myself.  The HUD-1(that was only but 1 of the proven fabricated fraudulently created docs none of the dollar amounts are correct) was labeled with transaction #3010145575 (the account that has 28.00 on it), the same for the fabricated note and mortgage.

The documents your office provided in reference to Loan ID #29875273 reflect the establishment of a new loan and all related fees and taxes.  This is clearly a violation of Georgia's Resident Mortgage Fraud Act, Identity Theft, and a few other criminal and civil statutes.  I approached this issue as a mistake or errors in someone's accounting initially and have proffered every opportunity to correct and no correction has been made.

**Please provide the documents requested and a detailed answer to each question within the time frame required by law. Upon receipt of your response, an audit will be conducted that may lead to further requests under an additional Qualified Written Request letter.**

16-13209

December 14, 2016

Erica

I have been waiting for more than a month to receive a response to my correspondence sent to you via e-mail on November 6, 2016. I also, submitted another request through the Fannie web site again.

My questions are **not** servicer related, but are related to the ownership of this purported note sold by Washington Mutual, FA in 2006. The Loan Number for that transaction was 3010145575 and your Fannie Mae number was #1702183017. This transaction should **now have a zero balance and the note cancelled and filed at the Douglas County courthouse as it has been more than a year.**

Now there is another servicer stating that there is another transaction that I have entered into with Loan # 29875273 for which I have no knowledge of and have requested the documents to support this transaction bearing my ink signature and they have not been provided.

I only purchased the 1 home in 2006 and never refinanced nor modified. The servicer Seterus states that #29875273 Loan Transaction is owned by Fannie Mae and is secured by my property. Please provide the proof of ownership or have your Servicer correct their records. I need to know if I am a victim of Identity Theft or if this is just another scam to end up with more billion dollar settlements for wrong doing.

I also received 2 letters from Seterus *denying my* request for a loan modification. I have and would never request a loan modification from this company from the thousands of complaints I have read on the CFPB's web site, especially not on a loan that is not mine. Please provide a response in a timely manner.

As before, I am always available to speak with you and would appreciate your assistance. But do provide a written response as well.

Thank You,
Leslie Hughes

Property Address:   2270 Charleston Place
                    Lithia Springs GA 30122
                    *770-639-9727* phone
                    (Written Response is Requested)

10/5/2016

Brock & Scott 16-13209
Attention: Patrick Taggart

SETERUS Loan Number: 29875273

Dear Sirs

I am sending this statement so that there will be no room for doubt about the exhausted disputes I have sent for nearly a year of your claims of an obligation by myself to the above listed loan.

I have never requested, approved, nor performed in any way with regards to Seterus Loan 29875273. Seterus has failed and refused to provide legal documentation to support Loan 29875273. A non-bank entity setting up new loans and attempting to secure these created loans to real property is not legal. I have on more than one occasion requested the Loan Application, and all related documents for loan 29875273 and you have not provided those documents. Per your own web site you are a servicer and not a lender, but yet you set up new loans? Rebranding, a zero principal balance and trying a balance transfer after the fact. Is a material misrepresentation to say the least. Loan numbers have a purpose and are material to a contract. I can print a copy of a note from any county deed office and hand write or overlay any new numbers I choose, but it will not make it legal.

Whatever contract you made with Chase to service the now 3010145575 that has no principal balance; you should contact Chase, as I have no contract with Seterus. Your attorney's at Brock & Scott have been fully aware of my dispute as they were notified in writing many times and continued to serve as a debt collector on a debt that has not been validated.

Leslie Hughes

September 22, 2016


Brock & Scott PLLC
4360 Chamblee Dunwoody Road
Foreclosure Division
Suite 310
Atlanta, GA  30341


Certified Mail Number:  9590 9402 1237 5246 3089 86


Dear Sir and Madam:

This is the second certified correspondence being sent to your office.  The first
was in response to your letter dated August 5, 2016 concerning property address:

2270 Charleston Place Lithia Springs, Georgia 30122
B & S File Number  16-13209
Loan Number ******5273   (This is not my LOAN)

Your correspondence dated August 5, 2016 stated that the above listed loan had
been placed with your office for foreclosure.  Your correspondence also indicated
that the letter was sent to comply with the Fair Debt Collection Practices Act.  My
dispute to your notice dated August 5, 2016 was sent certified mail and faxed
August 16, 2016.  You had the foreclosure notice *post marked August 19, 2016,
including the NOTICE OF FORECLOSURE SALE UNDER POWER.*

*My response to your initial letter unequivocally fully disputed the total amount
of the debt.  Considering the fact that your next notice was post marked 3 days
later, your office did not look too hard to validate the debt that you stated you
were trying to collect on.  Even though a statement is made that there is no
"demand for payment" you are still responsible for your collection actions.
Hopefully, you will also be held accountable for the fraudulent activities that*

*you are aiding SETERUS with.   Brock & Scott posted the notice that caused the fallout of bottom feeders to my home bold enough to walk up to my door and speak of foreclosure, post cards on my doors, sending letters to my mailbox and my eleven year old daughter has had to witness these intrusions and has been in tears with fear of losing the only home she has ever known.  With just a little bit of due diligence her pain could have been avoided.  She is now seeing a counselor.*

*Seterus had already stressed me to the point that I landed in the emergency room in February 2016 and could not function for months, my daughter was worried about her mom, but she did not know what was breaking her mom. Brock & Scott made sure the world told her she was about to lose her home.*

*Just a couple of key points that you will be hearing about in the coming days and to show what just a little due diligence could have prevented.  There are documents already in my hands and the reason for the dispute and I don't have your resources.  I am just a lowly homeowner with nearly 30 years of federal service and part of my job is connecting the dots on wrong doing.*

*Unpaid Principal Balance    0.00*
*Accrued Interest      0.00*
*Escrow Advances      0.00*

*In hand right now are papers showing 0.00 principal balance remains.*
*That is why your client created a new loan and rejected payments on the alleged loan account that has already been fully satisfied.*

*I am also attaching a copy of the complaint filed with the CFPB, for starters.  See CFPB complaint for further details.*

Leslie Hughes

January 11, 2016


SETERUS

14523 SW Millikan Way
Suite 200
Beaverton, OR  97005


Loan Number 29875273

 Current Mailing Certification Number:  9590 9402 1237 5246 3011 47

December 27th, 2015 mail certification letter number  7015 1520 0001 6936 0981

December 16th, 2015 mail certification letter number  7014 3490 0001 6367 2320

*Reason: Your refusal to accept and credit any payments to my loan you claim to have servicing rights too that would have my original loan number on it.*


To Whom It May Concern,


I am sending this 3rd letter to you , the 2 previous letters documented by the above referenced mailing certification numbers, to request yet again the information requested in the 2 previous pieces of correspondence and to ask for justification for declarations made during a conference call with a representative of your company, Congressman David Scott's office and myself.  This conference call took place on January 5th, 2016 at approximately 11:25am whereas the seterus representative stated the any payment that I make to your company bearing my original loan number will not be accepted and applied to my loan.  That statement would support the paper work your company sent to me indicating a new loan and the new loan number for which I am not a party of.  It appears your company and Chase have both misrepresented your relationship with my loan and home.   There apparently is no recording of any assignment of my one and only loan to either Chase or Fannie Mae to be found.  Is this perhaps the reason your company is erroneously trying to tie a new loan and number to my address.  Given the problems and complaints I filed with WAMU before they filed bankruptcy,  the still ongoing litigation, congressional hearings which included the validity of WAMU's single family home loans among other improprieties  with the origination of their loans, and the long list of documented if not admitted misconduct by those that followed claiming the ownership of a debt by me tied to my home, I am requesting you to provide the twice previously requested information to validate this pretended debt

that anyone can try and claim at this point I owe. All valid assignments to the original note are needed to be clear in addition to all other requested information as previously stated. McDonalds can send me a letter and assign me a number and tell me to start paying them. No one in their right mind would knowing agree to any of this madness that you and your predecessors are perpetrating on homeowners had it been disclosed in a manner intended to be understand. Most attorneys don't even understand the complexities of this chaos that has been created.

Also, as I am an ordinary citizen and even in using basic common sense cannot decipher a computer printout of how my payments have been applied by your accounting standards or Chases. A plain language statement of explanation would be greatly appreciated if it is intended for the public to understand. I need to know in plain language how my payments have been applied as my original notes details that information.

LESLIE HUGHES

2270 CHARLESTON PLACE

LITHIA SPRINGS GA 30122

1/22/2016

**Seterus, Inc**
**14523 SW Millikan Way**
**Suite 200**
**Beaverton, OR  97005**
**Your Loan Number  29875273**
**CERTIFIED MAIL # 7015 1520 0001 6935 4409**

**My Property Address:**
**2270 Charleston Place**
**Lithia Springs, GA  30122**

# R.E.S.P.A. QUALIFIED WRITTEN REQUEST

Please treat this letter as a "**qualified written request**" under the Federal Servicer Act, which is a part of the Real Estate Settlement Procedures Act, 12 U.S.C. 2605(e).

Specifically, we are disputing a) the identity of a true secured lender/creditor, and b) the existence of debt, and c) your authority and capacity to collect on behalf of the alleged lender/creditor. Because of extensive criminal activity and fraud in this arena, we require proof of the chain of secured ownership from the original alleged lender/creditor to the alleged current lender/creditor. Further, we require proof that you are the entity that has been contracted to work on behalf of the alleged lender/creditor.

Pursuant to "Subtitle E Mortgage Servicing" of the Dodd-Frank Wall Street Reform and Consumer Protection Act and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1), please provide:

1. A full, double sided, certified "true and accurate" copy of the original promissory note and security instrument and all assignments of the security instrument.

2. Full name, address and telephone number of the actual entity that funded the transaction.

3. Full name of Trust where the Note Number is trading, or has traded, and the identifying Series of Certificates.
(Note: If the note number is being traded in a Fannie Mae Trust or Freddie Mac Trust, please

provide all information to identify the Trust (i.e. Fannie Mae Pool Number, CUSIP Number, REMIC or SMBS Trust Number and Trust Class/Tranche).

4. Full name, address, and telephone number of the Trustee.

5. Full name, address, and telephone number of the **Custodian of my original Promissory Note**, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f)(2) of the Truth In Lending Act.

6. Full name, address, and telephone number of the **Custodian of my original Security Instrument**, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f)(2) of the Truth In Lending Act.

7. **A physical location (address) of the original promissory note, original security instrument, and all assignments** of the security instrument, and a **contact name and phone number of someone who can arrange for inspection** of said documents.

8. Full name, address and telephone number of any master servicers, servicers, sub-servicers, contingency servicers, back-up servicers or special servicers for this account.

9. The electronic MERS number assigned to this account if this is a MERS Designated Account.

10. **Proof of true sale of the note** from alleged Lender to investors, by showing:
Wire transfer document(s), and/or
Signed purchase and sale agreement(s),
Bank statements or similar documentation.

11. The MERS Milestone Report, if the note number and security instrument was tracked by Mortgage Electronic Registration Systems. I want to see the audit trail of the alleged transfer in ownership and alleged transfer in security interest.

12. A complete audit history from alleged loan origination, showing the dates payments were applied, and to what internal accounts (i.e. principal, interest, suspense, escrow, etc.) payments were applied.

13. A complete and itemized statement of all advances or charges against this account.

14. A complete and itemized statement from the date of the note origination to the date of your response to this letter of any suspense account entries and/or any corporate advance entries related in any way to this account.

15. A complete and itemized statement from the date of the loan to the date of your response to this letter of any property inspection fees, property preservation fees, broker opinion fees,

appraisal fees, bankruptcy monitoring fees, or other similar fees or expenses related in any way to this loan.

16. A statement/provision under the security instrument and/or note that authorizes charging any such fee against the account.

17. Copies of all property inspection reports and appraisals, broker price opinions, and associated bills, invoices, and checks or wire transfers in payment thereof.

18. Complete, itemized statement of the current amount needed to pay-off the alleged "loan" in full.

**You should be advised that within FIVE (5) DAYS you must send us a letter stating that you received this letter. After that time you have THIRTY (30) DAYS to fully respond as per the time frame mandated by Congress, in "Subtitle 'E' Mortgage Servicing" of the "Dodd-Frank Wall Street Reform and Consumer Protection Act and pursuant to 12 U.S.C. Section 2605(e)(1)(A) and Reg. X Section 3500.21(e)(1).**

Leslie D. Hughes

# NOTICE OF INSUFFICIENT VALIDATION

**Date: January 25, 2016**

**SETERUS, INC.**

**Mail Certification Number:  7015 1520 0001 6935 4256**

**Your Loan # 29875273**

I have sent you a certified mailed notice requiring you to **validate** this debt in accordance with 15 USC § 1692g. In response you have only sent a name and address, which may not be accurate.  Furthermore, you have failed to adequately respond to 2 subsequent certified letters requesting the same. This is unsatisfactory as proof that I owe the debt (please see Fields v. Wilber Law Firm, Donald L. Wilber and Kenneth Wilber, USCA-02-C-0072, 7th Circuit Court, Sept 2004.), and is hereby **rejected** as a validation of the debt. You have not complied with my right to have the debt validated according to the standards of the FDCPA, and your response is hereby **rejected** as a validation of the debt. You **CEASE all activity until validation is given or be subject to violation of the Fair Debt Collection Practices Act** or I will file a lawsuit for violation of FDCPA, § 809(b). Thank you for your assistance as I assert my right to have a proper **validation**/ not verification of the referenced account according to law.

Sincerely,

Leslie D. Hughes
2270 Charleston Place
Lithia Springs, GA  30122

January 29, 2016

Certified Mail# 7015 1520 0001 6935 4270

Seterus, Inc.
14523 SW Millikan Way
Suite 200
Beaverton, OR  97005

RE:  NOTICE OF VALIDATION OF ALLEGED DEBT

Your Loan Number:  29875273

Property Address:  2270 Charleston Place
                            Lithia Springs, GA  30122

Dear Sir,

This letter dated January 29, 2016 is to notify you, your firm and any other entity
claiming ownership of this alleged loan and note, that I am exercising my rights under
the "Fair Debt Collections Practices Act" as codified at 15 USC § 1692, which
stipulates that a debt collector must, if requested, provide validation of the alleged
debt, i.e. validate the debt, per "The Fair Debt Collections Practices Act", "FDCPA".
The debt collector (Foreclosure Attorney, Bank, Alleged Lender) is mandated under
"FDCPA" to cease and desist ALL collection activity until validation of the original
note is provided.

This letter requests VALIDATION of the alleged debt accompanied by an
Affidavit from the Alleged Lender.
Please provide the following:
1. Copy of the original alleged note accompanied by an AFFIDAVIT from the alleged
Lender
2. Identify to what the alleged debt pertains.
3. Provide details how the alleged debt was calculated.
(Field v. Wilber Law Firm, Donald L. Wilber and Kenneth Wilber, USCA-02-C-0072, 7th
Circuit Court, September 2004.

4. Provide Regulation Z, and Notice of Right to Cancel (Truth in Lending Act)
5. Provide copies of any papers that show that I agreed to pay the alleged debt.
6. Identify the original creditor.
7. Provide the agreement between the creditor and your company which authorizes you to collect funds (without a contract, your firm has no right to foreclose).
8. Provide evidence that the Statute of Limitations has not expired on this account.
9. Provide evidence that you are licensed to collect in my state.
10. Provide your license numbers and the Alleged Lender's Registered Agent.

Please provide the above information within five (5) business days from the postmark date to:
Leslie D. Hughes 2270 Charleston Place Lithia Springs, Ga 30122.

Sincerely,


Leslie D. Hughes

February 16, 2016


Seterus

14523 SW Millikan Way
Suite 200
Beaverton, OR  97005

You're Loan Number 29875273

Mail Certification Number:  7015 1520 0001 6935 4232


To Whom It May Concern,

In reference to the above listed loan number and your claims that at this point
now 2 months later still unverified; quite frankly reeks of attempted extortion.

Just sticking with the basics.  2 months ago I disputed having *any loans, accounts
and or obligations of any kind with the above reference loan number or account
number and respectfully requested that your company provide me with any
legally binding contract that I have entered into that would show differently and
you have not done so.  Your company has threatened to take my home if I do
not submit payments on this account, yet you have refused to provide that very
important bit of documentation.  Who in their right minds pays thousands of
dollars on an account that is not theirs?  I requested that you state whatever
laws that you are operating under, that I am not familiar with, that mandates a
consumer to do so, and you have not stated any such law.*  As we are intimately
familiar with the 1 and only mortgage contract that I have signed under a
complete cloud of deceptions, misrepresentations and what I know now to be
text book fraud; it makes no mention that the 1 loan may automatically create
new loans in my name and secure to my property without my agreement and

consent. If have missed that please highlight and forward that portion with everything else you have failed to provide to substantiate your claim.

Furthermore, you did not adequately respond to the "QWR" dated 1/22/2016. Please see items requested below.

1. A full, double sided, certified "true and accurate" copy of the original promissory note and security instrument and all assignments of the security instrument.

2. Full name, address and telephone number of the actual entity that funded the transaction.

3. Full name of Trust where the Note Number is trading, or has traded, and the identifying Series of Certificates.
(Note: If the note number is being traded in a Fannie Mae Trust or Freddie Mac Trust, please provide all information to identify the Trust (i.e. Fannie Mae Pool Number, CUSIP Number, REMIC or SMBS Trust Number and Trust Class/Tranche).

4. Full name, address, and telephone number of the Trustee.

5. Full name, address, and telephone number of the **Custodian of my original Promissory Note**, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f) (2) of the Truth In Lending Act.

6. Full name, address, and telephone number of the **Custodian of my original Security Instrument**, including the name, address and telephone number of any trustee or other fiduciary. This request is being made pursuant to Section 1641(f) (2) of the Truth In Lending Act.

8. Full name, address and telephone number of any master servicers, servicers, sub-servicers, contingency servicers, back-up servicers or special servicers for this account.

10. **Proof of true sale of the note** from alleged Lender to investors, by showing:
Wire transfer document(s), and/or
Signed purchase and sale agreement(s),
Bank statements or similar documentation.

You stated that you decline to provide me with the information requested in #10 as *you have determined that this information is irrelevant to the servicing of my loan and was not provided to you.* Given the fact that I have requested this information and it is *extremely relevant to validating and substantiating your claim, you should request this very necessary information.*

Finally, we have stated more than once of the well documented conference call on January 5th with your representative, myself and Congressman David Scott's Office at 11:25am (check your recordings for your records/ours are good) when your representative told me very brashly I might add, that if I sent a payment to your company with the only account number I have that it would not be applied or credited.

Your continued threats without justification have taken my family through more than enough turmoil and pain. Your refusal to provide what is reasonably requested given the fact that you claim you may take my home is more than troubling. This chaos you are creating is taxing the time and emotional well being of my family as a whole. How can you service an account that you obviously do not have full details of? How do you assure that your actions are appropriate to the correct account? Do you destroy the families first and then request what is needed to properly service an account? This has gone on long enough; it's been 2 months of torture, and bullying. Please provide the information requested within 15 days to substantiate your claim and validate the debt tied to this account or correct your records and leave my family alone.

Leslie Hughes

**APRIL 05, 2016**

**K. West**
**MP for KW**
**C/O Seterus**

14523 SW Millikan Way
Suite 200
Beaverton, OR  97005

You're Loan Number:  29875273

Mail Certification Number:  **7015 1520 0001 6935 4249**


K. West and All Others Concerned,

This correspondence is being sent to you in response to your correspondence and claims asserted in your letters dated February 3rd and March 11th of 2016. Please make note of the following facts:

**1.** I have no obligations and you have failed to provide any documentation to support your claims of any commitment that I have that pertains to the above listed loan number.  I have for the record requested that information from your company many times and you have yet to produce anything to support your claims.  **I ASK AGAIN. WHO IN THEIR RIGHT MIND WOULD PAY THOUSANDS OF DOLLARS ON AN ACCOUNT THAT IS NOT THEIRS?  YOUR RECORDS ARE IN ERROR AND I RESPECTFULLY REQUEST THAT YOU CORRECT THOSE ERRORS AND LEAVE MY FAMILY IN PEACE.**


**TO FURTHER SUBSTANTIATE YOUR ERROR, YOU CITED A CLOSING DATE THAT IS IN NO WAY TIED TO ME OR MY HOME.  DO NOT SEND ANY FURTHER**

-2-

**FRAUDULENT BILLING STATEMENTS PERTAINING TO THIS UNVALIDATED-
UNVERIFIED ACCOUNT AND THE ASSOCIATED DEBT TIED TO IT.**

**2.  Your suggestion that I contact Washington Mutual Bank, FA directly as the
originator of the alleged loan that you are apparently trying to rebrand as an
obligation to you (Seterus) is not our responsibility as YOU are trying to rebrand
some documents you have obtained from some source.  Did you purchase those
documents or the rights to those documents?  As you stated in your letter
Seterus was not a party to the origination of the alleged loan, you cannot speak
to the actions of the originator.   Please provide an explanation of your due
diligence process to assure that you are addressing the correct party.   Please let
me know how you were able to contact Washington Mutual, FA in 2016.**

**3.  "Fannie Mae" may own the above listed loan.  Fannie Mae has no ownership
in anything tied to this address.  Many times verification of that assertion has
been requested and you (Seterus) simply ignore the request.**

**4.  Your assertion that the correspondence we have sent to your company is
repetitive in nature and therefore not substantive is completely false and can be
documented as such, as all have been registered.**

**5.  There is an error with the escrow account as well as any details pertaining to
the above listed account, as the above listed account and any obligation to it is
NOT MINE.**

**6.  I AM NOT IN DEFAULT AND CANNOT BE IN DEFAULT OF AN OBLIGATION
THAT IS NOT MINE AND THERE IS CLEAR EVIDENCE OF YOUR ERROR AND MY
HAVING NOTIFIED YOU OF YOUR ERROR.  YOUR CONTINUED THREATS AGAINST
MY FAMILY AND HOME ARE ACTIONABLE.**

**LESLIE HUGHES**

*August 9, 2016*


**SETERUS INC.**

**14523 SW Millikan Way**
**Suite 200**
**Beaverton, OR  97005**

**PO BOX 1077**
**HARTFORD, CT 06143-1077**

## *You're Loan Number:  29875273*

## *CERTIFIED MAIL#  7015 0640 0001 6864 3906*

Seterus and all representatives:


I have replied to your previous correspondence as advised and have retained all records and registrations. ***YOU ARE IN ERROR. THIS IS NOT MY LOAN.*** See the following once again from my April 2016 correspondence to your company.

"This correspondence is being sent to you in response to your correspondence and claims asserted in your letters dated February 3rd and March 11th of 2016. Please make note of the following facts:

  I have no obligations and you have failed to provide any documentation to support your claims of any commitment that I have that pertains to the above listed loan number.  I have for the record requested that information from your company many times and you have yet to produce anything to support your

-2-

claims. **I ASK AGAIN. WHO IN THEIR RIGHT MIND WOULD PAY THOUSANDS OF DOLLARS ON AN ACCOUNT THAT IS NOT THEIRS?  YOUR RECORDS ARE IN ERROR AND I RESPECTFULLY REQUEST THAT YOU CORRECT THOSE ERRORS AND LEAVE MY FAMILY IN PEACE.**

**TO FURTHER SUBSTANTIATE YOUR ERROR, YOU CITED A CLOSING DATE THAT IS IN NO WAY TIED TO ME OR MY HOME.  DO NOT SEND ANY FURTHER**

**FRAUDULENT BILLING STATEMENTS PERTAINING TO THIS UNVALIDATED-UNVERIFIED ACCOUNT AND THE ASSOCIATED DEBT TIED TO IT. "**

Furthermore, we have noted the correspondence from your company addressed to me denying *my* request for a loan modification as a complete fabrication and further evidence of the erroneous nature of your records.  Please forward to me any requests that your office claims to have received from me or my representative for full review.  Your companies persistence in this manner without verifying the origins of the above listed account number is either a gross record keeping error or a deliberate act of deception.

I state again from the April 2016 correspondence.  "**I AM NOT IN DEFAULT AND CANNOT BE IN DEFAULT OF AN OBLIGATION THAT IS NOT MINE AND THERE IS CLEAR EVIDENCE OF YOUR ERROR AND MY HAVING NOTIFIED YOU OF YOUR ERROR. YOUR CONTINUED THREATS AGAINST MY FAMILY AND HOME ARE ACTIONABLE."** **Provide us with the history of the above referenced loan and its origins.**

**Leslie Hughes**

You're Loan Number:  29875273
CERTIFIED MAIL#  7015 0640 0001 6864 3890

10/5/2016

Brock & Scott 16-13209
Attention: Patrick Taggart

SETERUS Loan Number: 29875273

Dear Sirs

I am sending this statement so that there will be no room for doubt about the exhausted disputes I have sent for nearly a year of your claims of an obligation by myself to the above listed loan.

I have never requested, approved, nor performed in any way with regards to Seterus Loan 29875273. Seterus has failed and refused to provide legal documentation to support Loan 29875273. A non-bank entity setting up new loans and attempting to secure these created loans to real property is not legal. I have on more than one occasion requested the Loan Application, and all related documents for loan 29875273 and you have not provided those documents. Per your own web site you are a servicer and not a lender, but yet you set up new loans? Rebranding, a zero principal balance and trying a balance transfer after the fact. Is a material misrepresentation to say the least. Loan numbers have a purpose and are material to a contract. I can print a copy of a note from any county deed office and hand write or overlay any new numbers I choose, but it will not make it legal.

Whatever contract you made with Chase to service the now 3010145575 that has no principal balance; you should contact Chase, as I have no contract with Seterus. Your attorney's at Brock & Scott have been fully aware of my dispute as they were notified in writing many times and continued to serve as a debt collector on a debt that has not been validated.


Leslie Hughes

```
                              SETERUS, INC.
                              14523 SW MILLIKAN WAY SUITE 200
                              BEAVERTON, OR 97005


                                CUSTOMER ACCOUNT ACTIVITY STATEMENT
         REQ BY RB4


         LESLIE D HUGHES
         LOAN NUMBER: 0029875273

                              ACTIVITY FOR PERIOD 03/02/15 - 02/03/16
         PROCESS    DUE    TRANSACTION            TRANSACTION
         DATE       DATE   CODE                   DESCRIPTION
         ------------------------------------------------------------------
          TRANSACTION  PRIN. PAID/         ESCROW PAID/ -------
           AMOUNT       BALANCE   INTEREST  BALANCE    AMOUNT
         ------------------------------------------------------------------
         12-07-15  10-15  142  LOAN SETUP
                    0.00  119,954.20-      0.00       0.00
                          119,954.20                        NEW PRINC
```

 Gmail

Leslie Hughes <allie1920@gmail.com>

## Attention: Erica Ext 2301 Fannie Mae Resource Center

2 messages

**Leslie Hughes** <allie1920@gmail.com>
To: resource_center@fanniemae.com

Sun, Nov 6, 2016 at 6:15 PM

Erica

Thank you for the follow-up phone call to my contact with your office last week.  I have questions and concerns that need immediate answers.  Although I will always welcome a phone call from you in response to my inquiry, a written response is requested in this case as well.

There are actions being taken against my property in your name (Fannie Mae) that requires an explanation.  In September of 2011, I had conversations with and received correspondence from Fannie Mae Representatives; Jasmine Bynum, Terri Copeland and a representative named Kendra.  It was in 2011 that I learned for the first time that there was an investor in my property and the name of that investor was Fannie Mae.  To support this shocking revelation Fannie Mae listed their acquisition date of Loan Number 3010145575 originated by Washington Mutual as 9/1/2006.

Explain to me please why JP Morgan Chase Bank, NA on June 14, 2016, filed 2 Georgia Assignment of Security Deeds.

## Deed 1:

For Value Received, JP Morgan Chase Bank, National Association, the undersigned holder of a Security Deed {herein "Assignor") has this day transferred, sold, assigned, conveyed and set over to **FEDERAL NATIONAL MORTGAGE ASSOCIATION, ITS SUCCESSORS OR ASSIGNS,** (herein 'Assignee"), whose address is 14221Dallas Parkway, Suite1000 Dallas, TX 75254, as Assignee, its successors, representative and assigns, all its rights, title and interest in and to a certain Security Deed {or Deed to Secure Debt) executed by LESLIE D

HUGHES to WASHINGTON MUTUAL BANK, FA, dated July 5, 2005 and recorded on July 24, 2006.

Property Address: 2270 CHARLESTON PL, LITHIA SPRINGS, GA 30122

such Security Deed having been given to secure payment of One Hundred Forty Thousand Five Hundred Twenty Five and 00/100ths ($140,525.00) which Security Deed is of record in Book, Volume or LiberNo.2401, at Page 965-981 (or as No. N/A) in the Office of the Superior County Clerk for DOUGLAS County, State of Georgia, and all rights accrued or to accrue under such Security Deed.

Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #I-866-570-5277, which is responsible for receiving payments.

**DEED 2:**

For Value Received, **THE FEDERAL DEP0SIT INSURANCE CORPORATION, A CORPORATI0N ORGANIZED AND EXISTING UNDER AN ACT OF CONGRESS (FDIC),  WHOSE ADDRESS IS 1601 BRYAN STREET, DALLAS, TX 75201, AND ACTING IN ITS RECEIVERSHIP CAPACITY AS RECEIVER OF WASHINGTON MUTUAL BANK F/K/A WASHINGTON MUTUAL BANK, FA,** the undersigned holder of a Security Deed (herein "Assignor") has this day transferred, sold, assigned, conveyed and set over to **JPMorgan Chase Bank, National Association,** (herein "Assignee"), whose address is **700 Kansas Lane, MC 8000, Monroe , LA 71203,** as Assignee. Its successors, representative and assigns, all its rights, title and interest in and to a certain Security Deed (or Deed to Secure Debt) executed by **LESLIE D HUGHES to WASHINGTON MUTUAL BANK, FA,** dated **July 5, 2006** and recorded on **July 24, 2006**

Property Address: **2270 CHARLESTON PL, LITHIA SPRINGS, GA 30122**

Such Security Deed having been given to secure payment of **One Hundred Thousand Five Hundred Twenty Five and 00/100ths ($140,525.00)** which Security Deed is of record in Book, Volume or Libor No. 2401, at Page 965-981 (or as No. N/A) in the Office of the Superior County Clerk for **DOUGLAS** County, State of Georgia, and all rights accrued or to accrue under such Security Deed.

**This Assignment is intended to further memorialize the transfer that occurred by operation of law on September 25, 2008 as authorized by Section 11(d)(2)(G)(I)(II) of the Federal Deposit Insurance Act, 12 U.S.C.§1821(d)(2)(G)(I) (II).**

**Contact Federal National Mortgage Association for this instrument c/o Seterus, Inc., 14523 SW Millikan Way, #200, Beaverton, OR 97005, telephone #1-866-570-5277, which is responsible for receiving payments.**

**Questions that need answers.**

## *1. Did Fannie Mae issue deceptive information to me in 2011 and 2013 stating that the acquisition date of the above reference note was September 1, 2006?*

## *2. Has Chase used the name of Fannie Mae without Fannie's knowledge to file knowingly fraudulent documents in the DOUGLAS COUNTY Deed Office to enable another of violation of consent orders that offer no effective deterrent for this kind or the next kind violation that is the subject of this complaint and request for information.*

## *3. Who was entitled to and did receive my $59,332.00 down payment? Who was entitled and did receive the monthly installment payments being made since 2006?*

## *Statement of fact:*

*Although, it was 5 years later that I found out about Fannie Mae's involvement with the note tied to Loan Number 3010145575 it gave me an explanation why on October 19, 2006 when I received a very disagreeable letter from Washington Mutual stating that they had to adjust my monthly escrow payment to reflect a change in my property tax beginning 12/1/2006, which*

*I was licensed in the state of Georgia for Real Estate and pulled the property tax assessments for several years and there was no change to justify taking my monthly payment from $865.24 to $1,301.55.*

*After going back into my local WAMU office and speaking with the Financial Center Manager, Dionne V. Gajadhar and telling her that the information in that letter was false and that she needed to do something.  She and I spoke in great detail about the limits to payments and the reason why those limits were crucial.  I received a phone call from Ms. Gajadhar a few days later and she said that there was nothing that she could do.  I sent a letter from my Federal Building in Doraville GA as I was teaching a class there.  I still have the fax transmittal confirmation page telling Ms. Gajadhar to cancel the loan as it is in no way what we discussed and as I pulled all property assessment for a few years and the results showed that WAMU was clearly being deceptive.*

*I had a new baby girl and unfortunately a Cancer diagnosis behind me and did not want to get in over my head in case the unthinkable happened and the Cancer made a return visit.  And it did.*

*WAMU would not honor the request to terminate the loan in Nov. 2006 as it became apparent to me when I received your acquisition date of 9/1/2006, they had already sold that piece of paper to Fannie Mae.*

*That was just the first of many of WAMU's misconduct that led to their demise.*

*Back to CHASE.  Out of the frying pan and into the Fire.*

*I will not go back to 2011 and 2012 when Chase was misbehaving badly and it took until 2013 for a settlement and a slap on the wrist to get a $500.00 settlement check for surviving that attack.  I did while going through Oncology again and having 3 surgeries.  It cost me over $7,000.00 to unwind their mess, but I survived.  Donald S. Morgan out of their staged Stockbridge office was Chase's instrument of choice in those years.*

*Now, here we are in 2016 after several billions of dollars in settlements and fines they are still at it.  I have spent nearly 30 years working for the Treasury Department and I finally see the problem.  Billions of Dollars is nothing when*

*you look beyond the surface and actually breakdown the numbers. Banks such as Chase still net a huge profit despite the settlement funds and fines. If the illegal conduct produces profit, why wouldn't the bad conduct continue?*

## 22

SEP

2016

## JP Morgan Chase Satisfies $4 Billion Consumer Relief Obligation Under Mortgage Securities Settlement

FOR IMMEDIATE RELEASE: September 22, 2016   Contact: Hannah Harrill 919-508-7821

JP Morgan Chase Satisfies $4 Billion Consumer Relief Obligation Under Mortgage Securities Settlement Joseph A. Smith, Jr. credits Chase's consumer relief through March 31, 2016   RALEIGH, N.C. – In a report released today, Joseph A. Smith,.

**So let's take a look at the many ways Chase may have managed to accomplish this goal so quickly.**

**Chase zero outs the only Loan Number tied to my property #3010145575 files transfer deed in June 2016 with related Fannie Mae Number underneath the # 3010145575 Fannie number is #1702040017. Never refinanced nor modified the listed loan nor altered the Contract on file at the courthouse related to the Loan #3010145575.**

**Next, Chase transfers *servicing* of a zero principal balance to one of your sub servicers Seterus and Seterus takes it upon itself to have the consumers that they service wait for a welcome package that contains a new loan number and a schedule of their fees and expenses and until I reported it recently within the last few months they were returning payments with the documented Loan numbers of record and you could not get to a live person without a Seterus loan number, you had to wait. I have had a change of servicer before with other property and this made no sense, so I had to dig deeper. I had Congressman Scott's office call Seterus and conference me in and the Seterus Rep. stated quite smugly that they will not accept a payment that reflects the Loan #3010145545. This conference call took place on 1/5/2016 at 11:25 am. I was at work, and I was devastated to think that here we go again. Chase gets the disaster of a loan from WAMU and still gets paid from many sources. There is no peace to be had with the current financial system. I have spent the last 29 years working for the Treasury Department, I have the Treasury and OCC Consent Orders and every amendment up to #2015-064, where the findings stated Chase Columbus, Ohio had still failed to comply.**

After all the grief I have endured since 2006, I believed that there was finally some justice being served and my suffering was over, the feeling was very brief.

## Seterus and their Loan #29875273

Seterus after many months of ignoring my request for the loan documents tied to their loan number of 29875273 with the help of an equally unscrupulous law firm Brock & Scott listed my home for foreclosure on October the 4th 2016. I provided both with the zero principal balance letters from Chase and they proceeded. I sent so many certified return receipt letters I own stock in my local post office.

February my 11 year old daughter came into the living room to find me on the floor and I could not move my right side. She was terrified and so was I. I was surrounded by stacks and stacks of Fed Ex deliveries from Seterus still threatening to foreclose on a loan that is not mine. *A loan number is issued by a creditor, which Seterus is not. A loan number allows for the identification of a particular credit transaction. I did not complete a credit transaction of any kind with Seterus. I did not even know of this company until 2015 when the letters came.*

-

*Question:*

-

*1. Did Fanny Mae create this Loan #29875273 without my knowledge or consent?*

*Seterus, Inc. states that all actions including the foreclosure of my home for defaulting on Loan #29875273.*

-

*2. If Seterus is correct in their assertion that they are acting as a sub servicer for Fannie Mae, provide the Mortgage package that bears my signature for this Loan # 29875273.*

-

*3. K. West of Seterus has sent several letters here stating that this loan originated in 2015 and I am responsible for this obligation.*

-

*4. I received 2 letters denying my request for a loan modification that I never requested as I was still waiting how and who created the loan they were trying to collect on. I also took a look at the Data Boarding info and Corporate Advance History. States that completed loss mitigation on the new loan setup on 12/7/2015 many other transactions they are billing you for a loan that is not supported by anything.*

-

# UNSEALED: IBM, Seterus Scammed Nearly $13 Million from Fannie Mae

**_I believe that number is a lot higher.  Count the number of those Welcome Packages from Seterus._**

**Statements of Fact:**

*I am in the state of Georgia, which is a non-judicial state.  That simple fact allowed these criminals to tell me right up to the last minute that they were researching the issue and left me with no other choice but to file bankruptcy to protect my home.*

*Before that my mailbox my doors were flooded with foreclosure notices from all kinds of bottom feeders.  I had to keep my daughter inside as people would tape notices to the door "Stop your Foreclosure Now", "Don't lose your Home".  Strangers knocking on the doors and even yelling through the doors.  She is eleven now and it became impossible to shield her from the chaos.  She was next door at my neighbor's house and she passed out in their back yard.  They had to call the paramedics.  When they got her to come around she was worried about me, make sure my mommy is okay.  They are trying to take our house and I don't want her to get sick again is what she told my neighbors.  She had not been sleeping and eating.  She was a happy little girl in the accelerated gifted program in school and now she panics if she hears someone know at the door or turn around in the driveway.  My daughter is seeing a counselor every week now to help her cope with this madness.  Brock & Scott did not even verify this fake loan number.  There is no recorded mortgage or deed registered with that Loan Transaction number on it anywhere.  I have requested it and searched myself.  All of this grief is being done in the name of Fannie Mae.  Residential Mortgage Fraud is a criminal offense.*

*Being that I work for the Treasury Department my supervisor wanted an explanation.  I had to prepare a complete file of all research and findings to show that I have not been negligent in handling my affairs.  That file then was elevated to the next level of management and at my request it will be*

submitted to TIGTA. SIGTARP's investigations need to continue and also include non bank entities as well.


Strait to the point. Who created Loan # 29875273? Is Fannie Mae involved in the Scheme? Does Fannie Mae have the authority to redefine the definition of a servicer and the legal authorities a servicer has?


**Leslie Hughes**

**2270 Charleston Place**

**Lithia Springs GA 30122**

**770-639-9727 phone (Written Response is Requested)**

---

**Leslie Hughes** <allie1920@gmail.com>                    Sun, Nov 6, 2016 at 6:22 PM
To: Leslie <leslie.d.hughes@irs.gov>

[Quoted text hidden]



# Gmail

Leslie Hughes <allie1920@gmail.com>

## Fannie Mae
1 message

**resource_center@fanniemae.com** <resource_center@fanniemae.com>
To: leslie.d.hughes@irs.gov
Cc: allie1920@gmail.com

Fri, Dec 30, 2016 at 5:48 PM

Dear Ms. Hughes,

Thank you for contacting Fannie Mae. We have confirmed the ownership of your mortgage loan was transferred to Fannie Mae as of 09/01/2006. Please understand that Fannie Mae does not service your loan, so if you have questions about your loan, please contact your loan servicer. Additionally, please be advised that your request for your mortgage note or other loan documentation should be directed to your mortgage servicer.

If you have further questions regarding this matter, please call the Fannie Mae Resource Center at 1-800-2FANNIE (1-800-232-6643), Option 3, Monday through Friday, between the hours of 8 a.m. and 5 p.m., Eastern Time.

Thank you,

Royce
Fannie Mae Resource Center

# EXHIBIT

# 18

## MSP® Explorer: History of Corporate Advance Tran (DDCH)

### 659 - SETERUS, INC.

**Loan Number:** 0029875273                                    **Borrower Name:** HUGHES,LESLIE D

```
DDCH 0029875273    CORPORATE ADVANCE HISTORY SCREEN 269/001 08/17/16  15:41:19
LD HUGHES        L:C F:A B:  R:    10/01/15 TYPE CONV. RES.              MAN F
2270 CHARLESTON PL LITHIA SPRINGS GA 30122-4004
------------------------------------------------------------- * END *--------
_____ C/A PAYEE   ___ TRAN    ___ RSN    ___ USR    _____ ESC PAYEE
_ SORT          _ SORT      _ SORT    _ SORT        _ SORT
DATE RANGE:     _____ THRU _____
                                        C/A                          ORIG
TRN USR  ID   DATE      TRAN AMT  ESC PAYEE  PAYEE RSN  DESCRIPTION   DISBDT
633 NIV 0010 081016       25.00  EA50051    39T57 FTSF TECH SUBMISSION
631 NIV 0009 072016       15.00  EB56411    39R57 FPIF PROP INSPECTION
631 NIV 0008 051816       15.00  EB56411    39R57 FPIF PROP INSPECTION
631 NIV 0007 042116       15.00  EB56411    39R57 FPIF PROP INSPECTION
631 NIV 0006 012016       15.00  EB56411    39R57 FPIF PROP INSPECTION
631 NIV 0005 122315       15.00  EB11937    39R57 FPIF PROP INSPECTION
745 52A 0004 120915       25.00             39T57 PXFR PSPERMITSXFERTAX
745 52A 0003 120915       78.00             39T57 PBPO PS BPO COSTS
745 52A 0002 120915       14.00             39R57 PPIF PSPROPINSPECTION
745 52A 0001 120915       14.00             39R57 PPIF PSPROPINSPECTION

** BEGINNING CORP ADV BALANCE:               0.00
** TOTAL OF TRANS DISPLAYED ON DDCH:       231.00
** OUTSTANDING CORP ADV BALANCE:           231.00
```

*TAX* (handwritten annotation)

# EXHIBIT

# 19A

## NOTICE OF FORECLOSURE SALE UNDER POWER

DOUGLAS COUNTY, GEORGIA

### THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Under and by virtue of the Power of Sale contained in a Security Deed given by Leslie D. Hughes  to Washington Mutual Bank, FA, dated July 5, 2006, and recorded in Deed Book 2401, Page 965, Douglas County, Georgia Records, as last transferred to Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America by assignment recorded on June 14, 2016 in Book 3395 Page 116 in the Office of the Clerk of Superior Court of Douglas County, Georgia Records, conveying the after-described property to secure a Note in the original principal amount of One Hundred Forty Thousand Five Hundred Twenty-Five and 0/100 dollars ($140,525.00), with interest thereon as set forth therein, there will be sold at public outcry to the highest bidder for cash before the courthouse door of Douglas County, Georgia, within the legal hours of sale on October 4, 2016, the following described property:

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 430 of the 18th District and 2nd Section of Douglas County, Georgia, and being Lot 23 of Heritage Square Subdivision, Unit Three as shown by plat of said subdivision recorded in the real property records of Douglas County, Georgia in Plat Book 15, Pages 150, 151 and 152; said plat being made a part hereof by this reference being made thereto for a more complete description of the metes and bounds, courses and distances of said property.

The debt secured by said Security Deed has been and is hereby declared due because of, among other possible events of default, failure to pay the indebtedness as and when due and in the manner provided in the Note and Security Deed. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in Security Deed and by law, including attorney's fees (notice of intent to collect attorney's fees having been given).

The entity having full authority to negotiate, amend or modify all terms of the loan (although not required by law to do so) is: Seterus, Inc. they can be contacted at (866) 570-5277 for Loss Mitigation Dept, or by writing to 14523 SW Millikan Way, Ste 200, Beaverton, Oregon 97005, to discuss possible alternatives to avoid foreclosure.

Said property will be sold subject to any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), any matters which might be disclosed by an accurate survey and inspection of the property, any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Security Deed first set out above.

To the best knowledge and belief of the undersigned, the party in possession of the property is Leslie D. Hughes or tenant(s); and said property is more commonly known as 2270 Charleston Place, Lithia Springs, GA 30122.

The sale will be conducted subject to (1) confirmation that the sale is not prohibited under the U.S. Bankruptcy Code (2) final confirmation and audit of the status of the loan with the holder of the security deed and (3) any right of redemption or other lien not extinguished by foreclosure.

Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America as Attorney in Fact for Leslie D. Hughes.

Brock & Scott, PLLC
4360 Chamblee Dunwoody Road
Suite 310
Atlanta, GA 30341
404-789-2661
B&S file no.: 16-13209

## 40248190 102600 Hughes 16-13209 9/7, 14, 21, 28; 2016 NOTICE

## Details for 40248190 102600 Hughes 16-13209 9/7, 14, 21, 28; 2016 NOTICE

Sep 6, 2016

40248190 102600 Hughes 16-13209 9/7, 14, 21, 28; 2016

NOTICE OF FORECLOSURE SALE UNDER POWER DOUGLAS COUNTY, GEORGIA THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. Under and by virtue of the Power of Sale contained in a Security Deed given by Leslie D. Hughes to Washington Mutual Bank, FA, dated July 5, 2006, and recorded in Deed Book 2401, Page 965, Douglas County, Georgia Records, as last transferred to Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America by assignment recorded on June 14, 2016 in Book 3395 Page 116 in the Office of the Clerk of Superior Court of Douglas County, Georgia Records, conveying the after-described property to secure a Note in the original principal amount of One Hundred Forty Thousand Five Hundred Twenty-Five and 0/100 dollars ($140,525.00), with interest thereon as set forth therein, there will be sold at public outcry to the highest bidder for cash before the courthouse door of Douglas County, Georgia, within the legal hours of sale on October 4, 2016, the following described property: ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 430 of the 18th District and 2nd Section of Douglas County, Georgia, and being Lot 23 of Heritage Square Subdivision, Unit Three as shown by plat of said subdivision recorded in the real property records of Douglas County, Georgia in Plat Book 15, Pages 150, 151 and 152; said plat being made a part hereof by this reference being made thereto for a more complete description of the metes and bounds, courses and distances of said property. The debt secured by said Security Deed has been and is hereby declared due because of, among other possible events of default, failure to pay the indebtedness as and when due and in the manner provided in the Note and Security Deed. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in Security Deed and by law, including attorney's fees (notice of intent to collect attorney's fees having been given). The entity having full authority to negotiate, amend or modify all terms of the loan (although not required by law to do so) is: Seterus, Inc. they can be contacted at (866) 570-5277 for Loss Mitigation Dept, or by writing to 14523 SW Millikan

Way, Ste 200, Beaverton, Oregon 97005, to discuss possible alternatives to avoid foreclosure. Said property will be sold subject to any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), any matters which might be disclosed by an accurate survey and inspection of the property, any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Security Deed first set out above. To the best knowledge and belief of the undersigned, the party in possession of the property is Leslie D. Hughes or tenant(s); and said property is more commonly known as **2270 Charleston Place, Lithia Springs, GA 30122.** The sale will be conducted subject to (1) confirmation that the sale is not prohibited under the U.S. Bankruptcy Code (2) final confirmation and audit of the status of the loan with the holder of the security deed and (3) any right of redemption or other lien not extinguished by foreclosure. Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America as Attorney in Fact for Leslie D. Hughes. Brock & Scott, PLLC 4360 Chamblee Dunwoody Road

Suite 310

Atlanta, GA 30341 404-789-2661 B&S file no.: 16-13209

# EXHIBIT

# 19B

2315469719



# BROCK &SCOTT PLLC

4360 CHAMBLEE DUNWOODY ROAD
SUITE 310
ATLANTA, GA 30341
PHONE: 404-789-2661
FAX: 404-294-0919

December 15, 2016

**VIA CERTIFIED, RETURN RECEIPT REQUESTED
AND REGULAR MAIL**

**Leslie D. Hughes
2270 Charleston Place
Lithia Springs, GA 30122**

<table>
<tr><td>Re:</td><td>NOTICE OF FORECLOSURE SALE</td><td></td></tr>
<tr><td></td><td>Our File No:</td><td>16-13209</td></tr>
<tr><td></td><td>Mortgagor(s):</td><td>Leslie D. Hughes</td></tr>
<tr><td></td><td>Property Address:</td><td>2270 Charleston Place, Lithia Springs, GA 30122</td></tr>
<tr><td></td><td>County:</td><td>Douglas</td></tr>
</table>

Dear Sir(s) and/or Madam(s):

You previously received communication from our office where we notified you that the loan on the above referenced property was referred to this firm for handling. That letter also advised you of certain rights you could exercise within 30 days of your receipt of that letter, including your right to have the debt validated. Nothing in this letter will prevent you from exercising those rights as initially explained.

The entire amount of the outstanding balance of principal and interest owed on the loan and any other authorized charges are now due and payable. For additional information regarding the total amount due (aka "payoff amount"), please contact us immediately. Additionally, the terms of your note call for the addition of attorney's fees to the debt in case of collection by or through an attorney. Georgia law (O.C.G.A. Section 13-1-11) requires that you be allowed ten (10) days from your receipt of this letter to pay the entire amount owed without having to pay attorneys' fees. After that time, the full attorney's fees allowed by Georgia law may be added to the debt.

This office has begun foreclosure proceedings on behalf of Federal National Mortgage





## NOTICE OF FORECLOSURE SALE UNDER POWER

DOUGLAS COUNTY, GEORGIA

### THIS IS AN ATTEMPT TO COLLECT A DEBT. ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE.

Under and by virtue of the Power of Sale contained in a Security Deed given by Leslie D. Hughes to Washington Mutual Bank, FA, dated July 5, 2006, and recorded in Deed Book 2401, Page 965, Douglas County, Georgia Records, as last transferred to Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America by assignment recorded on June 14, 2016 in Book 3395 Page 116 in the Office of the Clerk of Superior Court of Douglas County, Georgia Records, conveying the after-described property to secure a Note in the original principal amount of One Hundred Forty Thousand Five Hundred Twenty-Five and 0/100 dollars ($140,525.00), with interest thereon as set forth therein, there will be sold at public outcry to the highest bidder for cash before the courthouse door of Douglas County, Georgia, within the legal hours of sale on February 7, 2017, the following described property:

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 430 of the 18th District and 2nd Section of Douglas County, Georgia, and being Lot 23 of Heritage Square Subdivision, Unit Three as shown by plat of said subdivision recorded in the real property records of Douglas County, Georgia in Plat Book 15, Pages 150, 151 and 152; said plat being made a part hereof by this reference being made thereto for a more complete description of the metes and bounds, courses and distances of said property.

The debt secured by said Security Deed has been and is hereby declared due because of, among other possible events of default, failure to pay the indebtedness as and when due and in the manner provided in the Note and Security Deed. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in Security Deed and by law, including attorney's fees (notice of intent to collect attorney's fees having been given).

The entity having full authority to negotiate, amend or modify all terms of the loan (although not required by law to do so) is: Seterus, Inc. they can be contacted at (866) 570-5277 for Loss Mitigation Dept. or by writing to 14523 SW Millikan Way, Ste 200, Beaverton, Oregon 97005, to discuss possible alternatives to avoid foreclosure.

Said property will be sold subject to any outstanding ad valorem taxes (including taxes which are a lien, but not yet due and payable), any matters which might be disclosed by an accurate survey and inspection of the property, any assessments, liens, encumbrances, zoning ordinances, restrictions, covenants, and matters of record superior to the Security Deed first set out above.

To the best knowledge and belief of the undersigned, the party in possession of the property is Leslie D. Hughes or tenant(s); and said property is more commonly known as **2270 Charleston Place, Lithia Springs, GA 30122.**

The sale will be conducted subject to (1) confirmation that the sale is not prohibited under the U.S. Bankruptcy Code (2) final confirmation and audit of the status of the loan with the holder of the security deed and (3) any right of redemption or other lien not extinguished by foreclosure.

Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America as Attorney in Fact for Leslie D. Hughes.

Brock & Scott, PLLC
4360 Chamblee Dunwoody Road
Suite 310
Atlanta, GA 30341
404-789-2661
B&S file no.: 16-13209



# 40257715 108823 Hughes 16-13209 1/11, 18, 25, 2/1; 2017 NOTICE

## Details for 40257715 108823 Hughes 16-13209 1/11, 18, 25, 2/1; 2017 NOTICE

Jan 10, 2017

40257715 108823 Hughes 16-13209 1/11, 18, 25, 2/1; 2017

NOTICE OF FORECLOSURE SALE UNDER POWER DOUGLAS COUNTY, GEORGIA THIS IS AN ATTEMPT TO COLLECT A DEBT, ANY INFORMATION OBTAINED WILL BE USED FOR THAT PURPOSE. Under and by virtue of the Power of Sale contained in a Security Deed given by Leslie D. Hughes to Washington Mutual Bank, FA, dated July 5, 2006, and recorded in Deed Book 2401, Page 965, Douglas County, Georgia Records, as last transferred to Federal National Mortgage Association ("Fannie Mae"), a corporation organized and existing under the laws of the United States of America by assignment recorded on June 14, 2016 in Book 3395 Page 116 in the Office of the Clerk of Superior Court of Douglas County, Georgia Records, conveying the after-described property to secure a Note in the original principal amount of One Hundred Forty Thousand Five Hundred Twenty-Five and 0/100 dollars ($140,525.00), with interest thereon as set forth therein, there will be sold at public outcry to the highest bidder for cash before the courthouse door of Douglas County, Georgia, within the legal hours of sale on February 7, 2017, the following described property: ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 430 of the 18th District and 2nd Section of Douglas County, Georgia, and being Lot 23 of Heritage Square Subdivision, Unit Three as shown by plat of said subdivision recorded in the real property records of Douglas County, Georgia in Plat Book 15, Pages 180, 181 and 182; said plat being made a part hereof by this reference being made thereto for a more complete description of the metes and bounds, courses and distances of said property. The debt secured by said Security Deed has been and is hereby declared due because of, among other possible events of default, failure to pay the indebtedness as and when due and in the manner provided in the Note and Security Deed. The debt remaining in default, this sale will be made for the purpose of paying the same and all expenses of this sale, as provided in Security Deed and by law, including attorney's fees (notice of intent to collect attorney's fees having been given). The entity having full authority to negotiate, amend or modify all terms of the loan (although not required by law to do so) is: Seterus, Inc., they can be contacted at (866) 570-5277 for Loss Mitigation Dept, or by writing to 14523, SW Millikan Way, Ste 200, Beaverton, Oregon 97005, to discuss possible

# EXHIBIT

# 20

Doc ID: 001545030001 Type: GLA
Filed: 07/24/2006 at 12:48:00 PM
Fee Amt: $202.50 Page 1 of 1
Transfer Tax: $192.50
Douglas County Georgia
Cindy Chaffin Clerk Superior Court
BK 2401 PG 964

After Recording return To:
William T. Cox, Jr.
107 Enterprise Path, Suite 304
Hiram, GA 30141
0606-226

## WARRANTY DEED

**STATE OF GEORGIA**
**COUNTY OF DOUGLAS**

THIS INDENTURE, made this 5 day of July, 2006, between **COMMUNITY TRUST BANK**, as party of the first part, hereinafter called Grantor, **LESLIE D. HUGHES**, as party of the second part, hereinafter called Grantee.

WITNESSETH: That Grantor for and in consideration of the sum of <u>Ten Dollars and other good and valuable consideration</u> in hand paid at and before the sealing and delivery of these presents, the receipt of which is hereby acknowledged, have granted, bargained, sold and conveyed and by these presents do grant, bargain, sell and convey unto the said Grantee, their heirs and assigns, all that tract or parcel of land described as follows:

ALL THAT TRACT OR PARCEL OF LAND lying and being in Land Lot 430 of the 18th District and 2nd Section of Douglas County, Georgia, and being Lot 23 of Heritage Square Subdivision, Unit Three as shown by plat of said subdivision recorded in the real property records of Douglas County, Georgia in Plat Book 15, Pages 150, 151 and 152; said plat being made a part hereof by this reference being made thereto for a more complete description of the metes and bounds, courses and distances of said property.

TO HAVE AND TO HOLD the said bargained premises, together with all and singular the rights, members and appurtenances thereof, to the same being, or in any wise appertaining, to the only proper use, benefit and behoof of the Grantee, their heirs, executors and assigns, in fee simple.

And the said Grantor, for their heirs, executors and administrators will warrant and forever defend the right and title to the above described property unto the said Grantee, their heirs and assigns, against the lawful claims of all persons whomsoever.

IN WITNESS WHEREOF, the said Grantor has hereunto set their hand and seal the day and year above written.

Signed, sealed and delivered
in the presence of:

_____
Witness

_____
Notary Public

BY: COMMUNITY TRUST BANK

_____ (Seal)
Andrew C. Casto, Sr. Vice Pres.

(Seal)

My commission expires
12-11-06





# SCHEDULE

# OF

# SUPPLEMENTAL

# EXHIBITS

# 1-4

**SUPP. 1-SULLIVAN &CROMWELL LLP**

**Indemnification Obligations request to FDIC on behalf of JPMC.**

**SUPP. 2- Sampling of Documents provided by JPMC to various Congressional Hearings identifying the FRAUD and FAILURES of WAMU loans and JPMC's prior knowledge used to profit from WAMU's Fraud.**

**SUPP. 3-Exhibit 8 from MRS lawsuit. Correspondence from the Office of The Commissioner of Financial Regulation of Maryland. Identifying the Scheme of Chase to get credit for consumer relief as part of a**

*settlement that they will never actually have to honor. Rebranding the written off loans with new numbers.*

**SUPP. 4- JP v. Michael Porzio et al.**

*Provides a good example of various deceptive acts and documents that Chase has committed and provided to courts.*

# SUPP. 1

# SULLIVAN & CROMWELL LLP

TELEPHONE: 1-310-712-6600
FACSIMILE: 1-310-712-8800
WWW.SULLCROM.COM

*1888 Century Park East
Los Angeles, California 90067-1725*

NEW YORK • PALO ALTO • WASHINGTON, D.C.

FRANKFURT • LONDON • PARIS

BEIJING • HONG KONG • TOKYO

MELBOURNE • SYDNEY

September 12, 2014

<u>Via FedEx</u>

Federal Deposit Insurance Corporation,
    Receiver of Washington Mutual Bank, Henderson, Nevada,
        1601 Bryan Street, Suite 1701,
            Dallas, Texas 75201.

            Attention:  Regional Counsel (Litigation Branch) &
                    Deputy Director (DRR - Filed Operations Branch)

            Re:    <u>Indemnification Obligations</u>

Dear Sirs:

   We refer to the Purchase and Assumption Agreement Whole Bank, dated as of September 25, 2008 (the "Agreement") by and among the Federal Deposit Insurance Corporation in its corporate capacity ("FDIC Corporate") and as receiver ("FDIC Receiver" and, together with FDIC Corporate, "FDIC") and JPMorgan Chase Bank, N.A. (together with its subsidiaries and affiliates, "JPMC") relating to the resolution of Washington Mutual Bank, Henderson, Nevada ("WMB").  This letter supplements our prior indemnification notices and provides you with written notice of additional matters for which JPMC is entitled to indemnification under Section 12.1 of the Agreement.

   The additional matters giving rise to JPMC's indemnity rights relate to costs incurred in connection with mortgages held by WMB prior to September 25, 2008. These costs have resulted from aspects of—and circumstances related to—WMB mortgages that were not reflected on the books and records of WMB as of September 25, 2008, and include:

     (a) Costs incurred by JPMC associated with individual assignments of
       WMB mortgages.  Where JPMC has initiated foreclosures on

Federal Deposit Insurance Corporation

properties associated with mortgages that were held by WMB prior to
its Receivership, JPMC has performed individual assignments of the
associated mortgages/deeds of trust and allonges to comply with a
recent appellate-level court decision in Michigan so as avoid potential
additional expense and/or liability. In so doing, JPMC has incurred
additional recording and legal fees, Limited Power of Attorney costs,
as well as quantifiable costs associated with increased staffing to
address these issues.

(b) Costs incurred by JPMC associated with preparing and submitting,
and/or updating information on, lien release documents related to
WMB-serviced loans that were paid in full prior to September 25,
2008.

(c) Costs incurred by JPMC to expunge records associated with WMB
mortgages as a result of errors in mortgage documentation occurring
prior to September 25, 2008, including erroneously recorded
satisfactions of mortgages and associated legal fees and disbursements.

(d) Costs incurred by JPMC to correct various defects in the chains of title
for WMB mortgages occurring prior to September 25, 2008, including
recording and legal services fees.

At the time of WMB's closure, the above liabilities were not reflected on
its books and records. (If you disagree, please identify where on WMB's books and
records such a liability was reflected.) As you know, the liabilities assumed by JPMC
were limited to those on WMB's "Books and Records," with a "Book Value," when
WMB was closed. JPMC did not assume any WMB liabilities that did not have a book
value on WMB's books and records at the time WMB was placed into receivership, nor
did it assume, for those liabilities on WMB's books and records, liability for any amounts
in excess of such book value. Thus, any liability for conduct that precedes WMB's
closure remains with the FDIC.

JPMC is advising you that the liability it may incur in connection with
these matters, including the costs and expenses it incurs in defending against any action
that may arise in relation to these matters, as well as the amount of any settlement or
adverse judgment, are subject to indemnification by the FDIC pursuant to Section 12.1 of
the Agreement.

As you are aware from previous correspondence notifying you of the
FDIC's indemnification obligations in other matters, the matters identified in this letter
are not intended to be exhaustive or to constitute a statement that no other facts have or
may come to our attention that could result in claims for which indemnification is

Federal Deposit Insurance Corporation

provided, and we reserve the right to supplement this notice as additional facts or circumstances may arise.

Sincerely,



ert A. Sacks

cc:    Lawrence N. Chanen
Joanna Jagoda
Jason Klein
(JPMorgan Chase Bank, N.A.)

Richard Osterman
David Gearin
✓Kathryn Norcross
(Federal Deposit Insurance Corporation)

Brent McIntosh
(Sullivan & Cromwell LLP)

# SUPP. 2

Footnote Exhibits - Page 0144

# Data Management Problem Statement



WaMu lacks a standard, enterprise approach to data management, which has resulted in higher total cost of ownership, competing versions of the "truth" and lost opportunities for competitive decision making.

*Poor Data Management Impacts Speed of Delivery, Quality, Cost, and Risk Resulting in Loss of Competitive Edge*

Washington Mutual:  December 2006 Board Presentation                (Confidential)                Page 2

Confidential Treatment Requested by JPMC

JPM_WM02657019

Footnote Exhibits - Page 0145

# Evolution of Data Management at WaMu



**Past** · **Present** · **Future State**

## History of Data Management

- The existing data warehouse (ED) was launched within the Finance organization in the early 1990s to provide a common financial reporting framework.

- Reporting was one-dimensional since WaMu was viewed as a single segment.

- As a result of acquisitions — PNC, Fleet, Dime — WaMu's reporting environment became more complex over time with the need to support multiple segments.

## Today's Data Issues

- Through our growth, we have developed over 160 databases supporting various business segments.

- Business decisions often rely on data gathered from multiple sources.

- Users mistrust data that is not controlled within their own segments.

- There is no enterprise-wide data inventory to know what is available.

- SOX 404 compliance and accurate financial and non-financial disclosures are achieved within required timeframes but only with numerous manual reconciliations and work-arounds.

## Future State Vision

- Enable better business decisions with timely, accurate data.

- Drive consistent data definitions and controls around data usage through Enterprise Data Governance.

- Increase cross-sell revenue opportunities through a single view of customer relationships across segments.

- Drive cost savings and reduce risk with a unified data environment; clear roles, consistent tools and standards; and repeatable, scalable processes.

**Basic** — **Evolved** — **Designed**

Washington Mutual: December 2006 Board Presentation        (Confidential)        Page 3



Confidential Treatment Requested by JPMC

JPM_WM02657020



# Today: Current State Need for Data

### Relevant Issues

| | |
|---|---|
| Multiple, redundant data stores | Lack of Data Governance |
| Manual reconciliation & validation | Complicated processes, lack of clear roles |
| Redundant data extracts | Difficulty in finding relevant data |

Everybody's Data (ED)

Data Source · Data Source · Data Source · Data Source · Data Source

Retail · Home Loans · Commercial · Corporate

### Business Impact

Fragmented data ownership and accountability.

Higher risk of data inconsistency, with potential impacts to valuations and business decisions:

**Actual Losses**
- Incentive Overpayment of Long Beach loans that were originated but not closed: 2.5M (200K per month) over 2 years, 2005-2006
- Basis Floater: inconsistent prepayment data led to misfit of prepayment model; correction led to downward revaluation of asset $42M in 2006

**Near Misses**
- $90M service fee error in 2004
- $130M MSR valuation change in 2005

Lack of enterprise insight into customer relationships, service, and profitability

Complexity of data movement increases effort and risks to enhance, retire, or add applications

Manually intensive reconciliations increase labor costs and reduce overall data quality

(Confidential)                                                    Page 4

Washington Mutual: December 2006 Board Presentation

Confidential Treatment Requested by JPMC

JPM_WM02657021

**WaMu**

### Post Funding Performance Benchmarks

The following is an example of the post funding performance benchmark scorecard from the Home Loans Credit Review Trending Report. Performance metrics have been agreed to by each business unit Chief Risk officer and integrated into business management of these products.

### Home Loans

**WaMu**  SCORECARD

**HOME LOANS CREDIT REVIEW**



| | Benchmark | Jun-06 # | Jun-06 % | Jul-06 # | Jul-06 % | Aug-06 # | Aug-06 % | Total | Total % |
|---|---|---|---|---|---|---|---|---|---|
| **LOAN REVIEW RATINGS** | | | | | | | | | |
| Unsatisfactory | <= 2.5% | 40 | 4.4% | 58 | 6.4% | 50 | 5.3% | 148 | 5.4% |
| Requires Improvement | <= 10% | 123 | 13.5% | 157 | 17.4% | 168 | 18.0% | 448 | 16.3% |
| Satisfactory with Qualification | <= 20% | 265 | 29.0% | 281 | 31.2% | 274 | 29.3% | 820 | 29.8% |
| Satisfactory | >= 80% | 488 | 53.2% | 406 | 45.0% | 443 | 47.4% | 1335 | 48.5% |
| **SAMPLE** | | | | | | | | | |
| Sample Requirement | | 875 | | 900 | | 875 | | 2,650 | |
| # of Loans Reviewed | | 914 | | 902 | | 935 | | 2,751 | |

Benchmark Trending

- Home Loans Benchmark Trending is inclusive of post-funding performance of loans originated through the Retail Home Loans, Wholesale, Consumer Direct, and Long Beach Mortgage origination channels.

- Unsatisfactory loan ratings coming out of the prime channels (subprime issues are addressed in the Appendix) are being driven largely by documentation issues that have an adverse impact on the security instruments and appraisal issues that could impact values. Examples would include: Security instrument (Notes, Deeds of Trust) that are inaccurate or missing; and or, appraisal discrepancies relating to a property type that may not be acceptable to the Bank, or comparable sales that are not within the same market or inappropriate to support the underlying collateral in a transaction. These findings have been used as a basis for providing training and counseling to the accountable staff.

- The Requires Improvement and Satisfactory with Qualification loan ratings in the prime channels are being driven largely from errors impacting the evaluation of the credit and the ultimate loan decision as well as errors relating to the accuracy of information stated on the applications. Examples would include: the lack of

Confidential Treatment Requested by JPMC

JPM_WM02657053



**Corporate Credit Review Quarterly Update**
December 2006

proper verification of income, employment, and/or other borrower assets that would provide additional strength to support the credit decision. A remediation plan is being developed.

Confidential Treatment Requested by JPMC

JPM_WM02657054

# Excerpts from Documents Related to Washington Mutual's
## Prime Home Loan Lending and Securitization Deficiencies

"Craig [Chapman, Wamu executive,] has been going around the country visiting home lending and fulfillment offices. His view is that band-aids have been used to address past issues and that there is a fundamental absence of process."

—OTS internal email, 8/13/04, Franklin_Benjamin-00003956_001

"[A]mong the referred cases there is an extremely high incidence of confirmed fraud (58% for [Downey office], 83% for [Montebello office])."

—Wamu internal email, 8/30/05, JPM_WM04026075, Exhibit 23

"Fraud Loan Samples[:] Loan #0694256827 Misrepresentation [of] the borrower's identification and qualifying information were confirmed in every aspect of this file, including: - Income – SSN – Assets – Alternative credit reference letters – Possible Strawbuyer or Fictitious borrower[.] The credit package was found to be completely fabricated. Throughout the process, red flags were over-looked, process requirements were waived, and exceptions to policy were granted."

—Retail Fraud Risk Overview, 11/16/05, JPM_WM02481943, Exhibit 22(b)

"[A]n extensive level of loan fraud exists in the Emerging Markets [loan processing centers in southern California], virtually all of it stemming from employees in these areas circumventing bank policy surrounding loan verification and review.   Of the 129 detailed loan review[s] … conducted to date, 42% of the loans reviewed contained suspect activity or fraud, virtually all of it attributable to some sort of employee malfeasance or failure to execute company policy. …  Based on the consistent and pervasive pattern of activity amount these employees, we are recommending firm action be taken to address these particular willful behaviors on the part of the employees named."

—Wamu So. CA Emerging Markets Targeted Loan Review Results, 11/17/2005, JPM_WM01083051, Exhibit 22(a)

"[D]elinquency behavior was flagged in October [2006] for further review and analysis …. The primary factors contributing to increased delinquency appear to be caused by process issues including the sale and securitization of delinquent loans, loans not underwritten to standards, lower credit quality loans and seller servicers reporting false delinquent payment status."

—WaMu Market Risk Committee Minutes, 12/12/06, JPM_WM02095545, Exhibit 28

"Our appetite for credit risk was invigorated with the expansion of credit guidelines for various product segments including the 620 to 680 FICO, low doc loans, and also for home equity. …  In 2007, we must find new ways to grow our revenue. Home Loans Risk Management has an important role to play in that effort."

—Home Loans Chief Risk Officer's message to risk management team, 12/26/06, JPM_WM02555659, Exhibit73

"I said the other day that HLs [Home Loans] (the original prime only) was the worst managed business I had seen in my career.  (That is, until we got below the hood of Long [B]each.)"

—Steve Rotella email, 8/23/07, JPM_WM00675851, Exhibit 79

Permanent Subcommittee on Investigations
**EXHIBIT #1e**

2

"Short story is this is not good. ... [L]arge potential risk from what appears to be a recent increase in repurchase requests. ... We are all rapidly losing credibility as a management team."
        —David Schneider email, 12/22/06, JPM_WM03100333, Exhibit 13(a)

"Long Beach represents a real problem for WaMu. ... Appraisal deficiencies .... Material misrepresentations .... Legal documents were missing or contained errors or discrepancies ... Credit evaluation or loan decision errors ... [D]eterioration was accelerating in recent vintages with each vintage since 2002 having performed worse than the prior vintage."
        —Ron Cathcart and Cynthia Abercrombie emails, Jan. 2007 & Dec. 2006, JPM_WM025556, Exhibit 16

"Washington Mutual Inc.'s subprime bonds are suffering from some of the worst rates of delinquency among securities in benchmark indexes, according to JPMorgan Chase & Co. research. ... Delinquencies of 60 days or more on loans supporting WaMu's Long Beach LBMLT 2006-1 issue jumped ... to 19.44 percent ... the highest among the 20 bonds in the widely watched ABX-HE 06-2 index of bonds backed by residential loans to risky borrowers."
        —"WaMu subprime ABS delinquencies top ABX components," Reuters, 3/27/07, Exhibit 52

"[T]he overall system of risk management and internal controls has deficiencies related to multiple critical origination and underwriting processes .... These deficiencies require immediate effective corrective action to limit continued exposure to losses."
        —Wamu audit of Long Beach, 8/20/07, JPM_WM02548940, Exhibit 19

"This [2007 audit report of Long Beach] seems to me to be the ultimate in bayonetting the wounded, if not the dead."
        —Steve Rotella email, 8/21/07, JPM_WM04859837, Exhibit 20

"132 of the 187 (71%) files were reviewed ... confirmed fraud on 115 [and 17 were] ... 'highly suspect'. ... 80 of the 112 (71%) stated income loans were identified for lack of reasonableness of income[.]  133 (71%) had credit evaluation or loan decision errors .... 58 (31%) had appraisal discrepancies or issues that raised concerns."
        —Wamu Corporate Credit Review of Long Beach, 9/28/07, JPM_WM04013925, Exhibit 21

Prepared by U.S. Senate Permanent Subcommittee on Investigations, April 2010

Footnote Exhibits  - Page 0153



**Home Loans/Home Equity - Non-Funded Adverse Action Notices**

Legend
(1) Incomplete or inaccurate bureau information (FCRA)
(2) Inaccurate reasons for action taken (ECOA)
(3) Missing or inaccurate notice (ECOA)

**Risk Issue:** Adverse Action Notices are incomplete, inaccurate or missing (ECOA & FCRA)

**Risk to WaMu:** There is a potential for regulatory criticism if not corrected. In addition, inaccurate notification to customers may result in reputation damage and an increase in customer complaints.

**Cause:** Underwriters not accurately completing this information on the Notice. Error rates are above tolerance in all Home Loans channels.

**Remediation Status:** Extensive ECOA and FCRA training conducted in all LFCs in August 2006. Underwriting has reissued policies and procedures, implemented a second review program, and conducts internal self-monitoring.

**Note:** Other adverse action notice requirements also have above-tolerance error rates, but affect much more limited customer populations and, thus, pose substantially less risk.



**Home Loans - FACT Act**

**Risk Issue:** FACT Act – Notice to Home Loan Applicant and Credit Score Disclosure missing or inaccurate.

**Risk to WaMu:** New regulatory requirement, expected to be examined by OTS in 2007. Potential regulatory criticism if not corrected.

**Cause:** The Wholesale vendor solution (Dorado) was attempted in June 2006, but was unsuccessful. In addition, as a separate issue, the vendor was not displaying or capturing required ("5th factor") information correctly. For LBM, errors resulted from inaccurate system programming. A vendor solution for Retail, Emerging Markets and CD was implemented successfully in February 2006, and error rates for those channels are now within tolerance.

**Remediation Status:** For Wholesale, all systematic programming corrections were implemented in October. For LBM in November, 50% of the system defects were resolved and the remaining 50% will be resolved with a December system fix. Additionally, these requirements are being built into the LOS for each Channel.

Confidential Treatment Requested by JPMC

JPM_WM02657028

# Corporate Compliance Review Update to ERMC

Footnote Exhibits - Page 0152

December 15, 2006

## Overview

Corporate Compliance Review (CCR) tests loan originations for Home Loans mortgages, home equity loans and lines, and Commercial loans. The full testing and reporting cycle has been completed for July through September fundings. In addition, Card Services Compliance identifies issues through various detective controls, and Retail Bank Compliance performs targeted testing of new high-risk deposit accounts. This report highlights key issues identified in the reviews that are of concern to Compliance management.

- **Home Loans Mortgages:** Eighteen of the 90 compliance requirements tested had error rates above tolerance levels in September. These errors span seven federal and one state regulation. Of the 18 above-tolerance issues, 6 affect only a small proportion of customers.
- **Home Equity:** Five of the 77 compliance requirements tested had error rates above tolerance levels in September. These errors span two federal regulations and one state regulation. Of the five above-tolerance issues, 3 affect only a small proportion of customers.
- **Commercial Lending:** No error rates were above tolerance in September for the Commercial Group.
- **Card Services:** The number of unresolved compliance issues at continues to be low. In addition, their severity and the number of customers affected do not warrant escalated attention.
- **Retail Bank:** Compliance testing of new high-risk deposit accounts (including Non-Resident Aliens and Small Business) for adherence to the USA PATRIOT Act Customer Identification Program did not reveal any significant findings in the most recent testing period.

Some of the above-tolerance issues show favorable error rate trends or are only marginally above tolerances, and are not considered by Compliance management to warrant ERMC attention. However, the three above-tolerance issues summarized in this report are sufficiently material or persistent to warrant ERMC awareness. Each has had persistently high error rates and involve regulatory requirements that apply to essentially all funded or nonfunded loans of the affected business units. If not corrected, they could result in regulatory criticism or other enforcement action. Remediation of each is in process, but continued focus on execution is needed to ensure that the fixes are effective.

**Process Change Note:** Corporate Compliance Review will be changing to a quarterly review cycle in 2007, from the current monthly cycle, with increased use of risk-targeted reviews. This change is being made to increase the cost effectiveness and risk focus of the program.

---

**Risk Issue:** Good Faith Estimate (RESPA) – Customary lender, broker, escrow, and/or title fees not disclosed correctly on GFE.

**Risk to WaMu:** Per VOCALS, upfront accurate fee disclosure is our Home Loans customer's primary concern. Inaccurate disclosure may cause customer dissatisfaction, increased complaints, and reputation damage. Also, there is a potential for regulatory criticism if not corrected.

**Cause:** Failure to follow established policies and procedures, coupled with a lack of systemic controls to drive results.

**Remediation Status:** Retail and Wholesale processes as well as automated controls recently have been modified to further reduce the error rates. That being the case, CCR trend reports published in early 2007 should reflect the positive impact of these system updates. Furthermore, the long-term solution is being built into the new LOS for each channel.



**Home Loans - Good Faith Estimate**

(Legend: ■ Jul-06  ■ Aug-06  ☐ Sep-06)

Error Rate: 40%, 35%, 30%, 25%, 20%, 15%, 10%, 5%, 0%

Categories: Retail Prime, Wholesale Prime

0% tolerance

1

Confidential Treatment Requested by JPMC

JPM_WM02657027

# SUPP. 3

# EXHIBIT 8

STATE OF MARYLAND
OFFICE OF THE COMMISSIONER OF FINANCIAL REGULATION
500 N. Calvert Street, Suite 402
Baltimore, MD 21202-3651
Mark Kaufman, Commissioner

# DLLR

DEPARTMENT OF LABOR, LICENSING AND REGULATION

## FAX COVER SHEET
## DIVISION OF FINANCIAL REGULATION

To:    Caroline Iacino

From:  Marcia Tonkins
       Financial Examiner

Of:    1ˢᵗ Fidelity Loan Servicing

Of:    Division of Financial Regulation

Phone:

Phone: 410 230-6393

Fax:   561 893 9808

Fax:   410-333-3866 or
       410-333-0475

Pages (Including Cover Sheet):

Date:  December 12, 2012

E-mail: mtonkins@dllr.state.md.us

Subject: Robert and Laurie Warwick
         Complaint# M 13 1150

COMMENTS---Please review this complaint and respond in writing by
December 14, 2012. It is our understanding that Chase Home Finance
cancelled this loan. Therefore, why is 1ˢᵗ Fidelity Loan Servicing collecting
on this debt? Please cease all foreclosure activities until we have completed
our investigation.

CONFIDENTIALITY NOTICE

THE INFORMATION IN THIS TRANSMISSION IS INTENDED ONLY FOR THE INDIVIDUAL NAMED
ABOVE. IT MAY BE LEGALLY PRIVILEGED AND CONFIDENTIAL. IF YOU HAVE RECEIVED THIS
INFORMATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY AND SEND THE ORIGINAL
TRANSMISSION TO US BY MAIL. RETURN POSTAGE IS GUARANTEED. IF THE READER OF THIS
MESSAGE IS NOT THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY
DISSEMINATION, DISCLOSURE, DISTRIBUTION AND/OR COPYING OF THIS COMMUNICATION
AND/OR CONTENT ARE STRICTLY PROHIBITED.

PHONE: 410.230.6100 • FAX: 410.333.3866/410.333.0475 • TTY USERS, CALL VIA THE MARYLAND RELAY SERVICE
Toll Free: 1-888-784-0136 • WWW.DLLR.STATE.MD.US/FINANCE • E-mail: FINREG@DLLR.STATE.MD.US

MARTIN O'MALLEY, GOVERNOR • ANTHONY G. BROWN, LT. GOVERNOR • LEONARD J. HOWIE III, SECRETARY

r..maryland.gov | Facebook.com /DLLR.Maryland | Twitter @MD_DLLR

.om: Jones, Kristin [mailto:kristin.jones@mlis.state.md.us]
Sent: Friday, November 30, 2012 5:45 PM
To: Anne B. Norton
Subject: Warwick - mortgage issue

Anne – Thank you again for your willingness to help navigate mortgage issues for the Rob & Laurie Warwick.   I've
attached a few relevant documents.  Obviously there are many more but I tried to include communications from both
Chase and First Fidelity.   Specifically, I included the (1) notice from Chase indicating that their debt has been cancelled;
(2) followed by an email from someone at S&A Partners / 1ˢᵗ Fidelity Loan Servicing LLC informing Laurie that "upper
management" at Chase has decided that they will not be honoring their letter of cancellation.  She indicates that
someone from Chase would call the Warwicks and confirm that – something that never happened; (3) followed by
another email from same individual at 1ˢᵗ Fidelity indicating that if the do not receive at least 2 payments by December
5, 2012 they will initiate foreclosure proceedings; (4) followed by a 2009 "notification of loan transfer" from 1ˢᵗ Fidelity
indicating that they had purchased the Warwick's loan from Chase; and (5) followed by a 2009 letter indicating their
payment arrangement.

I'm afraid based on the notification of loan transfer that Chase sold their loan some years ago.   Even so, why would
Chase cancel their debt and not Fidelity.    Further, I question whether Chase is somehow getting credit for a write-off
they never actually have to honor.

As you can imagine, Rob & Laurie are at their wits' end (in addition to being financially strapped mostly due to the
recession's impact on their small landscaping business) and I know they will appreciate any assistance you are able to
provide.  See their contact information below.  If you or anyone in your office needs to reach me, my office contact
shows below and my cell is (443) 852-0308.   Thanks so much again.  – Kristin


Laurie Warwick
443 336-4733 cell
410 695-2977 home



Kristin F. Jones, Chief of Staff
Office of the Speaker
State House, Room H-4
Annapolis, Maryland 21401
(410) 841-3916
(410) 841-3888 fax

2

# SUPP. 4

**JP v. Michael Porzio et al.**                                            findlaw.com

**JP v. Michael Porzio et al.**

ResetAA Font size: Print ShareThis

### Superior Court of Connecticut.

JP Morgan Chase Bank, National Association v. Michael Porzio et al.

### FSTCV095010388S

### Decided: October 31, 2013

MEMORANDUM OF DECISION ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT DATED OCTOBER 26, 2012 (# 239.00)

Do a series of mistakes and typographical errors cause the foreclosing plaintiff's Motion for Summary Judgment to be denied?    That is one of the questions before this court.

This court has applied all the requisite standards for decisions by trial courts in Motions for Summary Judgment without the need to restate those standards in this Memorandum of Decision.    Covello v. Darien, Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. FST CV 08–5008909 S (October 22, 2010, Tierney, J.T.R.) [51 Conn. L. Rptr. 40]; Forrest v. Sothebys International Realty, Inc. et al., Superior Court, judicial district of Stamford/Norwalk at Stamford, Docket No. FST CV 11–6010200 S (January 9, 2013, Tierney, J.T.R.).

The plaintiff commenced this foreclosure action by a February 8, 2009 complaint.    The Complaint was served on February 11, 2009.    The Operative Complaint is the Fourth Amended Complaint dated January 31, 2011 (# 181.00).    It alleges that on March 1, 2007 Michael Porzio and L. Michael Porzio borrowed $2,500,000 from Washington Mutual Bank, FA secured by a first mortgage on their property at 2 Angora Road, Westport, Connecticut.    Paragraph 4 of the Fourth Amended Complaint alleges that Washington Mutual Bank, FA (WAMU) was placed into receivership with the Federal Deposit Insurance Corporation in 2008 and "thereafter the FDIC sold WAMU, its subsidiaries arid assets to the Plaintiff."    The plaintiff is JP Morgan Chase Bank, National Association.    The plaintiff alleges that it is "the holder of said Note and Mortgage."    The plaintiff further alleges that the Note and Mortgage are in default by virtue of nonpayment of installments of principal and interest due on March 1, 2008 and each and every month thereafter.

The plaintiff is represented by two separate law firms in this litigation.    Both the defendants, Michael Porzio and L. Michael Porzio, have filed self-represented appearances.    Except for the filing of his self-represented appearance, the defendant, L. Michael Porzio, has filed no pleadings or documents nor has he appeared in court.    All defendants' pleadings filed and court appearances have been by the individual defendant, Michael Porzio.

There have been extensive pleadings filed during this four and one-half-year-old litigation.    The Plaintiff's

Motion for Summary Judgment dated October 26, 2012 (#239.00) now before the court requests a judgment against all defendants as to liability.    The motion claims that its supporting documents establish a prima facie case for foreclosure by demonstrating that it is the holder of the note and mortgage, that the loan is in default, and the borrowers were properly notified of the existence of the default in accordance with the terms of the loan documents.    The plaintiff further argues that despite the nine Special Defenses and a speaking Answer filed by the defendant, Michael Porzio, on February 22, 2013 (#263.00), the plaintiff is entitled to summary judgment.    Both parties filed extensive memorandum and documentation in support of their respective positions.    Both parties objected to the inclusion of certain documents for this court's consideration of the Motion for Summary Judgment.    The court held an extensive hearing and rendered decisions concerning the documents that will be considered by the court.    This court will read and consider all Memorandum of Law submitted by the parties.

The court will read and consider the following documents attached by the plaintiff to its Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment dated October 26, 2012 (#240.00); Exhibit A, the 28-page September 7, 2012 deposition of Michael Porzio; Exhibit B, the April 12, 2012 responses by Michael Porzio to the plaintiff's October 21, 2011 Request for Interrogatories and Production; Exhibit C, a twelve-page Memorandum of Decision Re: Motion to Dismiss #185 issued by Judge Mintz on August 1, 2011 (#193.00) [52 Conn. L. Rptr. 435]; and Exhibit D, sixty-six pages of trial court decisions.    The court also will consider the affidavit of Eric Waller dated October 19, 2012 (#241.00) along with the following exhibits attached to the Eric Waller affidavit; Exhibit A, the March 1, 2007 note; Exhibit B, the March 1, 2007 mortgage deed; Exhibit C, the Purchase and Assumption Agreement of thirty-nine numbered pages and four pages of title and table of contents dated September 25, 2008 between the FDIC and JP Morgan Chase Bank, National Associations; and Exhibit D, a two-page April 21, 2008 default notice letter sent to the defendant, Michael Porzio.    Although the plaintiff filed an Affidavit of Lost Note dated July 17, 2013 (#271.00), at oral argument the plaintiff withdrew that Affidavit of Lost Note from this court's consideration, leaving the Affidavit of Lost Note as an otherwise a viable pleading in this litigation.    The court notes that pleading #240.00 is 209 pages and pleading #241.00 is 75 pages.

The defendant, Michael Porzio, submitted more than 2,800 pages of memorandum, cases, documents, depositions, and agreements in opposition to the Motion for Summary Judgment.    After oral argument, the court ordered that the following documents filed by Michael Porzio will be read and considered by this court in opposition to the plaintiff's Motion for Summary Judgment.

The defendant filed Defendants' Objection to Plaintiff's Motion for Summary Judgment dated December 28, 2012 (#246.00).    Five separate exhibits were attached thereto with each marked as a separate numbered pleading; (#248.00, #249.00, #250.00, #251.00 and #252.00).    From Exhibit #252.00, the following documents will be read and considered by this court; Exhibit E, Javahori v. JP Morgan Chase Bank NA, United States District Court, Central District of California, Case No. CV 10–08185(ODW) decision dated June 2, 2011; Exhibit F, Kim v. JP Morgan Chase Bank, State of Michigan, Court of Appeals, No. 302528 decision dated January 12, 2012; Exhibit H, a September 25, 2008 Purchase and Assumption Agreement between FDIC and JP Morgan Chase Bank, National Association with four pages of title and table of contents and 39 numbered pages, but only if that the document is different than Exhibit C in the Eric Waller affidavit (#241.00).    Exhibit G, a 330–page Lawrence Nardi deposition taken in a Florida foreclosure lawsuit, JP Morgan Chase Bank v. Waisome, pending in the Circuit Court of the Fifth Judicial District in and for Lake County, Florida, docket number 2009 CA 005717.    Those portions of this Lawrence Nardi deposition as claimed by the defendant, Michael Porzio, must be delineated in detail in pleading to be filed by Michael Porzio by August 26, 2013.    That pleading will disclose the relevant pages of the Lawrence Nardi deposition that Michael Porzio wants the court to read and consider.    The court may still read and consider portions of the Lawrence Nardi deposition if Michael Porzio fails to file that delineation pleading.    Stuart v. Stuart, 112 Conn.App. 160, 184 (2009).

The court will read and consider Saxon Mortgage Services, Inc. v. Hillery, pending in the United States District Court, Northern District of California docket number C–08–4357 EMC decision dated December 9, 2008.    The court will also read and consider the defendant's July 30, 2013 Motion to Dismiss with Prejudice, which contains no attached documents (# 274.00).    The court will read and consider defendant's Motion for Summary Judgment dated July 30, 2013, which contains no attached documents. (# 275.00.) The court will read and consider defendant's July 31, 2013 Memorandum of Law in Support of Defendant's Motion to Dismiss with Prejudice, which contains no attached documents (# 277.00).    The court stated on the court record that it will not consider nor act on the Motion to Dismiss itself (# 274.00) nor the Motion for Summary Judgment itself (# 275.00).    Finally, the court will consider the decision of JP Morgan Chase Bank v. Butler pending in the Supreme Court of Kings County docket number 1686/10 (7–5–2013), decision dated July 5, 2013 by Arthur M. Schack, J.

After examination of the pleadings, the Memoranda in support of, and in opposition to the Motion for Summary Judgment, and the documents supporting the parties' respective positions, the court concludes that a number of mistakes and typographical errors were made by the plaintiff, its predecessor in title, and the plaintiff's representatives that affected this litigation.    The court is now going to outline some of those events.

1.    A March 1, 2007 $2,500,000 promissory note was secured by a mortgage recorded in the Westport Land Records.    The recordation of the mortgage deed did not occur until April 23, 2007.    The resulting $2,500,000 mortgage deed was recorded in the Westport Land Records in Volume 2789 at page 180. According to paragraph 8(a) of the Fourth Amended Complaint (# 181.00), a $2,500,000 mortgage dated March 16, 2007 in favor of "JP Morgan Chase Bank, National Association f/k/a Washington Mutual Bank f/k/a Washington Mutual Bank, FA" was recorded in the Westport Land Records on March 16, 2007 in Volume 2781 at page 337.    As to that mortgage referenced in paragraph 8(a), the plaintiff alleged: "Upon information and belief, it was intended that this mortgage be recorded subsequent to the Plaintiff's mortgage."    The plaintiff has prosecuted the March 1, 2007 $2,500,000 promissory note and has alleged to be secured by a first mortgage on the real property at 2 Angora Road, Westport, Connecticut.    From the plaintiff's own pleadings, the plaintiff has judicially admitted that the March 1, 2007 $2,500,000 mortgage is secured only by a second mortgage.

2.    The defendant, Michael Porzio, has alleged in his First Special Defense dated February 22, 2013 (# 263.00): "It has just been discovered by Defendant that JP Morgan Chase Bank has filed a fraudulent and deceptive document in the Westport Land Records entitled Subordination Of Mortgage."    It appears that such a document was recorded on the Westport Land Records which mentions the fact that it secures a $2,500,000 promissory note.    It is not clear from these allegations whether this Subordination Of Mortgage document is directed to the March 1, 2007 $2,500,000 promissory note or the March 16, 2007 $2,500,000 promissory note.

3.    The mortgage deed recorded in Book 2789 Page 180 of the Westport Land Records described the lender as Washington Mutual Bank, FA. The plaintiff's complaint in paragraph 1 indicates that the promissory note was payable to the order of Washington Mutual Bank, FA. The defendant's Third Special Defense (# 263.00) states: "The alleged Lender Washington Mutual Bank, FA ceased to exist on April 4, 2005 with a legal name change to Washington Mutual Bank." If in fact the lender was Washington Mutual Bank, FA, it no longer was Washington Mutual Bank, FA as of some date in 2005, there is a material issue of fact as to the viability of the March 1, 2007 $2,500,000 promissory note and mortgage deed in favor of Washington Mutual Bank, FA.

4.    The plaintiff filed two affidavits of lost notes; the first by Christie H. Hill dated April 6, 2007 on file (# 181.00, Exhibit B); the second by Vasti Powell dated March 5, 2012 (# 271.00).    Neither of these two

affidavits of lost notes were submitted to the court by the parties concerning the issues on the Motion for Summary Judgment.    A review of the court file demonstrates that a substantial number of pleadings concerning the accuracy and viability of these two affidavits were filed including a July 31, 2013 Motion to Strike filed by the defendant, Michael Porzio (# 276.00).    The only evidence of the status of the lost note is contained in Judge Mintz's twelve-page Memorandum of Decision Re: Motion to Dismiss # 185 dated August 1, 2011 (# 193.00).    Judge Mintz on page 2 outlined the history of the plaintiff's amendments to its complaint, all of which allege that the plaintiff "is the holder of said note and mortgage."    The original complaint, the Amended Complaint and the Third Amended Complaint dated December 14, 2010 all contain the same allegations.    So too does the Fourth Amended Complaint, the operative complaint in this case.    No where within the allegations of any complaint it is alleged that the note is lost.    Judge Mintz noted that fact in his Memorandum (# 193.00, page 2): "The plaintiff also attached a lost note affidavit dated April 6, 2007, from Christie H. Hill wherein she stated, for the first time, that the note at issue is lost."

Judge Mintz noted: "When the plaintiff filed a request for leave to file a third amendment complaint on December 14, 2010, the plaintiff included a proposed complaint that indicated it had attached a copy of the note that is at issue in this case.    Contrary to this allegation, there was no such note attached." (# 193.00, page 2.) The date the note was lost is a material issue of fact.

5.    The operative complaint, the Fourth Amended Complaint dated January 31, 2011, alleges that the plaintiff is the holder of the note.    That complaint fails to allege that the physical note has been lost.    That complaint fails to allege the date on or about, when the note was lost or when it was discovered by the plaintiff that the note was lost.

6.    Michael Porzio's deposition was taken and a photocopy of the March 1, 2007 promissory note was tendered to him for examination at his deposition.    Inquiries were made as to whether the photocopy of the note contains the photocopy of Michael Porzio's signature.    Michael Porzio responded to the effect that he always signs his name in blue ink.    The photocopy process only produced a black and white version of all of the signatures and therefore he could not adequately identify whether the promissory note that was produced at the deposition contained his signature.    He demanded that the original promissory note be produced for his examination in order for him to accurately testify as to whether or not the note contains his original signature.    No copy of the promissory note was produced in court for the undersigned's examination at the hearing on this Motion for Summary Judgment.    It appears that no color copy of the original of the promissory note has been produced by the plaintiff at any time.    The original of the note has never been produced by the plaintiff in this litigation.    Although the plaintiff may successfully prosecute a foreclosure when the note has been lost, the authenticity of signature of Michael Porzio on the photocopy of the note is a material issue of fact.

7.    The photocopy of the promissory note contains a stamp on the signature page that states "Pay to the order of Without Recourse WASHINGTON MUTUAL BANK, FA By CYNTHIA RILEY, VICE PRESIDENT."    Although the defendants do not concede, the court finds that this is a blank endorsement.

The endorsement contains no date.    This fact, the defendant argues, demonstrates that the plaintiff never had physical possession of the original note because the note was lost before Washington Mutual's assets were transferred by the FDIC in September 2008.    No affidavit or documentation is before this court concerning the handling and location of the original promissory note from the closing on March 1, 2007 until the end of 2008 when the FDIC procedures had been completed.    Judge Mintz discussed this situation: "Having reached this determination, the court is left with a situation where the plaintiff is the owner of the mortgage but it was never in possession of the note." (# 193.00, page 8.) That status raises an issue of material fact.

8.    Judge Mintz's criticism of the plaintiff's attorneys in handling this file is worthy of citation: "Nevertheless, the court is still quite displeased with the manner in which the plaintiff has conducted itself

in this case. When this action was commenced in February 2009, the plaintiff was aware it did not have physical possession of the note. Despite this knowledge, the plaintiff still alleged in its complaint that it was 'the holder of said Note and Mortgage.' Additionally, the plaintiff waited until December 2010, to reveal the fact that the note was lost to the court and the defendants. Although it has been determined from the fact that the plaintiff did not have a physical copy of the original note in its possession does not render the plaintiff without standing to bring this action, the court still concludes it was misleading for the plaintiff not to provide all interested parties with this relevant information." (# 193.00, pages 10–11.) Judge Mintz further characterized the plaintiff's litigation practice in this case by using the following phrases in his Memorandum of Decision: ". plaintiff misrepresented some facts of this case," "plaintiff knew about the lost note before it brought the foreclosure case and that the plaintiff should have pleaded as such in its original complaint," "the plaintiff probably should have alleged that the note was lost in its initial complaint," "the plaintiff delayed in furnishing any information regarding the lost note to the relevant parties," and "plaintiff's sloppy pleading and withholding of information." (# 193.00, pages 11, 12.)

9. Judge Mintz is not the first Judge to be critical concerning the litigation acts of JP Morgan Chase, National Association. JP Morgan Chase Bank v. Butler, Superior Court of the State of New York, Kings County, 2013 N.Y. Slip Op 51050(U) docket number 1686/10 (7–5–2013) decided on July 5, 2013. Judge Arthur M. Schack in a detailed decision castigated the JP Morgan Chase Bank, National Association lawsuit that involved the distribution of the proceeds of a sale of real property, a small 5,000 square foot residential lot in Brooklyn, New York that had been the subject of a $490,000 first mortgage issued in 2007 by Washington Mutual Bank, FA. Judge Schack found that JP Morgan Chase Bank, National Association and its litigation team furnished misrepresentations to the court, and engaged in continued subterfuge, and bad faith in violation of C.P.L.R. Rule 3408 including lost note claims by counsel for Chase. The defendant, Butler, on January 30, 2007 refinanced his home by executing a note and mortgage with Washington Mutual Bank, FA for $450,000 which was duly recorded in the office of City Register of the City of New York on March 7, 2007. In 2008 there was a dispute between Washington Mutual and the defendant, Butler, about a $10 late payment, which precipitated a series of correspondence and miscommunications between the parties. JP Morgan Chase Bank, National Association alleged that it was the owner of the Butler note and mortgage having acquired the rights by a September 25, 2008 Purchase and Assumption Agreement from the FDIC when Washington Mutual Bank, FA failed. Foreclosure litigation commenced. The Butlers were eventually able to sell the property privately without completing the foreclosure procedure with court approval, they deposited $490,000 with the Clerk of the Supreme Court for a determination in the foreclosure action as to who was entitled to those funds. The plaintiff was JP Morgan Chase Bank, National Association and the defendants were Frederick Butler et al.

The underlying foreclosure complaint alleged that JP Morgan Chase Bank, National Association was the owner of the mortgage and note. The trial court, after hearing all the evidence, made the following findings: "This case is troubling because various counsel for CHASE falsely claimed for almost two years, from January 20, 2010 until December 2011, that CHASE was the owner of the mortgage and note. Ultimately, in late 2011, after the subject mortgage had been satisfied, plaintiff CHASE's counsel admitted, in opposition to defendant BUTLER's October 26, 2011 order to show cause, that plaintiff CHASE did not own the BUTLER mortgage and note, but only the servicing rights to it. CHASE's counsel in its opposition papers, "submitted an affidavit, dated December 9, 2011, from Greg DeCastro, Director/Servicing Management of FANNIE MAE, claiming that FANNIE MAE had acquired from WAMU the BUTLER Mortgage and Note and 'Chase is the servicer of the loan.' " The trial court noted that: "The Automated City Register Information System (ACRIS) does not show any assignments of the WAMU mortgage to FANNIE MAE or CHASE." "Thus, plaintiff CHASE ultimately acknowledged that FANNIE MAE is the 'Wizard of Oz' operating behind the curtain, and the real owner of the subject BUTLER note and mortgage." The trial court relied on the September 25, 2008, documents which no doubt are the identical

documents that are before this court, as the Purchase and Assumption Agreement. The trial court further found that: "CHASE, despite its assertions to the contrary for almost two years in the instant action, purchased the servicing rights to WAMU's mortgages and notes, not the actual mortgages and notes."

10. On a number of occasions during oral argument the court noted that the plaintiff's allegation in all its complaints stated that: "The Plaintiff is the holder of said Note and Mortgage." The court inquired of the plaintiff as to whether or not it intended to amend the allegations to allege that the plaintiff is the owner, the partial owner, the investor, the partial investor, the holder of rights to receive funds and/or the servicer of the note and mortgage. The plaintiff represented to court that it is the plaintiff's intention to prosecute this foreclosure on the allegation that continues in paragraph 5: "The Plaintiff is the holder of said Note and Mortgage." The court further followed up by asking whether or not the plaintiff intended to amend its complaint to allege that JP Morgan Chase, National Association is the servicer and therefore entitled to foreclose under the provisions of J.E. Robert and Company v. Signature Properties, LLC, 309 Conn. 307, 318 (2013), officially released on July 16, 2013. To this question the plaintiff's counsel answered: NO.

11. The court has examined the September 25, 2008 Purchase and Assumption Agreement. Ex. 5 There is no specific chronological date for the closing. Bank Closing is defined on page 2 as "the close of business of the Failed Bank on the date which the Chartering Authority closed such institution." The date of that event closing the institution had to have been known prior to September 25, 2008, the date of the Purchase and Assumption Agreement, and must have occurred prior to September 25, 2008. Despite the fact that the Bank Closing date was known, no chronological Bank Closing date is contained in the Purchase and Assumption Agreement. "Settlement Date" is defined on page 7 as "the first Business Day immediately prior to the day which is one hundred eighty (180) days after Bank Closing, or such other date prior thereto as may be agreed by the Receiver and the Assuming Bank. The Receiver, in its discretion may extend the Settlement Date." This creates a material issue of fact as to whether, if ever, the transaction set forth in the Purchase and Assumption Agreement ever closed and title to whatever assets existed passed to JP Morgan Chase Bank, National Association.

12. The court notes that there is no exhibit or schedule attached to the Purchase and Assumption Agreement in which any mortgage or any asset of Washington Mutual Bank is set forth. This $2,500,000 mortgage is not included anywhere within the Purchase and Assumption Agreement. There is no place for any specific investment or mortgage asset to be included as an Exhibit or Schedule within the body of the Purchase and Assumption Agreement. There is no computer printout, listing Quicken type program, or spreadsheet attached to the Purchase and Assumption Agreement. There is no specific description or nature of assets that are being sold and conveyed. The agreement itself is silent on the exact nature of the assets of Washington Mutual and the related rights that were being sold and conveyed. Certain assets were to be listed in Schedule 3.1.a. There is no such Schedule 3.1.a. Ex. 5, page 9, paragraph 3.1.
    The only assets sold were the "right, title and interest of the Receiver," which assets are not further described in the Purchase and Assumption Agreements. Ex. 5, page 9, paragraph 3.1. There is a material issue of fact as to whether this March 1, 2007 $2,500,000 mortgage and note was an asset sold to JP Morgan Chase Bank, National Association by the FDIC pursuant to the September 25, 2008 Purchase and Assumption Agreement.

13. The salient portions of the Lawrence Nardi deposition discloses that he has not been able to locate any assignment of any mortgage whatsoever from Washington Mutual Bank through the FDIC and/or from the FDIC to JP Morgan Chase Bank, National Association for the Florida mortgage in question. So too in that Florida foreclosure no such assignment has been furnished to the court. No list of assets, affidavits, bill of sale, or in any other documentary form that refers to this March 1, 2007 $2,500,000 mortgage on 2 Angora Road, Westport, Connecticut has been furnished to this court. This too is a material issue of fact.

Case 17-52260-lrc   Doc 48-1   Filed 06/27/17   Entered 06/27/17 15:42:36   Desc
Adversary Complaint   Page 257 of 257

This court is disturbed by the limited information that it has in this file concerning Washington Mutual Bank, FA, its change of name from and to Washington Mutual Bank, the receivership by FDIC, the take over thereafter by JP Morgan Chase Bank, National Association, and the effect of the Purchase and Assumption Agreement.   Judge Schack expressed those concerns more vocally.   A trial is the opportunity for all of the facts to be presented to a court.   This court believes that the light of day should shine on every single fact.   This matter should be tried.

The court believes that the errors that have been made by the plaintiff, its predecessors in title, and its litigation team are sufficient to qualify as a material issue of fact in addition to the other material issues of fact already found by this court.

The plaintiff's Motion for Summary Judgment dated October 26, 2012 (# 239.00) is hereby denied.

BY THE COURT

Hon. Kevin Tierney

Judge Trial Referee

Tierney, Kevin, J.T.R.

Copyright © 2015 FindLaw, a Thomson Reuters business. All rights reserved.